**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

SOUND AROUND, INC.,               )

                                                )

                     Plaintiff,    )    Case No.:

                                                )

        v.                         )

                                              )    **COMPLAINT**

                                              )

MOISES FRIEDMAN, SHULIM ELIEZER  )
ILOWITZ, ML IMPORTS, INC., CYRF, INC.,  )
LRI GROUP, LLC, EXECUTIVE SERVICES,  )
EXECUTIVE LAUNDRY, LLC, MDF       )
MARKETING, INC., WORLD GROUP     )
IMPORT, LLC, HEFEI PAIDONG OUTDOOR  )
PRODUCTS CO., LTD.,                 )

                                              )

                     Defendants.  )

_____

**COMPLAINT**

       Plaintiff Sound Around, Inc. ("Plaintiff" or "Sound Around"), by its attorneys, Holland & Knight, LLP, as and for its Complaint against Defendants Moises Friedman ("Friedman"), Lazer Ilowitz ("Ilowitz") (Ilowitz and Friedman are collectively referred to herein as the "Individual Defendants"), ML Imports, Inc., Cyrf, Inc., LRI Group, LLC, World Group Import, LLC, Executive Laundry, LLC, Executive Services, MDF Marketing, Inc. Hefei Paidong Outdoor Products Co., Ltd., (referred to collectively as the "Corporate Defendants") (Individual Defendants and Corporate Defendants referred to collectively as "Defendants"), alleges as follows based on personal knowledge as to Sound Around and its own acts and as to all other matters, based on information and belief:

**NATURE OF ACTION**

1.      This case arises from the brazen, egregious, and deliberate actions taken by the Individual Defendants both during the time of their employment at Sound Around and following the termination of that employment.  In particular, Sound Around reposed trust and confidence in the Individual Defendants both of whom achieved substantial success and financial gain through their employment with Sound Around.

2.      As discussed in more detail herein, however, the Individual Defendants took full advantage of that trust for years by, among other things, misappropriating substantial confidential information and trade secrets from Sound Around, diverting corporate opportunities for their own gain, utilizing Sound Around's trade dress, registered trademark, and other trade secrets to market competing products for their own financial benefit, manipulating the pricing and marketing of Sound Around products to ensure their own products' sales grew while artificially depressing those of Sound Around products, and stealing hundreds of thousands (if not millions) of dollars from the company to build their business, pay their personal debts and expenses, and compete directly with Sound Around.

3.      The Individual Defendants also made numerous fraudulent statements to Sound Around, the manufacturers and vendors from whom Sound Around purchases products, and the retailers on whose platforms Sound Around operates its business.  The representations made by the Individual Defendants allowed them and the companies through which they orchestrated their scheme (including Corporate Defendants) to steal Sound Around's retail licenses, solicit thousands of dollars in unlawful kickbacks from vendors, and manipulate pricing schemes online to facilitate sales of their competing products over those of Sound Around.

4.      The Individual Defendants used the Corporate Defendants to facilitate their

unlawful conduct both by funneling payments through the Corporate Defendants and creating brands through the Corporate Defendants for the purpose of competing with Sound Around using the misappropriated information and trade secrets.

5.    In fact, Sound Around's investigation, which is yet in its beginning stages, has revealed that Defendants have been conspiring for years in a scheme to completely undermine Sound Around's business and enrich themselves at the expense of the company and those very individuals who put their utmost trust in the Individual Defendants.

6.    For years, Sound Around helped the Individual Defendants flourish and grow their employment gains from receiving around $50,000 in salary to a pinnacle where each was making well over $1 million from Sound Around's business on an annual basis.  Rather than reward Sound Around with their loyalty, the Individual Defendants operated with greed and impunity, seeking to take for themselves all they could from Sound Around, unfettered by (and entirely unconcerned with) their moral or legal obligations.

7.    By way of this action, Sound Around seeks a permanent injunction, damages, including defendants' profits, trebled under the law, punitive damages and related relief as more fully described herein.

## **PARTIES**

8.    Plaintiff Sound Around, Inc. is a New York corporation with its principal place of business in Brooklyn, New York.  Sound Around operates a consumer goods business that sources and imports of foreign products for distribution and resale within the United States.

9.    Defendant Moises Friedman, also known as Moshe Friedman, is an individual who, at all relevant times, has been domiciled in Monroe, New York.  Friedman was an employee of Sound Around from 2012 to February 2024.

10.     Defendant Shulem Eliezer Ilowitz, also known as Lazer Ilowitz, is an individual who, at all relevant times, has been domiciled in Brooklyn, New York.  Ilowitz was an employee of Sound Around from 2019 to January 2024.

11.     Defendant LRI Group, LLC is a New York limited liability company with its principal place of business in New York created, operated, and/or controlled by the Individual Defendants.

12.     Defendant ML Imports, Inc. is a New York corporation with its principal place of business in Monroe, New York created, operated, and/or controlled by the Individual Defendants.

13.     Defendant Cyrf, Inc. is a New York corporation with its principal place of business in Monroe, New York created, operated, and/or controlled by the Individual Defendants.

14.     Defendant World Group Import, LLC is a New Mexico limited liability company, with its principal place of business in Santa Fe, New Mexico created operated and/or controlled by the Individual Defendants.

15.     Defendant Executive Laundry, LLC is a New York limited liability company with its principal place of business in Farmingdale, New York created operated and/or controlled by the Individual Defendants.

16.     Defendant Executive Services is a New York company with its principal place of business in Farmingdale, New York created operated and/or controlled by the Individual Defendants.

17.     Defendant, MDF Marketing, Inc. is a New York corporation with its principle place of business in Monroe, New York created operated and/or controlled by the Individual Defendants.

18.     Defendant Hefei Paidong Outdoor Products Co., Ltd. ("Hefei") is a Chinese corporation with its principal place of business in China that was utilized by the Individual

Defendants in furtherance of their scheme to divert and usurp Sound Around's business opportunities. In particular, the Individual Defendants used Hefei to launch competing products on online retail sites such as Amazon.

## JURISDICTION AND VENUE

19.  This Court has jurisdiction over the subject matter of this action pursuant to 29 U.S.C. §§ 1331 and 1338, with respect to the claims arising under the Lanham Act 15 U.S.C. § 1051, *et seq*., the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. 1964(c).

20.  This Court has supplemental jurisdiction over all other claims under the laws of the State of New York and common law because they are so related to the claims in this action with the original jurisdiction of this Court that they form part of the same case or controversy.

21.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims that are the subject of this action occurred in this district.

## FACTUAL BACKGROUND

### A.  Sound Around's Business

22.  Sound Around is a business that was started in 1977 by Zigmond Brach ("Mr. Brach") who, along with his two sons, Jerry Brach ("Jerry") and Abraham Brach ("Abe"), still operates the business today. Sound Around's business revolves around the sourcing and importation of foreign products for distribution and resale within the United States. Sound Around currently conducts its business in the consumer goods sector. In particular, it advertises, markets, promotes, offers for sale and sells consumer goods through e-commerce channels, such as Amazon.com.

23.     Sound Around began as a small family business and, although it has grown over the past 48 years, maintains and operates based on its family-business environment and values.

24.     Beginning in the early 1990s, with the advent of the e-commerce industry, Sound Around began expanding its business online, commencing with the sale of its products and product lines on online retailers such as eBay and Yahoo.  Sound Around's business, which sold mainly audiovisual equipment at the time, grew rapidly during this time period in the new online environment.

25.     Nearly two decades later, Sound Around joined Amazon as a vendor and began expanding its products and product lines into areas such as kitchen appliances, products for the home, health and fitness products, and children's products, among other things.

26.     With this expansion, Sound Around also expanded its physical locations, opening several warehouses to facilitate its growing business.

27.     Sound Around's experience in the industry and its proprietary data relating to pricing, costs, systems and methods have allowed it to thrive in online retail sales.  Sound Around accomplishes this success through its confidential and proprietary analytics and methods that allow it to successfully market, price, and source products for sale in the United States.

**B.     Friedman's Employment with Sound Around**

28.     In 2013, Friedman, Abe's brother-in-law, approached Sound Around seeking employment.   Given the familial relationship and the financial difficulties Friedman was experiencing at the time, Sound Around agreed to hire Friedman as a warehouse manager and offered to pay him around $50,000 a year for that work.

29.     A few years after he began his employment with Sound Around, Friedman approached Mr. Brach asking for an increase in his salary.  In light of the work Friedman had done

as warehouse manager and the close familial relationship the Brachs had with him, Sound Around agreed to allow Friedman to transition into a new role as a "Buyer" for Sound Around. In that role, Friedman would be permitted to take company-funded trips to visit vendors and attend trade shows and conferences, both internationally and within the United States, where he could help identify and develop products that could be sold by Sound Around through online retailers, including on the Amazon platform.

30.    Sound Around agreed that Friedman could continue collecting his current salary but would also have the opportunity to transition into a commission-based role, whereby he could collect a portion of the net profits generated by Sound Around relating to products over which Friedman was given authority. Sound Around provided substantial training to Friedman relating to this new role and the strategies and formulae used for pricing and marketing products for Sound Around. It also provided him with access to Sound Around's trade secrets, business know-how, and confidential and proprietary information relating to operation of the business.

31.    As a Buyer, Friedman was given responsibility and discretion relating to the purchase, marketing, and sale of the products for which he was charged. In particular, he was given discretion to negotiate with the manufacturers overseas as to the pricing and purchase of products for Sound Around as well as discretion with the pricing and marketing of those products on Amazon and other online retailers.

32.    Friedman and Sound Around memorialized this relationship in a written contract executed on June 6, 2018 ("Friedman Contract"), a certified translation of which is attached hereto as **Exhibit A**.

