## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SOUND AROUND, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:24-cv-01986 |
| | ) | |
| v. | ) | |
| | ) | |
| MOISES FRIEDMAN, SHULIM ELIEZER | ) | |
| ILOWITZ, ML IMPORTS, INC., CYRF, INC., | ) | |
| LRI GROUP, LLC, EXECUTIVE SERVICES, | ) | |
| EXECUTIVE LAUNDRY, LLC, MDF | ) | |
| MARKETING, INC., WORLD GROUP | ) | |
| IMPORT, LLC, HEFEI PAIDONG OUTDOOR | ) | |
| PRODUCTS CO., LTD., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Sound Around, Inc. ("Sound Around"), pursuant to the Court's June 10, 2025

Order, submits its proposed findings of fact and conclusions of law in support of its Motion for

Preliminary Injunction.

Dated: June 27, 2025

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: /s/ Jesus E. Cuza
Jesus E. Cuza (*PHV*)
Florida Bar No. 428991
Email: jesus.cuza@hklaw.com
Rebecca Canamero (*PHV*)
Florida Bar No. 86424
Email: rebecca.canamero@hklaw.com
Annelise Del Rivero
Florida Bar No. 1003234 (*PHV*)
Email: annelise.delrivero@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 3313131

Marisa Marinelli
West 52nd Street
New York, NY 10019
(212) 513-3200
Marisa.Marinelli@hklaw.com

*Attorneys for Sound Around, Inc.*

In this action, Plaintiff Sound Around Inc. ("Sound Around" or "Plaintiff") sues Defendants Moises Friedman ("Friedman") and Shulim Eliezer Ilowitz ("Ilowitz") (collectively, "Individual Defendants"), former Buyers for Sound Around, and various companies used by Individual Defendants,[1] for claims stemming from Individual Defendants' unlawful conduct relating to a competing business they established while working as Buyers for Sound Around. Sound Around has moved for a preliminary injunction against Individual Defendants that would enjoin them from, among other things, purchasing products and selling them online, using the brands that were created by Individual Defendants during the time they worked for Sound Around, and using Amazon vendor licenses procured using Sound Around's relationships and resources. The motion for preliminary injunction is granted.

## PROCEDURAL HISTORY

Sound Around filed this action on March 15, 2024, and filed its initial motion for preliminary injunction on April 22, 2024. The action was reassigned to this Court on April 11, 2025, and the Court entered an order on April 16, 2025, denying the motion for preliminary injunction without prejudice in light of the reassignment. The present Motion for Preliminary Injunction (the "Motion") was filed on June 27, 2025. On July 18, 2025, Defendants filed their Memorandum of Law in Opposing to the Motion, and Plaintiff filed its reply on July 25, 2025. The following witnesses submitted affidavits in support of the Motion: Jeremiah Brach, Abraham Brach, Jack Tyberg, Ryan Parks, and Mohamed Sadik. The Court held an evidentiary hearing on July 29, 2025. Having considered the evidence, the Court makes the following findings of fact and conclusions of law.

---

[1] These entities, ML Imports, Inc., Cyrf, Inc., LRI Group, LLC, MDF Marketing, Inc., World Group Import, LLC, Executive Services, and Executive Laundry, LLC, are referred to collectively as the ("Corporate Defendants").

## FINDINGS OF FACT[2]

### I. Sound Around's Business

1.    Sound Around was started in 1977 by Zigmond Brach and is currently operated by Brach and his two sons, Jeremiah ("Jerry") and Abraham ("Abe") Brach.  J.Brach ¶

2.    Sound Around's business revolves around sourcing, purchasing and importing products, mostly from China, for resale in the United States and internationally.

3.    Generally, the business involves four phases or stages.  *First*, Sound Around identifies (a) products to purchase for resale and (b) manufacturers that have the expertise and infrastructure to manufacture those products and label them with Sound Around's brands.  *Second*, Sound Around arranges for the products to be shipped, mostly from China, through shippers. *Third*, the products that have arrived at a port in the United States are then transported to warehouses.  *Fourth*, the products are sold online and delivered to each consumer or retailer that purchases a product.

### II. Individual Defendants' Work at Sound Around

#### a. Friedman – Beginning at Sound Around

4.    Friedman, who is Abe Brach's brother-in-law, was hired by Sound Around in 2013. At the time, Friedman was in his early twenties and had very little work experience. J.Brach ¶ 1.

5.    Sound Around initially hired Friedman to work in its warehouse, paying him around $1,000 a week.  *Id.* ¶¶ 20-21.

6.    A few years later, Sound Around transitioned Friedman into a second role, as a Buyer, giving him the opportunity to increase his earnings. *Id.* ¶ 22.

---

[2] Citations herein reference the sworn declarations filed in support of the Motion.  Reference to the Declarations is cited as follows: "[NAME] ¶[#]" (e.g., J.Brach ¶1).

7.    Friedman had never occupied a role like this, so Sound Around provided substantial information and training to Friedman relating to this new role and the strategies and formulas used for pricing and marketing products for Sound Around.  A.Brach ¶ 13.

8.    For example, Sound Around trained Friedman about the use of the Amazon platform, marketing strategies, and pricing strategies that he could use for the products he was in charge of.  *Id.* ¶ 14.

9.    Sound Around initially agreed to pay Friedman 3% of the net revenue of the products he sold for Sound Around for his role as Buyer. At a later point, Sound Around changed its payment method and Friedman was paid 10% of net profits per product based on internal homegrown formulas and calculations for commissions to be paid to Buyers. Sound Around has always followed this approach to calculating commissions. J.Brach ¶¶24-25.

**b.  Friedman – Written Contract**

10.    In mid-2018, Friedman asked for a written agreement (the "Friedman Contract"). memorializing his roles at Sound Around and his compensation structure. *Id.* ¶ 30.

11.    In relation to Friedman's role as Buyer, the Friedman Contract provides that:

Party B has an additional role [the 2 roles are not linked at all, obviously], to serve as buyer for the above mentioned enterprise, one that is known in the business. world as Buyer; on that track, it is his role to hunt and search for all merchandise and goods and the likes, that he see an opportunity to turn a good profit on; this includes both, to buy goods from other merchants, and to manufacture goods from scratch, known as creating a private brand for the enterprise, - and when he finds such goods in either of the aforementioned ways, then he has to take the first step with those merchants, or with the manufacturers, to negotiate with them about the quality of the goods and about the price of the goods, or for manufacturing the goods, it should be for the best price; as well as about shipping the goods.