33.    In the Friedman Contract, Friedman agreed not to compete with Sound Around "neither during the hours in which he works as an employee with [Sound Around], nor if he leaves

his job either involuntarily or voluntarily," for two years after he leaves Sound Around's employ. Ex. A ¶ 11.  The non-compete provision encompassed both the sale of goods Friedman brought to Sound Around and other goods of Sound Around and provided agreement by Friedman not to work in the same line of business for that time period.  *Id.*

34.    In the non-compete provision, Friedman agreed that should he violate that covenant, he would be obligated to pay Sound Around half of the profit he earned from the violative business.  *Id.*

35.    In the Friedman Contract, Friedman further "obligated himself not to disclose to anyone anywhere any secrets that he has knowledge of [or] that he heard or observed in business matters, for the entire period of time" in which the non-compete prohibition is active.  *Id.*  This provision:

> includes but is not limited to – not disclosing to anyone anywhere the list of customers, or their address and telephone or their emails, the contacts with other firms that do business with the firm, and the manner of operational or financial procedures, etc., etc., in general: anything and any manner that he learned about anything that is related to the enterprise and the business shall remain a tightly-held secret, and he must not disclose it to anyone without exception.

Ex. A ¶ 13.  Friedman agreed that, in the event violated that provision or competed with Sound Around in a way that was not permitted under the agreement, Freedman would be required to pay Sound Around double the damages caused by the breach and/or double the profit earned by a competing business.  *Id.*

36.    Friedman remained in his role as Buyer until February 2024 when he was terminated by Sound Around after it uncovered the conduct described herein.

37.    Notably, the amount of commission Friedman could earn in his role as Buyer was not capped in any way, thus allowing him an infinite upside.  In 2018, Friedman requested that his commission payments to be made to his separate company, Defendant MDF Marketing, Inc.

38.     In 2018, Friedman (through his company) was paid nearly $500,000 in commission from Sound Around relating to his role as Buyer.  Just two years later, in 2020, he was paid over $1.2 million.  Subsequently, for both 2021 and 2022, Friedman was paid over $2 million annually. And although he experienced some decline in 2023—likely because he was dedicating the majority of his time to his competing business—he was still paid over $1 million.

39.     As discussed below, despite his financial success at the company, Friedman participated in an intricate scheme intended to steal from Sound Around, taking not only significant funds, but also the proprietary and confidential information of Sound Around in order to benefit Friedman and his co-conspirators' separate competing business.

### C.     Ilowitz' Employment with Sound Around

40.     In 2019, Jerry was contacted by his secretary who asked whether he would consider hiring her brother, Lazer Ilowitz, who was looking for a new job.  Jerry's family, including his wife and children, had a close relationship with his secretary's family, including her children. Given this close relationship and Ilowitz's need for new employment, Sound Around agreed to hire him as its second Buyer.

41.     Like Friedman, Ilowitz would be permitted to take company-funded trips to visit vendors/manufacturers and attend trade shows and conferences, both internationally and within the United States, where he was tasked with helping Sound Around identify and develop products that could be sold by the company on online retail platforms.

42.     Although not memorialized by written agreement, Sound Around agreed to pay Ilowitz the same portion of the net profits as Friedman relating to any products for which Friedman was given the authority to source and market.  Ilowitz also initially received a salary of around $50,000 to help him as he started in his Buyer role before transitioning into a full commission role.

43.     Sound Around also provided training to Ilowitz relating to this role and the strategies and formulae used for pricing and marketing products for Sound Around.  It also provided him with access to Sound Around's trade secrets, business know-how, and confidential and proprietary information relating to operation of the business.

44.     Ilowitz expressly agreed to maintain the confidentiality of the proprietary and confidential information of the company.  In addition, prior to commencing his employment, Ilowitz also received and acknowledged review of Sound Around's "Policies & Practices Guide." **Exhibit B**; **Exhibit C**.  The Policies & Practices Guide states that "[k]eeping company information, pricing structures and other financial data as well as any other proprietary information confidential is important." *Id.*  It further notes that "[e]mployees may be asked to sign a proprietary information agreement" but "whether you sign it or not, the information must be kept confidential." *Id.*

45.     As a Buyer, Ilowitz was given responsibility and discretion relating to the purchase, marketing, and sale of the products that he was assigned.  In particular, he was given discretion to negotiate with the manufacturers and vendors overseas as to the pricing and purchase of products for Sound Around as well as discretion with regard to the pricing and marketing of those products on Amazon and other online retailers.

46.     Ilowitz occupied the role as Buyer until he resigned January 30, 2024.

47.     Like Friedman, the amount of commission Ilowitz could earn in his role as Buyer was not capped.  Also, like Friedman, Ilowitz requested that his commission be paid to his separate company, Defendant Executive Laundry, LLC.

48.     By 2020, Ilowitz was making over $880,000 in commission from Sound Around. And by 2022, that grew to over $1 million.  And although he experienced some decline in 2023—

likely because he was dedicating the majority of his time to his competing business—he was still paid over $700,000.

**D.    Friedman and Ilowitz begin conspiring against Sound Around and collecting kickbacks**

49.    Upon information and belief, as early as 2020, Friedman and Ilowitz both of whom were still employed by Sound Around, and earning significant commissions from that employment, conspired and developed a scheme to defraud, embezzle, and divert Sound Around's assets and corporate opportunities and manipulate its business for their own financial gain.

50.    Indeed, not only did the Individual Defendants, through the use of the Corporate Defendants, compete with Sound Around, they essentially tried to accomplish a wholesale theft of Sound Around's business, sourcing and marketing competing (in many cases, identical) products while at the same time using their position at Sound Around, and the discretion and authority associated with that position, to manipulate the pricing, marketing, and sourcing of Sound Around's products (in order to ensure the sale of their own competing products over those of Sound Around).

51.    For example, the Individual Defendants were charged with the responsibility of pursuing an expansion of Sound Around's product lines and maintenance of Sound Around's existing products.  Rather than pursuing those responsibilities, the Individual Defendants embarked on an elaborate campaign of fraud and deception designed to usurp Sound Around's valuable business opportunities and purposely harm Sound Around.

52.    Similarly, part of the Individual Defendants' role was to help Sound Around develop new products and ideas as well as new brand and product names for Sound Around's further expansion.  Rather than fulfilling these obligations, the Individual Defendants were developing ideas and creating new brand and product names for their own competing business.

53.    Not only were the Individual Defendants using Sound Around's proprietary information and the training they were provided to further their scheme, they were also using Sound Around's telephones, computers, and other resources to assist them in creating and operating their competing business.

54.    In addition, the Individual Defendants were exploiting the relationships they had developed with Sound Around's vendors, manufacturers, and employees and the discretion that was bestowed upon them by Sound Around for their own financial gain to the detriment of the company.

55.    For example, the Individual Defendants began soliciting and demanding that overseas vendors pay kickbacks to them relating to the products they were purchasing for sale by Sound Around.

56.    By September of 2020, some vendors were transferring thousands (and sometimes tens of thousands) of dollars at a time in kickbacks to the Individual Defendants through Ilowitz' accounts (and those of companies the Individual Defendants' controlled).

57.    Upon information and belief, since that time, the Individual Defendants have obtained hundreds of thousands (and potentially millions) of dollars in kickbacks from vendors through whom they were supposed to be purchasing products for Sound Around.

58.    Significantly, the Individual Defendants had the discretion and responsibility to negotiate with those vendors to obtain the lowest purchase price for Sound Around.  Rather than complying with that obligation, however, the Individual Defendants were instead negotiating for themselves to receive substantial payments from the manufacturers and vendors, which resulted in significantly higher prices being paid by Sound Around to cover the cost of those payments.

59.    In fact, certain vendors have indicated that had those kickbacks not been demanded,

they would have offered the products at a significantly lower price.

60.    In the same vein, other vendors have indicated that the demand for kickbacks from the Individual Defendants actually caused those vendors to cease business with Sound Around altogether.

### E.    Diversion of Corporate Opportunity

61.    Sound Around has learned that, during their employment with Sound Around, the Individual Defendants used Sound Around's resources to fund and operate one or more companies and ventures outside the scope of their employment for Sound Around, keeping all of the profits for themselves and diverting resources and profits away from Sound Around.

62.    For example, the Individual Defendants took numerous international trips, for which they sought tens (if not hundreds) of thousands of dollars in reimbursement, under the false pretense that they were using those trips to source products for Sound Around and meet with manufacturers and/or vendors relating Sound Around's business.   In reality, however, the Individual Defendants were using these trips to source products for their own competing businesses and product lines.

63.    During their workdays, rather than performing the tasks for which they were contracted by Sound Around, the Individual Defendants were drafting and developing work product for their own competing product lines and utilizing Sound Around resources to do so.   In fact, by late 2021, the Individual Defendants begin using their workdays to develop and launch competing products for their own business line.   The Individual Defendants would then transmit that work product to their personal Gmail accounts.

64.    The Individual Defendants also began usurping products that were being presented to Sound Around by vendors and manufacturers, which they were supposed to evaluate for Sound

Around's business, and instead diverting those products to their own business lines.

65.     For example, Individual Defendants contacted vendors they met at conferences, trade shows, or other meetings—which they were attending on Sound Around's behalf and at Sound Around's expense—and solicited information and pricing from those vendors that they then used to list those products for themselves.

66.     Individual Defendants also contacted existing vendors to obtain information from them to allow them to list competing products.  The Individual Defendants contacted those vendors using their Sound Around email accounts and signature blocks, and citing the established brands by which Sound Around marketed that vendors' products.  In other words, the Individual Defendants represented to those vendors and manufacturers that they were seeking the information on Sound Around's behalf, when in reality they were seeking, and ultimately utilized, the information for their own benefit and product lines.

67.     By way of example, in late 2023, Jerry Brach was contacted by a vendor with whom Sound Around had an existing relationship to evaluate a new line of cookware.  Jerry then sent that information to Ilowitz for evaluation and incorporation into Sound Around's product line. Rather than complying with that request, however, Ilowitz evaluated and negotiated with the vendor to sell the product line through his own companies.