Party B is responsible for supervise the above-mentioned goods to be presented on internet sites, Amazon, E-Bay and the likes, in a manner that's most ideal to attract clients to interest them to buy the goods. He shall also be in steady contact with other team members in the enterprise who are involved in selling the goods, to see and to hear how one can succeed in selling the goods, and what else can be done to

succeed in selling the goods, such as how to present it, and the price of the goods in general, especially where the is a competitor, as well as to be involved with them with advice and understanding how to sell the goods as soon as possible, for the most profit possible; in any event, the goods shall not remain in the enterprise for more than one year.

Canamero Ex. 1 ¶ 5-6.

12.    The Friedman Contract also contains a non-compete provision:

Party B accepted upon himself in an effective manner not to compete (noncompete) with Party A in the aforementioned enterprise, neither during the hours in which he works as an employee with Party A, nor if he leaves his job either involuntarily or voluntarily, or if he they will terminate him - for 2 years after he leaves the job. The non-compete undertaking includes both, selling goods that Party B brought into the enterprise, or other goods of party A; Party B also obligated himself in an effective manner, not to work as an employee or any other types of work for others in this line of business; and it was stipulated and he committed himself in an effective manner, that in the event he breaches the aforementioned condition and obligation, that he has to pay Party A half the profit he earns from the goods that he obligated himself not to do business with, as outlined above.

*Id.* ¶ 11.

13.    In addition, the Friedman Contract provides the following relating to non-disclosure of confidential information:

Party B obligated himself not to disclose to anyone anywhere any secrets that he has knowledge of, that he heard or observed in business matters, for the entire period of time that he is under the non-compete prohibition. This includes but is not limited to - not disclosing to anyone anywhere the list of customers, or their address and telephone or their emails, the contacts with other firms that do business with the firm, and the manner of operational or financial procedures, etc., etc., in general: anything and any manner that he learned about anything that is related to the enterprise and the business shall remain a tightly-held secret, and he must not disclose it to anyone without exception.

*Id.* ¶ 13.

14.    In performing his duties at Sound Around, Friedman was given discretion in negotiating on behalf of Sound Around with manufacturers for the purchase of products, marketing

the products, and pricing the products and was obligated to act in the company's best interest. *Id.* ¶¶ 33-37.

15.     Under the Friedman Contract, Friedman was also responsible for creating and developing new brands and products for Sound Around. Canamero Ex. 1 ¶ 5.

### c.  Friedman – Commission Payments

16.     When he was initially hired in 2013, Friedman was paid individually and received a W-2 form. Around late 2017, Friedman requested that his commission payments be made to his company, MDF Marketing, Inc. ("MDF"). *Id.* ¶¶ 26-27.

17.     The total commissions paid to MDF are contained in the chart below:

**Total Commissions Paid to MDF Marketing Inc.**

| Year | Amount |
|------|--------|
| 2018 | $ 497,939.86 |
| 2019 | $ 645,995.92 |
| 2020 | $ 1,298,806.24 |
| 2021 | $ 2,150,000.00 |
| 2022 | $ 2,187,000.00 |
| 2023 | $ 1,162,217,67 |
| **Total** | $ 7,941,959.69 |

*Id.* ¶ 29.

### d.  Ilowitz – Beginning at Sound Around

18.     Around late 2018, Jerry Brach was contacted by his personal secretary to ask whether he would consider hiring her brother, Ilowitz. *Id.* ¶ 50.

19.     Ilowitz was 25 years old and had very little work experience at the time. Nonetheless, Sound Around offered Ilowitz a job as a Buyer. *Id.* ¶ 53.

20.     When Ilowitz started to work at Sound Around, he signed Sound Around's Policies and Practices Guide, in which he acknowledged the importance of maintaining the confidentiality of Sound Around's information and agreed to do so.  *Id.* ¶ 56.

21.     Sound Around agreed with Ilowitz that he would start at a salary of approximately $50,000 before transitioning into a full commission-based compensation structure.  *Id.* ¶ 59.

### e.   Ilowitz – Role and Duties

22.     Ilowitz's duties in his job as a Buyer were similar to Friedman's duties in his job as a Buyer.

23.     As with Friedman, Ilowitz was given responsibility and discretion relating to the purchase, marketing, and sale of the products that he was assigned or developed. *Id.* ¶¶ 63-65.

24.     He was also given discretion to negotiate with the manufacturers and vendors as to the pricing and purchase of products for Sound Around. *Id.*

25.     Ilowitz was also expected to work with Sound Around's best interest in mind and safeguard its information.  *Id.*

### f.   Ilowitz – Commission Payments

26.     Similar to Friedman, Ilowitz requested that his commission be paid to what he represented to be his separate company, Executive Laundry, LLC, and later Executive Services. *Id.* ¶ 67.

27.     But in reality, those entities are not owned by Ilowitz.  They are owned by Levi Rottenberg. *Id.* ¶ 68.

28.    The total commissions earned by Ilowitz by year are included in the below chart:

**Total Commissions Paid to Executive Laundry LLC**

| Year | Amount |
|------|--------|
| 2020 | $ 138,000.00 |
| Total | $ 138,000.00 |

**Total Commissions Paid to Executive Services**

| Year | Amount |
|------|--------|
| 2019 | $ 49,000.00 |
| 2020 | $ 219,000.00 |
| 2021 | $ 884,000.00 |
| 2022 | $ 1,378,103.00 |
| 2023 | $ 702,906.00 |
| Total | $ 3,233,009.00 |

*Id.* ¶ 71.

## III.    Individual Defendants' Access to Sound Around's Trade Secret and Confidential Information

### a.    Categories of Information

29.    In their roles as Buyer for Sound Around, Individual Defendants were provided high-level access to Sound Around's business systems and strategies, software, data, and analysis conducted by Sound Around and others for Sound Around — in other words, trade secret and confidential information that not all individuals working for Sound Around can access.  A.Brach ¶¶ 22-51.