68.     In addition, in instances where the Individual Defendants were ordering competing products from vendors that were also filling orders of those products for Sound Around, the Individual Defendants purposely caused the vendors to delay manufacture and development of Sound Around's products.  This tactic was intended to depress Sound Around's sales while at the same time allowing the Individual Defendants' competing products to flourish.

69.     The Individual Defendants also contacted Sound Around's network of vendors

seeking samples of certain products for evaluation and use for their own competing business. In obtaining those samples, the Individual Defendants used Sound Around's name and address representing that the samples were being sought for Sound Around. They also used Sound Around's bank accounts to pay for those samples and the shipping of the samples.

70.    By way of example, the Individual Defendants procured products and samples from Sound Around's vendors using Sound Around's established brands (e.g., Serene Life and Nutrichef), claiming to be sourcing and purchasing products for those brands on Sound Around's behalf. In reality, however, the Individual Defendants then commandeered those products for their own competing product lines.

71.    Separately, the Individual Defendants contacted vendors with established relationships with Sound Around, purporting to be acting on behalf of Sound Around, to obtain information on additional vendors that they could contact to purchase competing products.

**F.    Theft of Sound Around's funds for their own Business and Personal Needs**

72.    The Individual Defendants also began stealing funds from Sound Around to support their own business and personal needs.

73.    In late 2022, for example, Ilowitz contacted a commercial photographer in New York with whom Sound Around had an existing relationship and contracted with him to have photographs taken of Defendants' products. Ilowitz paid for these photographs using nearly $3,000 stolen from Sound Around's accounts.

74.    Ilowitz did the same with another photographer in California with whom Sound Around had an existing relationship. In that instance, Ilowitz caused thousands of dollars to be paid to the photographer from Sound Around's account in exchange for photos of Defendants' products.

75.    The Individual Defendants also contacted a separate photography studio in Spain with whom Sound Around had an established relationship to procure models for its product listings purporting to require the work for Sound Around products.  That studio then created images, for which thousands of dollars were paid for by Sound Around, but which the Individual Defendants used not for Sound Around but for their own business lines.

76.    In 2023, Defendants continued to hire photographers and brand creators for their products and product lines under the false premise that the work being done was for Sound Around. Defendants then paid the photographers and brand creators using Sound Around's account, stealing Sound Around's funds.

77.    The Individual Defendants also accessed Sound Around's bank and Paypal accounts to purchase items needed for their separate competing business.  For example, in late 2023, Ilowitz purchased a computer for himself to run his business by charging over $1,000 to Sound Around's Paypal account.

78.    Separately, Ilowitz accessed Sound Around's UpWork and Fiverr accounts to hire freelancers to produce creative work and product listings for Defendants' business and paid for that work using Sound Around's funds.

79.    The Individual Defendants also ordered samples for their own business using funds stolen from Sound Around's account.

80.    The Individual Defendants even directed other employees at Sound Around to conduct tests of those samples, representing that they were being tested for Sound Around, when in reality, the tests were being conducted their separate business.

81.    They also used Sound Around employees to collect samples of their products being tested in other locations.

82.    Even more brazenly, and unbeknownst to Sound Around, Friedman began using his access to Sound Around's accounts to pay off his personal credit card debts that were unrelated to his business with Sound Around.

**G.    Fraudulent Procurement and Theft of Sound Around's Retail Licenses**

83.    In furtherance of their scheme, the Individual Defendants began reaching out to online retailers with whom Sound Around had an established relationship in an effort to procure additional vendor licenses from those retailers, purportedly for Sound Around, but which the Individual Defendants intended to immediately convert for their own use.

84.    For example, in March, April, and May of 2022, Ilowitz emailed and called an individual at Amazon with whom Sound Around had a longstanding relationship asking to obtain a new "Vendor Central" account, which he claimed was needed for Sound Around's kitchen products line.

85.    As Ilowitz was aware, Sound Around had held its Vendor Central license through Amazon for over 12 years.

86.    A Vendor Central account allows a seller to create a direct relationship between Amazon and the vendor, making the license-holder's business much more profitable than it could otherwise be.  By 2022, however, it was (and still is) extremely difficult for any entity to obtain a Vendor Central license from Amazon.

87.    Ilowitz used his Sound Around email address and signature block in contacting Amazon to further his misrepresentation that he was obtaining the additional Vendor Central license for Sound Around.

88.    Contrary to his representation, the Individual Defendants actually intended to procure the Vendor Central license for Sound Around and immediately convert the license for their

17

own use to sell competing products through their separate product lines.

89.    When the Amazon representative questioned the need for an additional Vendor Central license given Sound Around's current account was active, Ilowitz claimed Sound Around was developing a new line of kitchenware not yet on the market and required an additional, separate license.

90.    In reality, however, Ilowitz (who would have been unable to obtain a Vendor Central license for himself or his companies) intended to steal the fraudulently-procured license from Sound Around and use it to sell his own competing products.

91.    Sound Around has also learned that Ilowitz even attempted to bribe the Amazon representative into providing the account, which the Amazon representative refused.

92.    When he was ultimately provided the form to register for the new Vendor Central account, Ilowitz used Sound Around's registered User ID and Mr. Abe Brach's email address.  He further represented to Amazon that the license would be used by a Sound Around sub-vendor on behalf of "Sound Around" as the "Main Vendor."  He also included Sound Around's address and phone number on the form.

93.    Unbeknownst to Amazon, however, the products listed on the registration form were not Sound Around products, but instead products that Defendants intended to market on their own behalf.

94.    Ultimately, based on false representations from Ilowitz, Amazon issued a new Vendor Central license to Sound Around.

95.    Defendants then proceeded to immediately convert that license for their own use— registering it with Defendant LRI Group, LLC rather than Sound Around—in order to sell their competing products.

96.     In fact, Defendants prevented Sound Around from accessing the new Vendor Central account by creating their own passwords, which they have never provided to Sound Around.

97.     Similarly, in December 2022, Ilowitz contacted an individual at WalMart with whom Sound Around had a relationship, requesting the issuance of a new vendor license from that retailer.  Ilowitz transmitted the communications through his Sound Around email address and with his Sound Around signature block to provide the impression that he intended to use the license for new products that Sound Around intended to market and sell on WalMart's platform.

98.     In reality, Ilowitz intended to steal the fraudulently-procured license from Sound Around and use it to sell his own competing products.

**H.  Misappropriation and use of Confidential and Proprietary Information**

99.     Despite that the Individual Defendants both expressly agreed in writing to maintain the confidentiality of Sound Around's proprietary and confidential information, they utilized that information for their own benefit and the benefit of the Corporate Defendants.

100.    In particular, the Individual Defendants misappropriated Sound Around's confidential information, business methods, know-how and other trade secrets and used the misappropriated information to develop and launch usurped business opportunities that clearly and indisputably originated with Sound Around.

101.    In doing so, they disclosed information that was confidential and not publicly known, without Sound Around's knowledge or consent, and utilized that information for their own business purposes.

102.    For example, the Individual Defendants asked individuals within Sound Around to provide instructional videos and formulae relating to Sound Around's process for uploading

listings to online retailers, under the guise that the information was needed for their work with Sound Around.

103.    In reality, the Individual Defendants utilized that proprietary information to upload and list their own competing products on those online retailers (*e.g.,* Wal Mart).

104.    The Individual Defendants also accessed and exported Sound Around's customer lists, which had been gathered from prior product sales and registrations and utilized that information for their own benefit.

105.    The Individual Defendants also began using Sound Around's proprietary business strategy, information about customers and product categories, market strategies for customers, pricing information and formulae, costs, warranty programs, and other trade secrets to elevate their own business.

106.    Sound Around derives an independent economic benefit from keeping this confidential information secret because a competitor attempting to use this information could try to replicate Sound Around's successful marketing strategy, product listing strategy, and other formulae, which took many years for Sound Around to develop.

107.    As discussed, the Individual Defendants also accessed Sound Around's vendor lists, leveraging the relationships that Sound Around had with those vendors in order to obtain access to products and pricing for their own business.

108.    The Individual Defendants also created various brand names to sell competing products with the same online retail platforms being utilized by Sound Around.

109.    In doing so, they continued to manipulate the prices and marketing of Sound Around's products to depress those sales and increase their own sales.

110.    For example, in February 2022, Ilowitz and Friedman purchased the domain name

for their new Lifemaster USA brand, which would offer the same and competing products to Sound Around's brands.

111.    One of the products sold by the Lifemaster brand was a series of children's scooters identical or nearly identical to those being sold by Sound Around.

112.    The Individual Defendants were able to purchase those products because they misrepresented to Sound Around's vendors that the scooters were being purchased on Sound Around's behalf, and those vendors provided those products based on the false representation that they were being purchased for Sound Around.

I.    **Use of Sound Around's Registered Trademarks, Trade Dress, and Trade Secrets.**

113.    Not only did the Individual Defendants convert Sound Around's business opportunities and retail licenses, but they also began using Sound Around's trademarks on their separate products.

114.    By way of example, the Individual Defendants' Lifemaster brand began selling children's scooters it had obtained under the false pretense that it was purchasing those products for Sound Around.

115.    In the packaging of those scooters and on the Lifemaster website, the Individual Defendants use the term "ScootKid," which is a trademark of Sound Around.

116.    The Individual Defendants also began using the packaging and design elements used by Sound Around to market their competing products.

117.    The Individual Defendants also obtained Sound Around's technical information relating to product listings, marketing, pricing, sales data, methods and techniques, and other e-commerce data belonging to Sound Around and used that information in their own product listings and marketing.

118.    This information being accessed by Sound Around is not information generally known to the public or readily ascertainable but was developed over years of business development and operations by Sound Around.

**J.    Defendants attempt to Pass Off their Products as those of Sound Around**

119.    Not only were Defendants selling the same products as Sound Around and utilizing the same packaging and trade dress as Sound Around, but they also began taking additional steps specifically directed at confusing consumers and causing them to believe they were actually purchasing products from Sound Around.