30.    For example, throughout their relationship with Sound Around as Buyers, Individual Defendants had unrestricted access to:

- Sound Around's Power BI System, a profit-tracking system that analyzes live data of Sound Around that had been amassed over many years in the business. The Power BI system contains data and analyses compiled by Sound Around, including sales numbers, profit margins, inventory levels by product, sales forecasts, Amazon sales forecasts, product costs, prices sold to retailers, vendor information, and advertising spend by product, among other things. *Id.* ¶¶ 23-28;

- Sound Around's Go Flow System and reports as well as its Consumer Registration Reports, both of which contain information collected over many

years about Sound Around's customers, including their contact information, product preferences and purchase histories. *Id.* ¶¶ 31-32;

- Sound Around's portal or operating system, which provided access to confidential information, including all orders being placed, products being transported, and product sales. *Id.* ¶ 33;

- Sound Around's hard drives and SharePoint files, which contain information on products Sound Around sells, vendor and customer data, marketing and listing information, financial information, and business strategy and work product relating to the listing of products for sale on Amazon and other retailers. *Id.* ¶¶ 34-35;

- Sound Around's vendor accounts on retail platforms (e.g., Amazon and WalMart), which contained access to Sound Around's catalog of products, sales information, listings and images for each product, SKU counts and other information. *Id.* ¶¶ 46-49; J.Brach ¶ 43;

- Sound Around's list of vendors, manufacturers, and e-commerce companies. J.Brach ¶¶ 47-48;

- Sound Around's performance reports on advertising and additional advertising data, including how much Sound Around was offering as a "Pay Per Click" bid to Amazon for any particular product at any given time. A.Brach ¶¶ 40, 43;

- Sound Around's inventory reports and information, allowing them to assess not only which products were performing well, but also whether Sound Around was saturated with inventory for a particular product or not. *Id.* ¶¶ 44-45;

- Additional confidential information provided on a weekly and monthly basis, including reports from Amazon regarding top performing items sold by Sound Around for periods of time, and average sales prices and profits (PPM). *Id.* ¶¶ 38-39.

31.    This information would be very valuable to a competitor (to Sound Around's detriment), who would benefit from having intimate knowledge of Sound Around's most profitable products, the best pricing formulas for each product, and consumer demand for products, among other things. *Id.* ¶¶ 25, 45, 48.

32.    With this information, Sound Around's competitors would be able to, among other things, (1) duplicate and use Sound Around's business methodology (including its pricing

strategies) and (2) evaluate demand for products, anticipate Sound Around's pricing strategies for products based on up-to-date inventory levels, and strategically tailor their own purchasing and marketing decisions to undercut Sound Around's pricing and advertising bids and ensure that their competing products would gain prominence over Sound Around's.  *Id.*

IV.    **Sound Around's Measures to Protect Confidential Information**

33.    Individual Defendants were made aware of and agreed to maintain the confidentiality of Sound Around's materials.  *Id.* ¶ 18; J.Brach ¶ 45.

34.    Sound Around uses a variety of measures to ensure that its business information is protected and can only be accessed by those individuals with specific authorization from the company.  Sadik ¶¶ 6-22.

35.    For starters, Sound Around employs firewalls to protect its network and the information contained thereon.  *Id.* ¶ 22.

36.    In order for someone to access Sound Around's system, software, and information, Sound Around requires the use of passwords and permission from the IT Department which uses role-based permissions providing various levels of access to individuals depending on their role. *Id.* ¶¶ 7-14.

37.    There is also certain software that requires higher levels of approval, such as Sound Around's Power BI system.  *Id.*

38.    Sound Around also uses protected sites to transmit information to individuals outside the company, who must be granted explicit permission to access the information. *Id.* ¶ 19.

V.    **Individual Defendants' Creation and Operation of a Competing Business using Sound Around's Resources and Information**

39.    Unbeknownst to Sound Around, Individual Defendants were using Sound Around's information and resources to create and develop a clandestine competing business from within

Sound Around.  Individual Defendants admitted that they were operating this business for years while working as Buyers for Sound Around.

40.    Like Sound Around's business, Individual Defendants' business involves four phases or stages.  *First*, they identify (a) products to purchase for resale and (b) manufacturers that have the expertise and infrastructure to manufacture those products and label them with Individual Defendants' brands.  *Second*, Individual Defendants arrange for the products to be shipped, mostly from China, through shippers.  *Third*, the products that have arrived at a port in the United States are then transported to warehouses.  *Fourth*, the products are sold online and delivered to each consumer or retailer that purchases a product.

### a. Creation and Early Steps

41.    As early as January 2022, Individual Defendants created new brand names, including Bakken-Swiss, BakkenMaster, LifeMaster, RunMaster, TopMaster, ProMaster and HighMaster to compete with Sound Around.[3] J.Brach ¶ 102; Canamero Ex. 2.

42.    During this time, Individual Defendants used Sound Around's vendor list, containing many vendors with whom Sound Around has established close working relationships over its years in business for their business.   J.Brach ¶¶ 110-115.

43.    For example, Individual Defendants were contacting Sound Around's manufacturers using their Sound Around email addresses and, at times, referencing Sound Around's established brands (e.g., Serene Life and Nutrichef), giving the impression that they were purchasing these products on Sound Around's behalf. *Id.*

---

[3] Individual Defendants have also since created additional brands Campior, Outdoor Cruiser, Emporio Kitchen, Dribbl, and Dave and Diana, which they use to sell their products online. J.Brach ¶ 104; Canamero Ex. 2.

44.     Several vendors confirmed that they believed the products Individual Defendants were purchasing for their competing business were actually being purchased on behalf of Sound Around. *Id.*

### b.  Procurement of Vendor Licenses

45.     Individual Defendants reached out to Amazon and WalMart, two online retailers with whom Sound Around had an established relationship in an effort to procure licenses for their business to sell on these e-commerce vendors' platforms. A.Brach ¶¶ 68-78.

46.     Specifically, in 2022, using his Sound Around email address and signature block, Ilowitz emailed and called an individual at Amazon with whom Sound Around had a longstanding relationship asking to obtain a new "Vendor Central" account,[4] which he claimed was needed for kitchen products line. *Id.* ¶¶ 69-74.  Amazon issued the new Vendor Central license, which was registered with Defendant LRI Group, LLC, a company owned by the Individual Defendants.

47.     Subsequently, Individual Defendants used the relationship with the Amazon representative to obtain an additional Amazon vendor central license, which they then registered with another entity owned by Individual Defendants, World Group Imports.  *Id.* ¶ 78.

48.     Ilowitz attempted to do the same with WalMart in December 2022 and, again using his Sound Around email address and signature block, contacted an individual at WalMart with whom Sound Around had a relationship, requesting the issuance of a new DSV vendor license from that retailer.  *Id.* ¶¶ 76-77.