120.    In fact, the Individual Defendants were taking product samples from Sound Around and sending those products to warehouses internationally asking that the Sound Around product be replicated.

121.    As another example, the Individual Defendants began using Sound Around's QR codes on the packaging for certain products they were selling under their own brands.

122.    In fact, they were even including Sound Around's warranty cards inside those products to suggest that they were in fact Sound Around products and thus covered by Sound Around's warranty.

123.    In doing so, Defendant were intentionally trying to confuse consumers and leading consumers to believe they could register their product with Sound Around's company, when in reality the products were not Sound Around's and thus registration would not be permitted.

124.    In fact, in January 2024, Sound Around became aware of the use of the QR Code when over 30 consumers accessed Sound Around's website and tried to register kids scooters that had been sold by Defendants under the Lifemaster brand, but which purported to be registerable to Sound Around.

125.    After becoming aware of the issue, Sound Around—unaware of Ilowitz'
involvement with the Lifemaster brand—reached out to Ilowitz (given the identical Sound Around
product was within Ilowitz' domain as Buyer) to raise the concern regarding the false products
using the QR code so Ilowitz could investigate the matter.

126.    Ilowitz claimed to have no knowledge regarding the Lifemaster brand or why it
would be using Sound Around's QR code and agreed to investigate the matter, ultimately laying
blame on an unrelated competitor of Sound Around that (in reality) had no involvement with
Lifemaster.

127.    Sound Around also instructed Ilowitz to order a sample of the product from
Lifemaster to obtain a copy of the warranty card being provided, but Ilowitz claimed that when he
received the product, he found no such evidence of the warranty card.  Sound Around, unaware of
Ilowitz' involvement, had no reason to believe Ilowitz would have removed the card to hide the
evidence of his infringement.

128.    As a result of the foregoing, unbeknownst to Sound Around, the Individual
Defendants were able to sell products falsely identified as Sound Around products and unlawfully
trade off Sound Around's goodwill and brand awareness to increase their own sales.

129.    The Individual Defendants thereby falsely led their consumers to believe they were
a source, presumably outside of Sound Around's normal channels for distribution, for Sound
around products, at better prices than being offered by Sound Around.

**K.    Defendants' efforts to Conceal their Unlawful Actions and Cover their tracks**

130.    As their business continued to develop, the Individual Defendants began taking
more steps to conceal their actions.

131.    This included, for example, directing communications from vendors (who believed

they were negotiating and communicating with Sound Around) to a separate "WeChat" platform outside of the Sound Around email servers.

132.    If, despite this request, vendors continued to respond to the Individual Defendants via the Sound Around email platform, the Individual Defendants would simply reply to those emails noting that they sent separate correspondence via the WeChat platform and that the conversation should continue there.

133.    In addition, the Individual Defendants began designating the kickback payments being paid to them as "donations" to disguise the true nature of those payments.

134.    For example, the Individual Defendants began requesting that the kickback payments be made as "donations" to not-for-profit organizations—*e.g.*, Congregation Kozover, a purported religious organization—to conceal their true purpose.  In reality, the donation aspect was simply a way to disguise the unlawful payments being made to the Individual Defendants.

135.    The Individual Defendants also used false personas to communicate with individuals in certain instances to hide their identities.  For example, Ilowitz used the name Sol Green to reach out to certain vendors and Sound Around employees.

136.    For example, Ilowitz (through his Sol Green persona) contacted an employee who provides graphic work for Sound Around under the false pretenses that he was an entirely unrelated company seeking to hire that employee.

137.    The Individual Defendants also began deleting files and emails from their company computers.

138.    In preparing for his resignation from Sound Around, Ilowitz also stole a hard drive from Sound Around the day before he resigned so that it could no longer be accessed by the company.  That same day, he downloaded confidential sales data information from Sound Around.

139.    In fact, Ilowitz emailed himself reminders to take the hard drive and download the data on the day before his resignation.

140.    Sound Around has now learned that it was apparently a regular practice of Ilowitz to remove Sound Around's hard drives to conceal his unlawful conduct.

141.    The Individual Defendants also attempted to disguise their improper conduct by using the various Corporate Defendants to collect and retain their unlawful profits and other payments.

## CLAIMS FOR RELIEF

### COUNT I - FEDERAL TRADE TRADEMARK INFRINGEMENT
### (against all Defendants)

142.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

143.    Defendants' offer to sell, and their sale, distribution, and advertisement of certain products under the unregistered trademarks of Sound Around are in violation of 15 U.S.C. §1125(a).

144.    Sound Around owns and exclusively controls certain trademarks, including the trademark set forth in the following application currently pending at the United States Patent and Trademark Office ("USPTO"):

| Mark | Goods and Services | First Use | Owner |
|---|---|---|---|
| SCOOTKID | Roller balance boards for improving strength, toning, condition, balance and proprioception; roller skates and toy scooters, and accessories therefor | 10/15/2023 | Sound Around, Inc. |

(the "SCOOTKID Mark").

145.    Registration for the above trademark was filed with the USPTO on April 14, 2022

and was assigned Application Number 97/362,757 ("the '757 Application"). The '757 Application was approved for publication on May 5, 2023, was published for opposition on June 13, 2023, and was allowed for registration on the Principal Register on March 4, 2024. Sound Around is awaiting the registration number for the SCOOTKID Mark.

146.    The SCOOTKID Mark is entitled to protection under both federal and common law and has been accepted onto the Principal Register at the USPTO.

147.    Defendants have used the SCOOTKID Mark in marketing and selling their own toy scooter (identical to that sold by Sound Around) both on Defendants' packaging and on their advertisements, including their website and product listings.

148.    For example, the below image taken from Defendants' Lifemaster website portrays the packaging for Defendants' competing kids scooter, which contains Sound Around's trademark:[1]



149.    Sound Around is the senior user of the SCOOTKID Mark.

150.    Defendants' use of the SCOOTKID Mark on an identical product in an identical manner, marketing to the same consumers through the same channels of trade, is likely to cause

---

[1] Available at https://www.lifemasterusa.com/products/kids-scooter-foldable-seat.

consumer confusion.

151.    Defendants' unauthorized use of Sound Around's SCOOTKID Mark has caused, and unless enjoined, will continue to cause substantial and irreparable injury to Sound Around for which Sound Around has no adequate remedy at law, including substantial and irreparable injury to the goodwill and reputation associated with Sound Around's trademark.

152.    Upon information and belief, Defendants' infringement of the SCOOTKID Mark is willful and reflects Defendants' intent to trade on the goodwill and brand recognition associated with the SCOOTKID Mark.

153.    Sound Around is entitled to injunctive relief, and also entitled to recover damages, costs, reasonable attorney's fees, and Defendants' profits under 15 U.S.C. §§ 1114, 1116, 1117.

### COUNT II - FEDERAL TRADE DRESS INFRINGEMENT
### (against all Defendants)

154.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

155.    Sound Around's trade dress, including its product listings, is inherently distinctive as to the source of the product.  In particular, Defendants copied the design, photography, and details from Sound Around listings to create listings to sell nearly identical, parallel products through their own companies, including brands operated through Corporate Defendants.

156.    Sound Around's trade dress is not functional, but is distinctive.

157.    Sound Around's trade dress has acquired secondary meaning through extensive promotion and public recognition over the past 10+ years.

158.    There is a likelihood of confusion between the source of the goods offered by Defendants and those offered by Sound Around.

159.    Defendants have willfully copied and employed the distinctive look of Sound

Around in their own product listings and are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

160.    Defendants' unauthorized use of Sound Around's trade dress has caused, and unless enjoined, will continue to cause substantial and irreparable injury to Sound Around for which Sound Around has no adequate remedy at law, including substantial and irreparable injury to the goodwill and reputation associated with Sound Around's trade dress.

161.    Upon information and belief, Defendants' infringement of the Sound Around's trade dress is willful and reflects Defendants' intent to trade on the goodwill and brand recognition associated with the trademark.

162.    Sound Around is entitled to injunctive relief, and also entitled to recover damages, costs, reasonable attorney's fees, and Defendants' profits under 15 U.S.C. §§ 1114, 1116, 1117.

### COUNT III – FEDERAL FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION
### (against all Defendants)

163.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

164.    Defendants' offer to sell, and their sale, distribution and advertisement of products under the Sound Around trademarks and trade dress constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

165.    Sound Around's SCOOTKID trademark is entitled to protection under both federal and common law.

166.    In addition, Sound Around's trade dress is inherently distinctive as to the source of the product.

167.    Sound Around's trade dress is not functional but is distinctive.

168.    Sound Around's trade dress has acquired secondary meaning through extensive promotion, marketing, and public recognition over the course of Sound Around's operation.

169.    Defendants have willfully copied and employed the distinctive trade dress and trademark in their own competing business and are in violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

170.    Defendants' unauthorized use of the Sound Around trade dress and trademark constitutes unfair competition and the use of a false designation of origin that is likely to cause confusion and deceive customers as to the impression that Defendants' products are authorized by or associated with Sound Around in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

171.    Defendants' unauthorized use of the Sound Around trade dress and trademark has caused, and unless enjoined, will continue to cause substantial and irreparable injury to Sound Around for which Sound Around has no adequate remedy at law, including substantial and irreparable injury to the goodwill and reputation associated with Sound Around.

172.    Upon information and belief, Defendants' infringement of the Sound Around trade dress and trademark is willful and reflects Defendants' intent to trade on the goodwill and brand reputation of Sound Around.

173.    There is a likelihood of confusion between the sources of the products being offered by Sound Around and those being offered by Defendants.

174.    By way of example, Sound Around has already been contacted by consumers purchasing products from Defendants which those consumers believe to be Sound Around's brand of products and who are seeking to register those products with Sound Around.