### c.  Operation of the Business

---

[4] A Vendor Central account allows a seller to create a direct relationship between Amazon and the vendor, making the license-holder's business much more profitable than it could otherwise be. This is because it allows a company to sell directly to Amazon. *Id.* ¶ 71.

49.     Ilowitz and Friedman purchased from Chinese manufacturers working with Sound Around identical or nearly identical products to those being purchased by Sound Around. *J.Brach* ¶ 116.

50.     As just some examples, they purchased (1)  portable air conditioners to sell using their LifeMaster brand from Sound Around's vendor Yoau, which is the same vendor from whom Friedman purchased air conditioners for Sound Around; (2) bakeware products from CnCooktone, the same vendor from which Sound Around purchases bakeware sets; and (3) identical children's scooters from Fulaitai, again,  the same vendor from whom Sound Around purchased its children's scooters. *Id.* ¶¶ 118-120.

51.     Individual Defendants were consistently pricing their products lower than the prices they caused or allowed for Sound Around's products. *Id.* ¶¶ 121-122.

### VI.    Individual Defendants' Steps to Conceal their Business

52.     Ilowitz and Friedman went to great measures to conceal their business from Sound Around. *Id.* ¶¶ 132-136.

53.     In order to hide their conversations with manufacturers, Individual Defendants directed communications from vendors to a separate "WeChat" platform outside of the Sound Around email servers.  *Id.* ¶ 133

54.     Individual Defendants also used aliases—such as Sol Green (for Ilowitz) and Moshe Freund (for Friedman)—to conceal their true identities when communicating regarding their competing business.  *Id.* ¶ 134-135.

### VII.    Sound Around's Investigation and Individual Defendants' Lies

55.     Because of the steps taken above, Individual Defendants were able to hide their business for years from Sound Around.

56.    Nonetheless, when it became apparent to Sound Around that a competitor company was using Sound Around's information and even trademarks, it began to conduct an investigation regarding that company. *Id.* ¶ 72.    Sound Around involved Individual Defendants in that investigation, unaware that the competing business operation it was investigating was operated by them. *Id.* ¶¶ 73-86.

57.    For example, in early January, Sound Around copied Ilowitz on emails with pictures of products being sold by a LifeMaster brand, but which contained Sound Around's "Pyle" and "SCOOTKID" trademarks and a QR code that led back to Sound Around's registration system. *Id.* ¶¶ 73-80.

58.    In response, Ilowitz did not reveal that the LifeMaster brand was his and Friedman's company. *Id.*  Instead, he claimed that the company was operated by an individual Friedman had identified previously.  *Id.*

59.    Shortly thereafter, on January 30, 2024, Ilowitz resigned from his role as Buyer at Sound Around — but not without first emailing to his personal email Sound Around's confidential information.  *Id.* ¶ 81.

60.    After his resignation, Jerry and Abe Brach became suspicious of Ilowitz and began to review his emails at Sound Around, uncovering for the first time that Ilowitz was behind the competing business that had been operating for years. Some of these emails revealed (also for the first time) Friedman's involvement.  *Id.* ¶¶ 82-85.  As a result, Friedman was terminated in a matter of days, on February 3, 2024.  *Id.* ¶ 89.

**VIII.   Individual Defendants' Stealing of Information Prior to their Departure**

61.     As reflected by his emails, there is evidence that leading up to his resignation, Ilowitz began emailing himself, downloading, and otherwise acquiring a variety of Sound Around's confidential information in preparation for his departure.  *Id.* ¶ 129; A.Brach ¶31-32.

62.     The information he sent to himself or downloaded included, among other things, Power BI reports, Customer Registration spreadsheets, and advertising analytics.  *Id.* ¶ 129; A.Brach ¶31-32.

63.     Ilowitz also asked a Sound Around employee to provide instructional videos relating to Sound Around's process for uploading listings to online retailers. A.Brach ¶ 52.

64.     In addition, Ilowitz took his hard drive with him when he left Sound Around with Sound Around's confidential information. *Id.* ¶ 37.

**IX.     Individual Defendants Demand for and Receipt of Millions of Dollars in Kickbacks and Bribes**

65.     Not only were Individual Defendants operating the competing business for years from within Sound Around, but they also demanded and received more than three million dollars in commercial bribes and kickbacks from Sound Around's manufacturers in China.  J.Brach ¶¶ 137-155.

66.     The evidence—including bank records—shows that beginning in 2020, both Ilowitz and Friedman were receiving payments from China in relation to orders they were placing for Sound Around. *Id.* ¶ 155.

67.     Several vendors have admitted paying 3-5% of Sound Around's total orders to Ilowitz and Friedman after being threatened that without such payments, the orders on behalf of Sound Around would not be placed.  *Id.* ¶¶ 140-148.

68.     The evidence to date demonstrates that the kickbacks to Friedman were paid to MDF and that the kickbacks to Ilowitz were paid to the Defendant Executive Laundry, owned by

Levi Rottenberg, or to a separate non-profit entity, Congregation Kozover, also controlled by Levi Rottenberg.

69.    Approximations of the total amounts of kickbacks/bribes (known to date) are contained in the chart below:

| | 2020 | 2021 | 2022 | 2023 | 2024 | Dates Unknown | Total |
|---|---|---|---|---|---|---|---|
| **Friedman** | $462,505 | $845,749 | $529,753 | $763,892 | $174,629 | | **$2,776,527** |
| **Ilowitz** | $119,535 | $236,946 | $351,298 | $283,154 | $7,993 | $26,675 | **$1,025,601** |
| | | | | | | | *$3,802,128* |

*Id.* ¶ 155.

70.    As a result of the kickbacks, vendors raised the prices being charged to Sound Around. Now that these vendors no longer have to pay kickbacks to Individual Defendants, several vendors have now significantly lowered the prices charged to Sound Around.  *Id.* ¶¶ 156-163.

71.    Other vendors have informed Sound Around that they stopped shipping products to Sound Around when Ilowitz halted all orders based on its refusal to send him kickbacks.

## CONCLUSIONS OF LAW

A party seeking to obtain a preliminary injunction, must show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Citigroup Global Mkts., Inc. v. VCG Special Opports. Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original).  Importantly, "[h]earsay evidence may be considered in deciding a motion for a preliminary injunction."  *Barturen v. Wild Edibles, Inc*., No. 07 Civ. 8127(LLS), 2007 WL 4468656, at *3 n.5 (S.D.N.Y. Dec. 18, 2007).