175.    Sound Around has no adequate remedy at law.  If use of the Sound Around

trademark by Defendants' is not enjoined, Sound Around will suffer substantial and irreparable injury to its business reputation and the goodwill associated with Sound Around's trademark.

176.    Sound Around is entitled to injunctive relief, and also entitled to recover its damages, costs, reasonable attorney's fees, and Defendants' profits under 15 U.S.C. §§ 1114, 1116, 1117.

### COUNT IV – FALSE ADVERTISING
### (against all Defendants)

177.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

178.    This is a cause of action for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

179.    As set forth in this Complaint, Defendants are, through nefarious means, operating businesses competing with Sound Around selling identical goods as those sold by Sound Around. The goods sold by Defendants are identical to those sold by Sound Around as Defendants have usurped, stolen, and misappropriated suppliers from Sound Around, as set forth in greater detail in this Complaint.

180.    Despite selling identical products to Sound Around, Defendants advertise and market those products in very different, misleading, and false ways.

181.    For example, Sound Around and Defendants both sell 14 inch nonstick pizza trays:





(Sound Around's product)



(Defendant's product).

182.     Defendants engage in false and deceptively misleading advertising by advertising their identical product as being "Swiss" and utilizing a "Swiss Coating":



183.    Defendants' product – which is identical to Sound Around's product – is not from Switzerland, has no affiliation with the country of Switzerland, and does not utilize a "Swiss Coating."

184.    These false and/or deceptively misleading statements not only violate various federal laws regarding the marking of imported products, they are likely to cause consumer confusion and divert customers from Sound Around to Defendants thereby causing harm to Sound Around.

185.    The false and/or deceptively misleading statements made by Defendants are the proximate cause of harm to Sound Around in that they misrepresent the nature of a product that is identical in nature to the product sold by Sound Around, falsely and deceptively making an identical product appear to be superior.

186.    Sound Around has no adequate remedy at law.  If the false advertising by Defendants is not enjoined, Sound Around will suffer substantial and irreparable injury to its business reputation and the goodwill associated with Sound Around's trademark.

187.    Sound Around is entitled to injunctive relief, and also entitled to recover its damages, costs, reasonable attorney's fees, and Defendants' profits under 15 U.S.C. §§ 1114, 1116, 1117.

## COUNT V - MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
### (against all Defendants)

188.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

189.    The Individual Defendants had access to much of Sound Around's Confidential information as a result their employment at Sound Around.

190.    For example, by virtue of their employment with Sound Around, the Individual Defendants were given access and possessed Sound Around's confidential information, which includes trade secrets of Sound Around, such as, among other things, proprietary data relating to pricing, costs, listings, sales, and other systems and methods relating to online retail, technical product specifications and testing, sales data, e-commerce data, and other commercially sensitive information including customer lists, vendor relationships, the identity of contractual counterparties, internal cost structure and operating expenses, and e-commerce data.

191.    Sound Around took reasonable steps to maintain the confidentiality of Sound Around's confidential information including by, among other things, requiring employees to sign contracts and/or Policies and Practices Guide, which prohibit unauthorized disclosure and use of Sound Around's confidential information.

192.    The Individual Defendants have misappropriated Sound Around's confidential information and is using it to compete with Sound Around.

193.    As a direct and proximate result of the Individual Defendants' misappropriation of Sound Around's confidential and proprietary information, Sound Around is threatened with, and has experienced: (a) the loss of product sales, (b) the loss of business expectancies, customers, vendor-relationships and goodwill; (c) substantial and irreparable harm.  Sound Around will continue to be harmed unless the Individual Defendants are enjoined and restrained by order of

the court.

## COUNT VI - MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836
### (against all Defendants)

194.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

195.    By virtue of their employment with Sound Around, the Individual Defendants were given access and possessed Sound Around's confidential information, which includes trade secrets of Sound Around, such as, among other things, proprietary data relating to pricing, costs, listings, sales, and other systems and methods relating to online retail, technical product specifications and testing, sales data, e-commerce data, and other commercially sensitive information including customer lists, vendor relationships, the identity of contractual counterparties, internal cost structure and operating expenses, and e-commerce data.

196.    Sound Around's confidential information, including its trade secrets, were developed and maintained by Sound Around over many years at great time, effort and expense to Sound Around, and are maintained on password-protected networks accessible only by Sound Around employees with the need to use such trade secrets on Sound Around's behalf and for its benefit.

197.    In addition, Sound Around has taken reasonable measures to maintain the secrecy of Sound Around's confidential information, including its trade secrets, including by requiring employees to sign agreements prohibiting disclosure and having policies in place restricting the use of Sound Around's information.

198.    The Individual Defendants had no right to retain or use any of Sound Around's trade secrets (or any other of Sound Around's confidential information) after leaving the employ

of Sound Around.

199.    Sound Around's confidential information, including its trade secrets, derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of such information.

200.    The Individual Defendants knew that the information they used constituted trade secrets belonging to Sound Around.  The Individual Defendants provided this information for use by the Corporate Defendants as well.

201.    Defendants possess and are retaining and using Sound Around's confidential information and trade secrets to compete with and/or otherwise harm Sound Around.

202.    Sound Around did not consent to the Individual Defendants' (or any of their Companies') use of its confidential information or trade secrets.

203.    Defendants have used Sound Around's confidential information, including its trade secrets without express or implied consent from Sound Around.

204.    Defendants knew or should have known that Sound Around's confidential information, including its trade secrets, (1) are confidential; (2) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (3) were developed or acquired by Sound Around at great time, effort and expense; (4) were maintained as confidential and are not generally available to the public and Sound Around's competitors; (5) would provide significant benefit to a competitor seeking to compete with Sound Around; and (6) are critical to Sound Around's ability to conduct its business successfully.

205.    Defendants misappropriated Sound Around's confidential information, including its trade secrets, without Sound Around's consent.

206.    Defendants will be or are unjustly enriched by their misappropriation of Sound Around's confidential information, including its trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Sound Around's confidential information, including its trade secrets.

207.    Defendants' misappropriation has been willful and malicious.

208.    As a direct and proximate result of the Defendants' misappropriation of Sound Around's confidential information, including its trade secrets, Sound Around will be threatened with loss of business expectancies, customers, employees, its trade secrets and goodwill and otherwise be substantially and irreparably harmed unless the Individual Defendants are enjoined and restrained by order of the Court.

209.    Unless restrained by this Court, Defendants will cause further irreparable harm to Sound Around.

210.    Sound Around is also entitled to a seizure order providing for the seizure from the Defendants of Sound Around's confidential information, including its trade secrets, insofar as necessary to prevent the propagation, dissemination, and use of them.

211.    In addition, as a result of the Defendants' conduct, Sound Around has suffered direct and consequential damages, and is entitled to recover actual, incidental, compensatory and punitive damages, attorneys' fees, and other damages in an amount to be determined at trial.

212.    Sound Around is also entitled to injunctive relief.

**COUNT VII - MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (against all Defendants)**

213.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

214.    By virtue of their employment with Sound Around, the Individual Defendants were given access and possessed Sound Around's confidential information, which includes trade secrets of Sound Around, such as, proprietary data relating to pricing, costs, listings, sales, distribution, and other systems and methods relating to online retail, business and marketing strategy, technical product specifications and testing, sales data, e-commerce data, and other commercially sensitive information including customer lists, vendor relationships, the identity of contractual counterparties, internal cost structure and operating expenses, and e-commerce data.

215.    The Individual Defendants used those trade secrets in breach of the terms of their employment with Sound Around and the confidential relationship between each of them and Sound Around.

216.    The Corporate Defendants used those trade secrets after being provided them by improper means through the Individual Defendants.

217.    Sound Around's confidential information, including its trade secrets, were developed and maintained by Sound Around over many years at great time, effort and expense to Sound Around, and are maintained on password-protected networks accessible only by Sound Around employees with the need to use such trade secrets on Sound Around's behalf and for its benefit.

218.    In addition, Sound Around has taken reasonable measures to maintain the secrecy of Sound Around's confidential information, including its trade secrets, including by requiring employees to sign agreements prohibiting disclosure and having policies in place restricting the use of Sound Around's information.

219.    The Individual Defendants had no right to retain or use any of Sound Around's trade secrets (or any other of Sound Around's confidential information) after leaving the employ

of Sound Around.

220.    Sound Around's confidential information, including its trade secrets, derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of such information.

221.    The Individual Defendants knew that the information they used constituted trade secrets belonging to Sound Around. The Individual Defendants provided this information for use by the Corporate Defendants as well.

222.    Defendants possess and are retaining and using Sound Around's confidential information and trade secrets to compete with and/or otherwise harm Sound Around.

223.    Sound Around did not consent to the Individual Defendants' (or any of their Companies') use of its confidential information or trade secrets.

224.    Defendants have used Sound Around's confidential information, including its trade secrets without express of implied consent from Sound Around.

225.    Defendants knew or should have known that Sound Around's confidential information, including its trade secrets, (1) are confidential; (2) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (3) were developed or acquired by Sound Around at great time, effort and expense; (4) were maintained as confidential and are not generally available to the public and Sound Around's competitors; (5) would provide significant benefit to a competitor seeking to compete with Sound Around; and (6) are critical to Sound Around's ability to conduct its business successfully.

226.    Defendants misappropriated Sound Around's confidential information, including its trade secrets, without Sound Around's consent.

227.    Defendants will be or are unjustly enriched by their misappropriation of Sound Around's confidential information, including its trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Sound Around's confidential information, including its trade secrets.

228.    Defendants' misappropriation has been willful and malicious.

229.    As a direct and proximate result of the Defendants' misappropriation of Sound Around's confidential information, including its trade secrets, Sound Around will be threatened with loss of business expectancies, customers, employees, its trade secrets and goodwill and otherwise be substantially and irreparably harmed unless the Individual Defendants are enjoined and restrained by order of the Court.