I.    **Sound Around is entitled to an injunction enforcing the restrictive covenant in the Friedman Contract.**

A.    ***Sound Around has established a Likelihood of Success on its Breach of Restrictive Covenant by Friedman.***

Sound Around has presented sufficient evidence to demonstrate that it is likely to succeed on its breach of contract claim against Friedman relating to the noncompete restrictive covenant. *Serv. Sys. Corp. v. Harris*, 41 A.D. 2d 20, 23 (4th Dep't 1973) ("Employers should be afforded reasonable protection from the pirating of their business by disloyal employees who agree by contract to refrain from such unfair activities.").

1.    **The Applicable Contract**

Friedman entered a written contract in which he agreed, among other things:

[N]ot to compete (noncompete) with [Sound Around] . . . neither during the hours in which he works as an employee with [Sound Around], nor if he leaves his job either involuntarily or voluntarily, or if he they will terminate him - *for 2 years after he leaves the job*.  The non-compete undertaking includes both, selling goods that [Friedman] brought into the enterprise, or other goods of [Sound Around]; [Friedman] also obligated himself in an effective manner, not to work as an employee or any other types of work for others in this line of business.

Friedman breached that agreement *years before he left Sound Around* when he formed a competitor of Sound Around from within its walls in 2022**,** with full access and visibility (in real time) into every step, analysis, and strategy being taken by Sound Around at all times. Not only was Friedman operating in the same "line of business" as Sound Around, he also copied and duplicated Sound Around's exact business to sell products and brands for his own gain. There is substantial evidence supporting that Friedman breached (and continues to breach) the non-compete provision.

2.    **Enforceability of the Restriction**

The non-compete provision sets forth a 2-year temporal scope and does not have a geographic restriction. In light of the specific facts of this case, the scope of the non-compete is

16

reasonable under New York law and the provision is, therefore, enforceable. *See JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 106 (2d Cir. 2024) ("[A] restrictive covenant will . . . be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.") (affirming district court preliminary injunction order enforcing non-compete provision).

*First,* the unlimited geographic restriction in the Friedman Contract is reasonable because Sound Around sells products nationwide and internationally through online retailers. Covenants of broad or unlimited geographic scope are routinely upheld where the employer operates a national or international business. *See Bus. Intel. Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984) (upholding covenant with unlimited geographic scope in view of international nature of plaintiff's business); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs.,* 871 F. Supp. 709, 728 (S.D.N.Y. 1995) (covenant preventing competition anywhere in United States reasonable in light of national scope of business); *MasterCard Int'l Inc. v. Nike, Inc*., 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) ("where an employer's business is conducted worldwide to a global customer base, the lack of a geographic restriction is necessary") (citation omitted).

*Second,* the 2-year temporal scope of the Friedman Contract is also reasonable and enforceable because courts frequently uphold covenants not to compete for at least two years in duration. *See Gelder Med. Grp. v. Webber,* 363 N.Y.2d 680, 685 (N.Y. Ct. App. 1977) (5-year non-compete reasonable); *Albany Med. Coll. v. Lobel*, 745 N.Y.S. 2d 250, 252 (N.Y. App. Div. 2002) (5-year non-compete reasonable); *Alside Div. of Assoc. Material, Inc. v. Leclair*, 743 N.Y.S.2d 898, 899 (3d Dep't 2002) (2-year non-compete/ nondisclosure covenant reasonable).

Because Friedman's violations of the non-compete are apparent from the record, the Court

finds a likelihood of success on Sound Around's breach of contract (restrictive covenant) claims against Friedman. *See Devos, Ltd. v. Record*, No. 15-cv-6916, 2015 WL 9593616, at *8 (E.D.N.Y. Dec. 24, 2015) (finding a breach of a restrictive covenant where the fact of the defendant's competition was virtually undisputed and noting "[t]he Defendants do not dispute that they are competing with Devos. Nor do the Defendants dispute that they are soliciting business from customers of Devos." … "The Defendants do not dispute that they are engaged in the conduct that forms the basis of the Plaintiff's breach of contract claim.").

### B. Sound Around is likely to suffer irreparable harm if the relief is not granted.

"[I]t has consistently been held that the loss resulting from a party's breach of a restrictive covenant is not easily quantifiable by money damages and is, therefore, protectable by a preliminary injunction." *Devos, Ltd.*, 2015 WL 9593616, at *8. "Generally, when a party violates a [reasonable] non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm for purposes of imposing a preliminary injunction." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc*., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004); *see also Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.,* No. 1:24-CV-9914-MKV, 2025 WL 304500, at *5 (S.D.N.Y. Jan. 27, 2025) ("[I]t is very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."). Indeed, "[i]n cases such as this, involving a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it appropriate to presume the existence of such an injury." *Glob. Switching Inc. v. Kasper*, No. CV 06 412(CPS), 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006) (granting preliminary injunction to enforce restrictive

covenant finding plaintiff demonstrated that employee "possesses confidential pricing information about [] customers which can and has been used to undercut [plaintiff's] pricing in order to solicit customers to [] competitor"). Courts enforcing non-compete covenants, including the Second Circuit, have stated that "[t]hreatened dissemination of trade secrets generally creates a presumption of irreparable harm." *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) (affirming district court's grant of an injunction and conclusion that defendant breached a non-compete).

The Court finds that there is substantial, irrefutable evidence of Friedman's creation and operation of a competing business for years while working for Sound Around and thereafter in contravention of this non-compete, facilitated by the misappropriation of trade secrets and confidential information in the record. This, alone, is sufficient to establish irreparable harm to Sound Around.

Moreover, Individual Defendants' conduct is putting Sound Around's goodwill and business reputation at risk, including in Sound Around's relationships with its vendors and manufacturers that have been built up over years, which is not monetarily ascertainable. Sound Around's relationships with certain of its manufacturers have already been, and will continue to be, affected, including those whose products have been siphoned off to Individual Defendants' competing business and those who have done business with Individual Defendants believing their business is associated with Sound Around. There is also a high chance that Individual Defendants may interfere with or affect Sound Around's relationships with its customers, as it is undisputed that Individual Defendants downloaded spreadsheets with Sound Around's customer information and preferences just days prior to their departure from Sound Around, which contains those customers' contact information.