230.    Unless restrained by this Court, Defendants will cause further irreparable harm to Sound Around.

231.    Sound Around is also entitled to a seizure order providing for the seizure from the Defendants of Sound Around's confidential information, including its trade secrets, insofar as necessary to prevent the propagation, dissemination, and use of them.

232.    In addition, as a result of the Defendants' conduct, Sound Around has suffered direct and consequential damages, and is entitled to recover actual, incidental, compensatory and punitive damages, attorneys' fees, and other damages in an amount to be determined at trial.

233.    Sound Around is also entitled to injunctive relief.

### COUNT VIII - BREACH OF THE COMMON LAW DUTY OF LOYALTY UNDER NEW YORK LAW
**(against the Individual Defendants)**

234.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

235.    An employee is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

236.    The Individual Defendants breached the common law duty of loyalty they owed to Sound Around by, among other things, taken the various actions alleged herein.

237.    Sound Around has suffered damages by reason of the actions of the Individual Defendants in violating and participating in the violation of the duty of loyalty.

238.    Sound Around is entitled to an award of damages in an amount to be determined at trial.

## COUNT IX - UNJUST ENRICHMENT
### (against all Defendants)

239.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

240.    Defendants have enriched by using the materials, trade secrets, concepts, confidential and proprietary information, and resources in operating their competing businesses.

241.    Defendants misappropriated the materials, trade secrets, concepts, confidential and proprietary information, and resources without permission, justification and without paying for them.

242.    It is contrary to equity and good conscience to permit the Defendants to retain the materials, trade secrets, concepts, confidential and proprietary information, and resources of Sound Around without compensating Sound Around

243.    Sound Around is entitled to an award of damages in an amount to be determined at trial, plus interest.

## COUNT X - BREACH OF FIDUCIARY DUTY UNDER NEW YORK LAW
### (against the Individual Defendants)

244.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

245.    The Individual Defendants were employees of Sound Around and in that capacity had a duty to act for and give advice for the benefit of Sound Around.  Sound Around repose trust and confidence in the Individual Defendants.

246.    The Individual Defendants owed a duty of good faith and loyalty to Sound Around.

247.    The Individual Defendants owed Sound Around a fiduciary duty both during and after their employment not to use Sound Around's confidential information and trade secrets other than for purposes of Sound Around's employment.

248.    The Individual Defendants breached their fiduciary duties to Sound Around by making improper use of Sound Around's time, facilities, and proprietary secrets to create a competing business The Individual Defendants' use of Sound Around's proprietary information and trade secrets constituted an egregious breach of trust and confidence.

249.    The Individual Defendants diverted and exploited various opportunities that belonged to Sound Around during the time of their employment with Sound Around and thereafter.

250.    The Individual Defendants usurped, without consent, opportunities belonging to Sound Around in which Sound Around had a tangible expectancy.

251.    The Individual Defendants' breaches of their fiduciary duties were the proximate cause of substantial damages to Sound Around.

252.    Based on the foregoing, Sound Around is entitled to an award of damages, both compensatory and punitive.

**COUNT XI - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**UNDER NEW YORK LAW**
**(against Corporate Defendants)**

253.    Sound Around repeats and realleges paragraphs 1 through 141 and paragraphs 245-251 as if fully set forth herein.

254.    The Individual Defendants breached their fiduciary duties to Sound Around by making improper use of Sound Around's time, facilities, and proprietary secrets to create a competing business with Sound Around.

255.    The Corporate Defendants knowingly participated in and facilitated the breaches of the Individual Defendants' fiduciary duties, providing substantial assistance to the Individual Defendants.

256.    Sound Around suffered damages as a result of the Defendants conduct.

257.    Based on the foregoing, Sound Around is entitled to an award of damages, both compensatory and punitive.

**COUNT XII - UNFAIR COMPETITION UNDER NEW YORK LAW**
**(against all Defendants)**

258.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

259.    The Individual Defendants' unlawful activities as set forth herein constitute unfair and improper actions against Sound Around, resulting in monetary injury to Sound Around, as well as injury to Sound Around's reputation and good will.

260.    The Individual Defendants' bad faith actions took advantage of the labors and expenditures of Sound Around, and Defendants are using the fruits of those labor and expenditures to unfairly compete with Sound Around.

261.    In addition to converting Sound Around's funds and tortiously interfering with

Sound Around's business relationships, the Individual Defendants—while they were trusted employees of Sound Around—used Sound Around's resources to fund and operate one or more companies outside the scope of their employment for Sound Around.

262.    The Individual Defendants unlawfully misappropriated Sound Around's property rights to their commercial advantage in order to further its infringing activity and to obtain an unfair competitive advantage over Sound Around.

263.    With knowledge of the reputation Sound Around products have, Defendants intended to and did trade on the goodwill and brand recognition associated with Sound Around's products by manufacturing, distributing, promoting and selling products using Sound Around's trademark and/or trade dress.

264.    The Individual Defendants' acts are likely to cause confusion, mistake and deception to consumers as to the affiliation, connection, or association of Defendants' products with Sound Around's brands and as to the origin and approval of Sound Around with regard to Defendants' products.

265.    The Individual Defendants used their position at Sound Around and their affiliation with Sound Around to promote themselves and their companies at the expense of Sound Around.

266.    Based on their activities, which involved others who are currently unknown to Sound Around, the Individual Defendants kept all of the profits for themselves and unidentified individuals who conspired with the Individual Defendants to divert resources and profits away from Sound Around.

267.    The Individual Defendants unlawful acts constitute unfair competition as proscribed by New York common law.

268.    The Individual Defendants' acts of unfair competition have caused Sound Around

to sustain pecuniary damage, loss, and injury.

269.    Upon information and belief, the Individual Defendants engaged in these activities knowingly and willfully.

270.    The acts of unfair competition complained of herein, unless enjoined by this Court, will continue to cause Sound Around to sustain irreparable damage, loss, and injury.

271.    Sound Around has no adequate remedy at law.

272.    Sound Around is entitled to an award of damages in an amount to be determined at trial, including punitive damages, as well as injunctive relief.

**COUNT XIII - VIOLATION OF NY GEN BUS L § 360-L**
**(against the Individual Defendants)**

273.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

274.    The Individual Defendants have in bad faith misappropriated and used a commercial advantage belonging to Sound Around by exploiting proprietary information and/or trade secrets.

275.    The Individual Defendants have physically taken, copied and/or are using confidential information of Sound Around.

276.    The Individual Defendants have also diluted Sound Around's trade dress.

277.    Sound Around has no adequate remedy at law.

278.    Sound Around is entitled to a permanent injunction enjoining Defendants form using Sound Around's trade dress and proprietary information.

**COUNT XIV - DIVERSION OF CORPORATE OPPORTUNITY**
**UNDER NEW YORK LAW**
**(against the Individual Defendants)**

279.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth

herein.

280.    As part of their employment with Sound Around, the Individual Defendants dealt directly with Sound Around's manufacturers and vendors in China (and elsewhere) to facilitate the manufacturing, production and supply of Sound Around products for marketing and sale to retail consumers in the United States.

281.    The Individual Defendants began taking actions to misdirect Sound Around's marketing efforts and assets, contravening the directives of Sound around, and negatively impacting and interfering with Sound Around's business.

282.    For example, the Individual Defendants instructed certain of Sound Around's vendors to delay production of Sound Around's products and expedite production of their own products. In doing so, the Individual Defendants diverted hundreds of thousands of dollars in profits that would have gone to Sound Around into their own pocket or those of their corporations.

283.    The Individual Defendants also diverted and exploited for their own benefit opportunities that should have been deemed assets of Sound Around.

284.    The Individual Defendants usurped these corporate opportunities to their own competing business for their financial benefit.

285.    Sound Around had a tangible expectancy in those corporate opportunities that were diverted by the Individual Defendants

286.    The Individual Defendants actions were made for a wrongful purpose and in bad faith, and they used dishonest, unfair and improper means to disrupt and interfere with Sound Around's established business relationships with its manufacturers and vendors in China.

287.    Sound Around was damaged by the Individual Defendants' diversion of its corporate opportunities.

288.    Based on the foregoing, Sound Around is entitled to an award of damages to be determined at trial, including the return of compensation paid to the Individual Defendants, compensatory damages, profits the Individual Defendants achieved based on the diversion of Sound Around's corporate opportunities, and punitive damages.

### COUNT XV - BREACH OF CONTRACT AGAINST FRIEDMAN
### (against Friedman)

289.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

290.    Defendant Friedman entered into a contractual relationship with Sound Around relating to his employment as a Buyer for the company.

291.    Defendant Friedman breached his contractual obligations set forth in the Friedman Contract by: (1) drawing compensation from Sound Around pursuant to an employer-employee relationship between Friedman and Sound Around while spending all or substantially all of his time in the pursuit of his competing businesses, (2) competing with Sound Around in violation of his agreement not to compete in any business involving the sale of goods for two years after the termination of his employment with Sound Around, and (3) disclosing secrets he learned during his employment with Sound Around to the other Defendants and unnamed conspirators with whom he developed a scheme to completely undermine Sound Around's business and enrich himself at the expense of the company.

292.    As a result of these breaches, Sound Around has been harmed and is Sound Around is entitled to recover damages.

### COUNT XVI - BREACH OF CONTRACT AGAINST ILOWITZ
### (against Ilowitz)

293.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth

herein.

294.    Defendant Ilowitz entered into a contractual relationship with Sound Around relating to his employment as a Buyer for the company.

295.    Defendant Ilowitz breached his contractual obligations set forth in the Ilwitz Contract by: (1) drawing compensation from Sound Around pursuant to an employer-employee relationship between Ilowitz and Sound Around while spending all or substantially all of his time in the pursuit of his competing businesses, and (2) disclosing secrets he learned during his employment with Sound Around to the other Defendants and unnamed conspirators with whom he developed a scheme to completely undermine Sound Around's business and enrich himself at the expense of the company.