Sound Around's irreparable harm is established and supported by the facts, warranting a preliminary injunction. *See IDG USA, LLC*, 416 F. App'x at 88 (affirming district court's grant of an injunction and conclusion that defendant breached a non-compete because "immediately after he left IDG, Schupp began working nearby for one of IDG's competitors, soliciting IDG's clients, and disclosing IDG's confidential information. This evidence is sufficient to reasonably conclude that Schupp violated the non-compete…").

### C. Scope of Relief Granted

Based on the foregoing, the Court hereby enjoins Friedman, and every entity or individual acting in concert with Friedman, from operating in the same line of business as Sound Around, including the existing competing businesses. *See, e.g., Inflight Newspapers, Inc. v. Mags. In-Flight, LLC*, 990 F. Supp. 119, 123 (E.D.N.Y. 1997) (enjoining named defendants "and their agents, employees, attorneys or successors or anyone in active concert or participation with them who shall receive actual notice" from operating same line of business as former employer).

II.    **Sound Around is entitled to an injunction based on its claim for Diversion of Corporate Opportunities.**

A.    ***Sound Around has established a Likelihood of Success on its claim for Diversion of Corporate Opportunity.***

The corporate-opportunity doctrine provides that "corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca*, LLC, No. 13 Civ. 4650, 2015 WL 7078641, *4 (S.D.N.Y. Nov. 12, 2015). "A corporate opportunity may be shown where the party has an 'interest' or 'tangible expectancy' in the opportunity, which is something 'more certain than a 'desire' or a 'hope.'" *Altman Stage Lighting Inc., v. Smith*, No. 20 CV 2575 (NSR), 2022 WL 374590, at *8 (S.D.N.Y. Feb. 8, 2022). "The Second Circuit has stated the doctrine prevents employees from acquiring property which the corporation needs or is

seeking, or which they are otherwise under a duty to the corporation to acquire for it." *Id.*  In addition to showing that a corporate opportunity exists [], a plaintiff asserting a claim for usurpation must [] show that the defendant took that opportunity for himself." *Le Metier*, 2015 WL 7078641 at *4.

The evidence in the record demonstrates that Defendants wrongfully diverted Sound Around's business, usurping corporate opportunities by, among other things, soliciting and developing products from manufacturers and vendors (including those being used by Sound Around) for their own competing business while working for Sound Around as Buyers; and developing brands under which to sell products and registering them (in secret) to themselves or entities they own or control while working for Sound Around.  Individual Defendants used at least twelve brands currently in their competing business, at least six of which (BakkenMaster, Bakken-Swiss, Lifemaster, Highmaster, Runmaster, Promaster, and TopMaster) were created and registered during the time they worked for Sound Around.

In addition, the evidence shows Individual Defendants used Sound Around's resources, email addresses and company name to solicit and obtain vendor licenses from some of Sound Around's online retailers, such as Amazon.  For example, in 2022 Individual Defendants capitalized on Sound Around's contacts at Amazon (with whom Sound Around had an existing relationship and channel of communication not available to the general public), using Sound Around's email server and signature block, to procure a vendor license for their competing business (although purportedly being sought for Sound Around).  Since shortly thereafter in 2022, Individual Defendants have been uninterruptedly selling products using that license—years before their relationship as Buyers of Sound Around ended in early 2024.

The record contains testimony establishing that Individual Defendants' obligation as

Buyers for Sound Around was to source products and develop brands for Sound Around. Thus, every product and brand developed by Individual Defendants during the time they were working as Buyers for Sound Around should have been presented to Sound Around. Yet, Individual Defendants instead unlawfully diverted those products and brands and usurped those business opportunities for themselves. *See Altman Stage Lighting, Inc.*, 2022 WL 374590, at *8 (corporate opportunity doctrine "prevents employees from acquiring property which the corporation needs or is seeking, or which they are otherwise under a duty to the corporation to acquire for it."). Thus, the Court concludes Sound Around is likely to succeed on its claim for diversion of corporate opportunity against Defendants.

### B. Sound Around is likely to suffer irreparable harm if the relief is not granted.

It is well-established that the loss of business opportunities constitutes irreparable harm. *ADP, LLC v. Olson*, No. CV2003312KMJBC, 2020 WL 6305554, at *12 (D.N.J. Oct. 28, 2020) (recognizing that courts "have had no difficulty in finding that the loss of business opportunities and goodwill constitutes irreparable harm" and noting that "there is overlap between [plaintiff and defendant's] lines of business); *Automated Merch. Sys., Inc. v. Crane Co*., No. 3:08-CV-97, 2008 WL 11383753, at *14 (N.D.W. Va. Dec. 2, 2008) (finding irreparable harm where "plaintiff has shown that it will suffer a loss of market opportunities as consumers are diverted from its products to defendant's products"); *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co*., 414 F.3d 700, 704 (7th Cir. 2005) (affirming grant of preliminary injunction, noting that "[b]ecause the value of the diverted sales and lost opportunities would have been impossible to track, the plaintiff would have suffered irreparable harm without an injunction"); *see also Celsis In Vitro, Inc. v. CellzDirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012) (commenting that "price erosion"; "loss of customer good will (*e.g.*, when an effort is later made to restore the original price)"; and

"loss of business opportunities" constitute irreparable harm that there is "no effective way to measure").

The Court concludes that the usurpation by Individual Defendants of brands, products, and vendor licenses that should have been presented to Sound Around has resulted in the loss of business opportunities to Sound Around. The Court also concludes Sound Around has suffered, and will continue to suffer, unquantifiable harm as a result of Individual Defendants (1) selling products and brands rightfully belonging to Sound Around, and (2) using vendor licenses that also rightfully belong to Sound Around  There is no way to measure the loss of sales or potential growth Sound Around could have had but for the diversion of these opportunities.

The Court further concludes that because the usurped opportunities constitute property rightfully belonging to Sound Around, there is a high likelihood that Sound Around will be entitled to a constructive trust over that property.  *See Poling Transp. Corp. v. A & P Tanker Corp*., 84 A.D.2d 796, 797, 895, 897 (2d Dep't. 1981) ("If plaintiff can establish a diversion of corporate opportunity, the law will impress a constructive trust in favor of the corporation upon the property acquired."); *see also Kraus USA, Inc. v. Magarik*, No. 17-CV-6541 (ER), 2020 WL 2415670, at *13 (S.D.N.Y. May 12, 2020) (noting the usurped corporate opportunity "constitutes property in which [company] has an interest").