296.    As a result of these breaches, Sound Around has been harmed and is entitled to recover damages.

## COUNT XVII - TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (against Individual Defendants)

297.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

298.    At all relevant times, Sound Around maintained ongoing business relationships with its manufacturers and vendors in China, which permitted Sound Around to purchase products at a reasonable price and to earn a profit when those goods were sold to retail customers.

299.    At all relevant times, the Individual Defendants were aware of Sound Around's business relationships with these manufacturers and vendors.

300.    These business relationships were significantly harmed by the Individual Defendants' actions.

301.    As part of their employment with Sound Around, the Individual Defendants dealt

directly with Sound Around's manufacturers and vendors in China (and elsewhere) to facilitate the manufacturing, production and supply of Sound Around products for marketing and sale to retail consumers in the United States.

302.    The Individual Defendants began taking actions to misdirect Sound Around's marketing efforts and assets, contravening the directives of Sound around, and negatively impacting and interfering with Sound Around's business.

303.    For example, the Individual Defendants instructed certain of Sound Around's vendors to delay production of Sound Around's products and expedite production of their own products. In doing so, the Individual Defendants diverted hundreds of thousands of dollars in profits that would have gone to Sound Around into their own pocket or those of their corporations.

304.    The Individual Defendants also demanded kickbacks from those vendors (in some cases threatening to cut off all Sound Around purchases if they were not made) for their own financial gain.  While some vendors acquiesced to that request, others refused to do any further business with Sound Around based on those demands.  This not only harmed Sound Around's relationship with its vendors, but also caused significant financial harm to Sound Around.

305.    The Individual Defendants' actions were taken for a wrongful purpose and in bad faith, and they used dishonest, unfair and improper means to disrupt and interfere with Sound Around's established business relationships with its manufacturers and vendors in China.

306.    The Individual Defendants had no justification for their actions.

307.    Absent the actions taken by the Individual Defendants in, among other things, contravening Sound Around's instructions, usurping Sound Around's business relationships with its manufacturers and vendors in China, and interfering with Sound Around's product orders from those vendors, the Individual Defendants knew Sound Around would continue to have a positive

and beneficial business relationship with its vendors and manufacturers in China.

308.    As a result of the Individual Defendants dishonest, unfair, and improper acts of interference, Sound Around lost potential profits and endured damage to its business relationship with those entities.

309.    Upon information and belief, the harm caused to Sound Around's business was the Individual Defendants' intended result.

310.    As a result of the Individual Defendants' actions, Sound Around has suffered pecuniary damages, including the loss of sales.

311.    As a proximate result of the Individual Defendants' wrongful acts, Sound Around has also been irreparably harmed and is entitled to injunctive relief and damages for an amount to be determined at trial.

## COUNT XVIII - COMMON LAW FRAUD
### (against Individual Defendants)

312.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

313.    In connection with the unlawful conduct of Defendants described herein, the Individual Defendants made overt and fraudulent statements to Sound Around and others with regard to, among other things, reimbursement of expenses claimed to be related to their work at Sound Around, the purpose of their trips to visit international vendors and attend trade conferences, their competing business, the need for certain confidential business information and their intended use of the information for their own competing businesses, the use of Sound Around's trademarks, trade dress, and trade secrets, their decisions regarding the pricing and marketing of Sound Around products and the manipulation of the same, and kickbacks they were demanding and receiving from Sound Around's vendors.

314.    By way of example, on August 10, 2023, Ilowitz sought reimbursement of nearly $4,000 from Sound Around relating to a trip he had taken a trip to China and represented that he conducted work for Sound Around during that trip.  Upon information and belief, however, Ilowitz used that trip to source and purchase products for his own business, solicit unlawful kickbacks, and manipulate production of Sound Around's products.  Ilowitz made similar representations regarding trips taken in June 2022, July 2022, February 2023 and other dates throughout 2020 to 2023, for which he sought thousands of dollars in reimbursements from Sound Around.

315.    Sound Around relied on those representations to tis detriment in reimbursing the amounts sought and authorizing Ilowitz to continue take trips both domestically and internationally.

316.    Similarly, Friedman took numerous trips both domestically and internationally between 2020 and 2023, which he charged to his personal credit card.  Friedman represented to Sound Around that the purpose of those trips was to solicit and review products for Sound Around. Upon information and belief, however, Friedman used those trips to source and purchase products for his own business, solicit unlawful kickbacks for he and Ilowitz, and manipulate production of Sound Around products. In reliance on these misrepresentations, Sound Around permitted Friedman to reimburse those expenses from Sound Around's bank accounts.

317.    In fact, Friedman reimbursed himself for hundreds of thousands of dollars in expenses from Sound Around's bank account from November 3, 2020 through December 15, 2023, representing to Sound around on each occasion that those expenses were incurred in fulfilling his employment duties with Sound Around.  Upon information and belief, during that entire time period, Friedman was dedicating a substantial portion of his time to his own competing business and ventures and incurred those expenses for the purpose of his own business.

318.    The Individual Defendants also used Sound Around's Paypal account to make direct payments to photographers, brand creators, and other third parties of thousands of dollars to create content and listings for their own competing business.  For example, upon information and belief, on January 25, 2023, February 6, 2023, March 14, 2023, March 29, 2023, March 30, 2023, April 25, 2023, and January 9, 2024, the Individual Defendants caused a total of nearly $25,000 to be paid to a photographer who was tasked with producing videos and photographs to be used by the Individual Defendants in their competing business.

319.    The Individual Defendants also represented to Sound Around that they were negotiating the best price for Sound Around from the vendors with whom they were communicating for Sound Around's purchase of products.  In reality, however, the Individual Defendants were negotiating and demanding substantial kickbacks for themselves, which resulted in an increase in the price offered to Sound Around.

320.    For example, on or around September 14, 2020, Ilowitz represented he negotiated a favorable price for products from a Chinese vendor for Sound Around, when in fact he solicited and obtained a kickback payment for nearly 48,000 from that vendor.

321.    The Individual Defendants made similar representations to Sound Around and received unlawful kickbacks from vendors on September 23, 2020, September 28, 2020, October 8, 2020, December 11, 2020, December 24, 2020, January 4, 2021, January 6, 2021, January 20, 2021, January 22, 2021, February 10, 2021, March 2, 2021, and March 15, 2021, among other occasions.

322.    Sound Around relied on those representations to its detriment in paying higher prices for products to facilitate the payment of the substantial kickbacks to the Individual Defendants.  In fact, vendors have now decreased prices going forward to account for not having

the need to pay kickbacks to the Individual Defendants.

323.    The Individual Defendants made misrepresentations to employees at Sound Around to solicit confidential information to which they had no access in order to use that information for their own competing business.  For example, in October 2023, Ilowitz reached out to a Sound Around employee asking for specific proprietary files and videos relating to product listings and the methodology surrounding specific postings.  Ilowitz did so under the false representation that the information was needed for Sound Around related products.

324.    Upon information and belief, however, the Individual Defendants used that information to post competing products and market their products in a more favorable way while at the same time depressing the marketability of Sound Around products.

325.    Sound Around relied upon those representations to its detriment.

326.    Sound Around is entitled to recover damages, both compensatory and punitive.

### COUNT XIX - CONVERSION UNDER NEW YORK LAW
### (against all Defendants)

327.    Sound Around repeats and realleges paragraphs 1 through 141 and 313 through 325 as if fully set forth herein.

328.    Sound Around was the sole owner of the funds in its bank accounts and the vendor licenses issued to it by various retailers, including Amazon.

329.    Defendants conspired to take, and did take, a substantial amount of funds from Sound Around's bank account to, among other things, pay for personal computers unrelated to their employment at Sound Around, pay off their personal credit card debts unrelated to their employment with Sound Around, operate their competing and unlawful business including by shipping samples to and from vendors, and pay for the services of photographers, brand creators, and other professionals who were producing content for the Individual Defendants' unlawful,

competing businesses.

330.   Defendants' actions have deprived Sound Around of these funds.

331.   In unlawfully converting those funds, Defendants, without permission or authority, have assumed and exercised the rights and ownership over the monies, assets, and business opportunities rightfully belonging to Sound Around and has converted same to their own use and purpose to the exclusion of Sound Around's ownership rights.

332.   Defendants also conspired to take, and did take, Sound Around's Vendor Central account, which was issued by Amazon to Sound Around at the request of the Individual Defendants, but which expressly belonged to Sound Around alone.

333.   Defendants' actions have deprived Sound Around of access to their Vendor Central account and the account itself.

334.   In unlawfully converting that account, Defendants, without permission or authority, have assumed and exercised the rights and ownership over the account, assets, and business opportunities rightfully belonging to Sound Around and has converted same to their own use and purpose to the exclusion of Sound Around's ownership rights.

335.   Defendants also conspired to take, and did take, electronic records from Sound Around's computer, which expressly belonged to Sound Around.

336.   Defendants' actions have deprived Sound Around of access to those electronic records.

337.   In unlawfully converting those records Defendants, without permission or authority, have assumed and exercised the rights and ownership over those records rightfully belonging to Sound Around and has converted same to their own use and purpose to the exclusion of Sound Around's ownership rights.

338.    Defendants' improper exercise of the rights of ownership over Sound Around's monies, assets, and business opportunities is inconsistent with Sound Around's ownership rights to the same and constitutes unlawful conversion of Sound Around's property.

339.    By reason of the foregoing, Sound Around has sustained damages and has suffered irreparable harm in being unable to access its Vendor Central account.

340.    Sound Around is entitled to an award of damages in an amount to be determined at trial plus interest.  Sound Around is also entitled to punitive damages.