Here, the products, brands, and vendor license in the possession or control of Individual Defendants rightfully belong to Sound Around.  Yet without the relief requested, Individual Defendants' control over and use of those brands during the pendency of litigation may prevent Sound Around from any meaningful relief—i.e., constructive trust—at the conclusion of the case because those products and brands may be rendered worthless as a result of Individual Defendants' actions. *See Poling*, 84 A.D.2d at 797 ("The failure to grant the motion [enjoining the defendant

from transferring property rightfully belonging to employer] would prevent the court from utilizing the typical remedy in a corporate opportunity suit, i.e., the constructive trust. Additionally, we believe that denial of the motion would be inconsistent with the purposes of this doctrine, namely, to prevent a breach of trust, and to restore to the corporation property which rightfully should belong to it.").

For these reasons, the Court finds that Sound Around has established irreparable harm as a result of Individual Defendants' diversion of corporate opportunities.

### C. Scope of Relief Granted

Based on the foregoing, the Court will enjoin Individual Defendants, and any entities or individuals acting in concert with Individual Defendants, from (a) selling products online that were developed during the time they worked for Sound Around; (b) using the brands that were created by Individual Defendants and their entities during the time Individual Defendants worked for Sound Around; and (c) its Amazon vendor licenses.

### III. Sound Around is entitled to an injunction based on its claims for Misappropriation of Trades Secrets and Confidential Information.

### A. Sound Around has established a Likelihood of Success on its claims for Misappropriation of Trade Secrets and Confidential Information.

"To prevail on a claim for misappropriation of trade secrets a plaintiff must prove that 1) it possesses a trade secret and 2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 208 (N.D.N.Y. 2011). Similarly, to prevail on its claim for trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA"), a plaintiff must prove that "(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Democratic Nat'l Comm. v. Russian Fed.*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019). And "[t]o state a claim for misappropriation of confidential information, a plaintiff must allege the defendant

used the plaintiff's confidential information for the purpose of securing a competitive advantage."

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343 at 352 (S.D.N.Y. 2010).

### 1. Defendants Possessed Sound Around's Trade Secrets and Confidential Information

Under New York law, a trade secret has been defined as "any pattern, formula, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 201 (W.D.N.Y. 2020).[5] Courts in New York and within the Second Circuit have defined the kinds of information which constitute trade secrets. For instance, a company's confidential proprietary data relating to pricing, costs, systems, and methods are trade secrets. *See, e.g.*, *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 340 (E.D.N.Y. 2020) (quoting *Jasco Tools, Inc. v. Dana Corp.* ("In re Dana Corp."), 574 F.3d 129, 152 (2d Cir. 2009)).

Customer lists and pricing information are also considered trade secrets. *Id.*; *Kraus USA,*

---

[5] "The DTSA defines 'trade secret' to include 'all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,' so long as: (1) 'the owner thereof has taken reasonable measures to keep such information secret' and (2) 'the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023). The evidence shows that Sound Around uses reasonable efforts to maintain the secrecy of its trade secrets, including by maintaining password-protected networks and systems, requiring confidentiality provisions be signed by employees, and promptly terminating employee access once terminated. *See Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 380 (N.D.N.Y. 2021) ("Courts in this Circuit generally look to whether confidentiality or nondisclosure agreements are in place and whether the information is guarded by physical- or cyber-security protections."); *Better Holdco*, 666 F. Supp. 3d at 386–87 (looking to the requirement that employees sign agreements regarding non-disclosure of information as well as "prompt termination of employee access" following termination to support reasonable measures").

*Inc. v. Magarik*, 2020 WL 2415670, at *1 (S.D.N.Y. May 12, 2020) (noting "customer lists and pricing information have traditionally been considered trade secrets"); *see also Continental Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40-41 (2d Cir. 2019) (customer and supplier lists and pricing and payment terms are "routinely afforded trade secret protection").

Similarly, business strategies, advertising data analytics, customer preferences, and vendor relationships are also trade secrets. *Id.*; *Helio Logistics, Inc. v. Mehta*, 2023 WL 1517687, at *4 (S.D.N.Y. Feb. 3, 2023); *Kraus USA, Inc.*, 2020 WL 2415670, at *1; *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039 (S.D.N.Y. 1987) ("There is little doubt that information which McCaw learned while employed at Webcraft concerning customer preferences and Webcraft's pricing is protectible.").

Through their employment, Individual Defendants obtained knowledge about each category of trade secrets of the company noted above. Individual Defendants had access to Sound Around's proprietary profit-tracking systems (*i.e,* Power BI) and data generated by those systems, proprietary pricing software, pricing strategies, vendor relationships, customer lists and purchasing patterns, listing processes and business strategies, marketing strategies, and other nonpublic financial and strategic details.

### 2. Defendants Misappropriated Sound Around's Trade Secrets and Confidential Information.

The evidence is also clear that Individual Defendants accessed and used Sound Around's trade secrets and confidential information when: (1) creating their competing business, (2) operating their competing business for years during the time they worked at Sound Around, and (3) operating their competing business even after their departure from Sound Around. Individual Defendants used their knowledge of and access to Sound Around's information and trade secrets to build a replica of Sound Around's business—a business that but for Sound Around's

information and what they learned at Sound Around, they would not have been able to create.

*First,* the evidence showed Individual Defendants developed their competing business using their knowledge of Sound Around's business structure, software, data compilation, analyses, vendor and retailer relationships, and inner workings. *See Marcone APW, LLC v. Servall Co.*, 85 A.D.3d 1693, 1696 (4th Dep't 2011) (finding defendants misappropriated "virtually all of [plaintiff]'s customer information" and utilized that information to establish a competing business in the northeastern United States).

*Second,* and while still at Sound Around, Individual Defendants continued to operate their business with live access to Sound Around's systems, sales data, sales forecasts, order history, and inventory levels and with the benefit of Sound Around's vendors and retailer relationships.