**COUNT XX – CIVIL RICO CLAIM**
**(Violation of 18 U.S.C. § 1962(c))**
**(against all Defendants)**

341.    Sound Around repeats and realleges paragraphs 1 through 141 and 313 through 325 as if fully set forth herein.

342.    The Individual Defendants, acting in association with each other and other unnamed co-conspirators, with the Corporate Defendants under their control, formed an illegal association-in-fact and engaged in a pattern of racketeering activity, the principal objections of which were, among other things: (1) to deprive Sound Around of property and profits, with regard to corporate opportunities that were usurped by the enterprise; (2) to misappropriate and misuse Sound Around's trademark, trade dress, trade secrets and proprietary information to obtain a competitive advantage over Sound Around while at the same time manipulating the marketing of pricing of Sound Around's products (using the trust reposed in them); (3) to steal and convert Sound Around's monies and property for their own benefit, and (4) to conceal their unlawful conduct from Sound Around and others.

343.    Defendants with criminal intent and through a pattern of racketeering activity, operated the association-in-fact that constituted a criminal enterprise (the "Enterprise"), which

functions from New York and China, and which affected interstate commerce.

344.    The Enterprise had an ascertainable structure and hierarchy that set it apart from the mere commission of predicate acts set forth herein, and that form a pattern of racketeering activity.

345.    At all relevant times, Defendants were "persons" within the definition of 18 U.S.C. § 1961(3) and 1962(c).

346.    The Individual Defendants operated and controlled an enterprise within the meaning of 18 U.S.C. § 1961(4).

347.    In the alternative, the association-in-fact of all the "persons' listed herein constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and for pleading purposes, this association-in-fact is also included in the definition of the Enterprise.

*The RICO Enterprise*

348.    Defendants and their co-conspirators were a group of persons associated together in fact for the common purpose of carrying out the Enterprise, which was an ongoing criminal enterprise, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Defendants participated in the operation or management of the Enterprise.

349.    The Enterprise was an association-in-fact where its members, the Defendants herein and others, functioned as a continuing unit over a substantial period of time in a pattern of acts to achieve the objects of the Enterprise. Defendants' common purpose in using and operating the Enterprise were: (1) to collect from Sound Around unjustified payment and reimbursement of costs related to their competing business, but which the fraudulently represented resulted from actions taken for the business of Sound Around; (2) misappropriate Sound Around's trademark, trade dress, trade secrets, and other confidential and proprietary information to operate a competing

business and pass off their products as Sound Around's products, relying on the goodwill and reputation associated with Sound Around's brand; (3) usurp and divert Sound Around's corporate opportunities for Defendants' own financial benefit; (4) take advantage of the trust and confidence reposed in the Individual Defendants in their employment at Sound Around to manipulate the pricing and marketing of Sound Around products to depress its sales and bolster sales of the Defendants' competing productions; and (2) conceal the true facts from Sound Around and others.

350.    The primary managers who operated the Enterprise were the Individual Defendants, who operated for both their own benefit, as well as for the benefit of the Corporate Defendants.

351.    From the beginning, Defendants' activities were designed to prevent detection and prosecution.  The Defendants and their unnamed co-conspirators fraudulently concealed and continue to fraudulently conceal the trust facts from Sound Around, including by deleting and/or stealing Sound Around's documents and files to prevent discovery of their unlawful conduct. Defendants have obstructed and continue to obstruct Sound Around's ability to determine the full extent of the conduct of the Enterprise.

352.    At all relevant times, the Enterprise was engaged in, and its activities affected foreign and interstate commerce within the meaning of 18 U.S.C. § 1962(c).

353.    The Individual Defendants have, for the duration of the Enterprise, been responsible for overseeing the scheme, and directing others to take actions necessary to accomplish the Enterprise's overall purposes.  Other than the Individual Defendants, the specific membership, roles and organization of the Enterprise has been generally structured to operate as a unit to accomplish the overall wrongful purposes of the scheme.

*The Pattern of Racketeering Activity*

354.    From at least 2020, continuing through the present, Defendants engaged in a pattern of racketeering activity.

355.    Specifically, Defendants engaged over a number of years in a continuous scheme or artifice to defraud Sound Around out of money and/or property and use the trust and confidence reposed in Individual Defendants to divert Sound Around's corporate opportunities and business expectancy for their own benefit.  Defendants' scheme constituted multiple and repeated violations of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341 & 1343) and theft of trade secrets (18 U.S.C. § 1832).

356.    Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Sound Around and/or others (including Sound Around's vendors and e-commerce platforms such as Amazon and WalMart).

357.    Defendants agreed to "conduct or participated in the conduct" of the Enterprise's affairs through a "pattern of racketeering activity" which the Individual Defendants knew would include a scheme to defraud Sound Around and misappropriate Sound Around's trade secrets, carried out by at least two acts of mail or wire fraud and theft of trade secrets within a period of ten years.

358.    Thus, in furtherance of their scheme, and as described herein, Defendants engaged in mail fraud by placing and causing to be placed matters and things in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service, and deposited or caused to be deposited matters and things to be sent or delivered by any private or commercial interstate carrier, and/or engaged in wire fraud by transmitting, or causing to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including, faxes and emails including those described herein.

359.    Defendants also engaged in theft of trade secrets, as described herein, with the intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of the members of the Enterprise stole, and/or without authorization appropriated, concealed, and/or by fraud, artifice, or deception obtains such information, knowing that their actions would injure Sound Around.  Defendants also conspired with the members of the Enterprise to commit the theft of the trade secrets.

360.    Each of the communications and acts of theft was in furtherance of the conspiracy of persons conduct the Enterprise.

361.    In addition, from at least 2020 and continuing to the present, Defendants, in furtherance of the objects of the Enterprise, planned to, took steps to, have actively concealed their wrongful deeds and continue to obstruct Sound Around's investigation of the same.

362.    Defendants intended that Sound Around, its vendors, consumers, and e-commerce platforms such as Amazon and WalMart would rely upon the fraudulent misrepresentations and deceitful conduct in which the conspirators engaged, and Sound Around was in fact deceived and defrauded by the racketeering conduct of Defendants.

363.    The allegations herein constituted unlawful, related, and continued predicate acts by Defendants. The conduct of each of Defendants described herein constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). This pattern of racketeering activity continues to date.

364.    Sound Around was directly and proximately injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Sound Around directly and proximately caused by reason of the violations of 18 U.S.C. § 1962(c) include, but are not limited to, wrongfully diverted and fraudulent procured funds, property, and corporate

opportunities, misappropriated trade secrets and proprietary information, and attorneys' fees and costs associated with uncovering and exposing the Defendants' fraudulent scheme, in an amount to be proved at trial. Sound Around is entitled to treble damages.

365.    Sound Around's injuries were a direct, proximate, and reasonably foreseeable result of Defendants' violations of 18 U.S.C. § 1962(c), because Sound Around was the target and victim of Defendants' unlawful Enterprise. Defendants actively concealed these injuries from Sound Around for years.

366.    Sound Around was an "innocent person" in this matter. Sound Around in no way benefited from the operation of the Enterprise, and was the Enterprise's intended victim.

367.    Sound Around is entitled to an award of damages in an amount to be determined at trial, trebled, plus interest.  Sound Around is also entitled to punitive damages.

### COUNT XXI – CONSPIRACY TO VIOLATE RICO
### (Violation of 18 U.S.C. § 1962(d))
### (against all Defendants)

368.    Sound Around repeats and realleges paragraphs 1 through 137, 313 through 325, and 342 through 366 as if fully set forth herein.

369.    Defendants unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others both named and unnamed in this Complaint to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

370.    Defendants knew that they were engaged in a conspiracy to commit the predicate acts alleged herein, and they knew that the predicate acts were part of such racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

371.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme

to, among other things, convert Sound Around's assets and monies, usurp corporate opportunities, and use Sound Around's trademark, trade dress, and trade secrets to bolster its competing business and depress that of Sound Around.

372.    It was part of the conspiracy that the Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the predicate acts of racketeering set forth herein, as well as the active concealment thereafter.

373.    As a direct, proximate and intended result of the Defendants' RICO conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Sound Around has been injured in its business and deprived of its property.  Defendants' activity concealed these injuries from Sound Around.

## COUNT XXII – ACCOUNTING
### (against all Defendants)

374.    Sound Around repeats and realleges paragraphs 1 through 141 as if fully set forth herein.

375.    At all times relevant hereto, a fiduciary relationship existed between Individual Defendants and Sound Around.

376.    The amount of money due from Defendants to Sound Around is unknown and cannot be ascertained without an accounting from the Defendants of the revenues and profits realized by the Defendants.

377.    Equity demands that Defendants be required to fully and intelligently account for all revenues and profits realized from the unlawful acts complained of herein

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sound Around seeks judgment against Defendants as follows:

a)  A permanent injunction:

b)  A seizure order providing for the seizure from Defendants of Sound Around's trade secrets insofar as necessary to prevent Defendants' propagation or dissemination of Sound Around's trade secrets;

c)  An award of damages in an amount to be determined at trial, including without limitation direct, consequential, actual, incidental, compensatory as well as the reasonable attorneys' fees and expenses Sound Around has been forced to incur to identify, investigate, address and remediate Defendants' wrongdoing;

d)  An award of treble damages;

e)  An award of punitive damages;

f)  Interests;

g)  Injunctive Relief; and

h)  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Sound Around demands trial by jury for all issues so triable.

Dated: March 15, 2024                Respectfully submitted,

                                     HOLLAND & KNIGHT LLP

                                     By: */s/ Marisa Marinelli*
                                     31 West 52nd Street
                                     New York, NY 10019
                                     (212) 513-3200
                                     Marisa.Marinelli@hklaw.com
                                     Attorneys for Plaintiff Sound Around, Inc.


                                     Jesus E. Cuza (*PHV to be submitted*)
                                     Florida Bar No. 428991
                                     Email: jesus.cuza@hklaw.com
                                     Rebecca Canamero (*PHV to be submitted*)
                                     Florida Bar No. 86424
                                     Email: rebecca.canamero@hklaw.com

Annelise Del Rivero
Florida Bar No. 1003234 (*PHV to be submitted*)
Email: annelise.delrivero@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 33131