*Finally*, even after their departure from Sound Around, Individual Defendants continue to operate their business using Sound Around's confidential information and trade secrets. Individual Defendants' business incorporates and uses Sound Around's business strategies, processes, data, know-how, analyses, formulas, and software on a daily basis. Therefore, even after their departure from Sound Around, Sound Around is still in the predicament of "a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995); *see also Lumex, Inc. v. Highsmith,* 919 F. Supp. 624 (E.D.N.Y.1996) (finding risk of inevitable disclosure based on, among other things, the employee's access to highly sensitive information concerning manufacturing costs, pricing structure and new products, plus the fact that the industry in question was a "copy cat" or "cloning industry"). Individual Defendants are direct competitors of Sound Around, providing the same or similar products, occupying nearly identical positions to that of Buyers in Sound Around, and they "cannot eradicate [Sound Around's] secrets from [their] mind." *DoubleClick Inc. v. Henderson*,

No. 116914/97, 1997 WL 731413, at *5 (N.Y. Sup. Ct. Nov. 7, 1997) ("Injunctive relief may issue where a former employee's new job function will inevitably lead her to rely on trade secrets belonging to a former employer."); *Juniper Ent., Inc. v. Calderhead*, No. CV072413ADSAKT, 2007 WL 9723385, at *27 (E.D.N.Y. Aug. 17, 2007) (applying inevitable disclosure doctrine to essentially "bind the employee to an implied-in-fact restrictive covenant" where the employee is working for a direct competitor of his former employer, performing the same job functions, and had access to highly confidential or technical knowledge concerning manufacturing processes, marketing strategies or the like.).

The Court therefore finds that Sound Around has established a likelihood of success on the merits on its misappropriation of trade secrets and confidential information claims against Individual Defendants. *See Intertek Testing Servs., N.A., Inc.,* 443 F. Supp. 3d at 303 (finding likelihood of success on the merits where defendant forwarded plaintiff's trade secrets and confidential information to his personal email account shortly before and after tendering his resignation, and used the information, without plaintiff's consent, after commencing employment with plaintiff's competitor in an attempt to solicit plaintiff's client); *Helio Logistics, Inc.*, 2023 WL 1517687, at *4 (finding likelihood of success on the merits where defendants obtained trade secrets and used them to start a competing business); *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039 (S.D.N.Y. 1987) (finding likelihood of success on the merits where Defendant "converted information which Webcraft considers confidential, including the identity of Webcraft's customers and prospects; the identity of Webcraft's contact person at each customer or prospect; customer preferences with respect to printed products and promotions; and knowledge of Webcraft's prices and pricing methods.").

### B. Sound Around is likely to suffer irreparable harm if injunctive relief is not granted.

Courts have held that "[i]rreparable harm is presumed, where, as here, trade secrets have

been misappropriated." *DoubleClick Inc.* , 1997 WL 731413, at *7; *IDG USA, LLC v. Schupp,* 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."); *Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009) ("the loss of trade secrets cannot be measured in money damages where that secret, once lost, is 'lost forever.'"); *ExpertConnect, LLC v. Parmar*, 773 F. App'x 651, 653 (2d Cir. 2019) ("[T]he District Court [is] entitled to infer that the Defendants' use and disclosure of trade secrets would have serious reputational harm for [plaintiff] absent an injunction, and that it would be exceedingly hard to calculate the loss of good will and reputation at trial."); *Intertek Testing Servs., N.A., Inc.,* 443 F. Supp. 3d at 303 ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm.").

The Court concludes that Individual Defendants' access to and misappropriation of Sound Around's trade secrets and confidential information—including, among other things, its vendor lists, pricing formulae, and sales and product information—will place Sound Around at a competitive disadvantage that a legal remedy could not redress. *Marcone*, 85 A.D.3d 1693, 1696 ("While the loss of sales over a finite period of time can be calculated and adequately remedied by an award of monetary damages…the court properly determined that, without the expanded preliminary injunction, plaintiff 'would likely sustain a loss of business impossible, or very difficult, to quantify'"); *Intertek Testing Servs., N.A., Inc.,* 443 F. Supp. 3d at 303 (dissemination of trade secrets to competitor is sufficient to show a likelihood of irreparable harm absent a preliminary injunction.).

Indeed, as the Court noted above, Individual Defendants *are* Sound Around's competitor, have built their entire business using Sound Around's confidential and proprietary information and

trade secrets, and have already used the knowledge of Sound Around's information and trade secrets against Sound Around. "[T]he actual use of [Sound Around's] trade secrets" and Individual Defendants' clandestine and deceitful conduct while at Sound Around "demonstrate [their] cavalier attitude toward their duties to their former employer…giv[ing] rise to a reasonable inference that they would use [Sound Around's] confidential information against it." *DoubleClick Inc.*, 1997 WL 731413, at *7 (finding irreparable harm where "plaintiff has demonstrated that [former employees] have no compunction against using [plaintiff's] business information to compete against it. The damage that could be inflicted upon [plaintiff] by defendants' exploitation of their intimate knowledge of [plaintiff's] proprietary information is impossible to quantify in dollar terms."). Under such circumstances and pursuant to what is known as the "inevitable disclosure doctrine" courts have found it appropriate to enforce a restrictive covenant— even in the absence of non-compete agreements. *Id.* at *4-5 ("As employees of DoubleClick defendants owed their employer a duty not to divulge confidential information, therefore it is not necessary to determine the viability of the confidentiality agreements and [] covenant not to compete. . . Even in the absence of a contract restriction, a former employee is not entitled to solicit customers by fraudulent means, the use of trade secrets, or confidential information.").

### C. Scope of Relief Granted

This is a situation where "even assuming the best of good faith, it is doubtful whether the defendant[s] could completely divorce [their] knowledge of the trade secrets from any . . . work [they] might engage in." *Juniper*, 2007 WL 9723385. Individual Defendants' past conduct undermines any assumption that they are acting or will act in good faith. Allowing them to operate any aspect of their business during the pendency of this proceeding will undoubtedly result in inevitable disclosure of trade secrets and irreparable harm. Accordingly, based on Individual Defendants' misappropriation of trade secrets and the inevitable disclosure doctrine, the Court will

enjoin Individual Defendants, and any entities or individuals acting in concert with them, from operating in the same line of business as Sound Around (*i.e.*, purchasing products from China and selling on online platforms) during the pendency of this case. *See Props for Today, Inc. v. Kaplan*, 163 A.D.2d 177, 558 N.Y.S.2d 38 (1st Dep't 1990) (granting preliminary injunction against employees who organized competing business while still employed by plaintiff to the extent of enjoining defendants from soliciting any of plaintiff's customers or placing orders with any of plaintiff's suppliers, notwithstanding that former employee who initiated a competitive business had not signed a non-competition agreement).

Done and ordered in New York, New York, on _____, 2025.

_____
Denise L. Cote
United States District Judge