**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————X

SOUND AROUND, INC.,                 :

                                       :

                     Plaintiff,    :      Case No.: 1:24-cv-01986

                                       :

     v.                             :

                                       :

MOISES FRIEDMAN, SHULIM ELIEZER   :      **DEFENDANTS' RESPONSE TO**

ILOWITZ, ML IMPORTS, INC., CYRF, INC.,   :      **PLAINTIFF'S STATEMENT**

LRI GROUP, LLC, EXECUTIVE SERVICES,   :      **<u>OF MATERIAL FACTS</u>**

EXECUTIVE LAUNDRY, LLC, MDF           :

MARKETING, INC., WORLD GROUP         :

IMPORT, LLC, HEFEI PAIDONG OUTDOOR   :

PRODUCTS CO., LTD.,                    :

                                       :

                   Defendants.   :

————————————————————————X

      Pursuant to Local Rule 56.1(b), Defendants MOISES FRIEDMAN ("Friedman"),

SHULIM ELIEZER ILOWITZ ("Ilowitz") (collectively with Friedman, the "Individual

Defendants"), ML IMPORTS, INC. ("ML Imports"), CYRF, INC. ("CYRF"), LRI GROUP LLC

("LRI"), MDF MARKETING, INC. ("MDF"), and WORLD GROUP IMPORT, LLC ("World

Group") (collectively with ML Imports, CYRF, LRI, and MFD, the "Corporate Defendants")

(collectively, the "Defendants") respectfully submit the following response to Plaintiff SOUND

AROUND, INC. ("Plaintiff")'s Statement of Material Facts:

      1.     Sound Around was started in 1977 by Zigmond Brach ("Ziggy") and has been

operated for the last two decades by Ziggy and his two sons, Jeremiah Brach ("Jerry") and

Abraham Brach ("Abe").  **Exhibit 1** ¶ 2.

      **Response: Undisputed**.

      2.     Sound Around's business revolves around sourcing, purchasing and importing

foreign products for resale in the United States and internationally.  *Id.* ¶ 3.

**Response: Disputed**. Sound Around's business revolves around purchasing and importing foreign products for resale in the United States and internationally. *See* Declaration of Moises Friedman in Opposition (hereinafter, the "Friedman Decl."), ¶ 36; *see* Declaration of Shulim Eliezer Ilowitz in Opposition (hereinafter, the "Ilowitz Decl."), ¶ 33.

3.      Specifically, Sound Around's business generally involves four phases or stages. First, Sound Around identifies (a) products that it wants to purchase for resale and (b) manufacturers that have the expertise and infrastructure to manufacture those products and label them with Sound Around's brands. *Id.* ¶ 4. Second, Sound Around arranges for the products to be shipped mainly to the United States, mostly from China, through shippers that meet its needs. *Id.* Third, the products that arrive at a port in the United States are then transported either to one of Sound Around's warehouses or directly to warehouses owned and operated by some of Sound Around's clients who purchase products from Sound Around to resell (e.g., Amazon). *Id.* Fourth, the products are sold online and delivered to each consumer or retailer that purchases a product. *Id.*

**Response: Disputed**. With respect to the products developed by Friedman and Ilowitz, Friedman and Ilowitz identified products and developed relationships with manufacturers who could manufacture those products in a profitable manner before presenting them to Plaintiff for purchase, import into the U.S., and sale online. *See* Friedman Decl., ¶¶ 21, 40, 48, 53, 56-57; *see* Ilowitz Decl. ¶¶ 35, 38, 46-51, 54-55, 60;

4.      Most of Sound Around's products are sold via well-known and reputable e-commerce companies with very strong e-commerce platforms (e.g., Amazon, Walmart, and Target). *Id.* ¶ 5.

**Response: Undisputed**.

5.     For example, Sound Around has had a long-standing relationship selling products with Amazon, going back to at least 2009.  *Id.* ¶ 7.

**Response:  Disputed**. Plaintiff's relationship with Amazon was, until approximately 2019-2020, confined to specific product categories such as audio products and car stereo equipment. Plaintiff had no relationship with any product managers in the categories of kitchen, home, sporting goods, or outdoor products. *See* Transcript from the May 13, 2025 Deposition of Jeremiah Brach (hereinafter, the "J. Brach. Trans."), 19:4-12; *see* Friedman Decl, ¶¶ 39-40; *see* Ilowitz Decl., ¶¶ 37-38.

6.     More than 90% of Sound Around's sales are to Amazon for resale by Amazon.  *Id.* ¶_. Thus, Amazon is Sound Around's largest customer, a fact of which both Friedman and Ilowitz were aware. *Id.* ¶ 6.

**Response: Undisputed.**

7.     Friedman is Abe's brother-in-law and was hired by Sound Around in approximately August 2012 to work as a warehouse manager. **Exhibit 2** at 52:9-24; 100:5-101:8 ; **Exhibit 1** ¶ 8.

**Response: Undisputed**.

8.     A few years later, in approximately 2017, Sound Around transitioned Friedman into a second role—as a "Buyer" for Sound Around.  **Exhibit 1** ¶ 9.

**Response: Disputed**. Friedman's second role as a buyer was not developed until 2018. *See* Friedman Decl., ¶ 4.

9.     As a Buyer, Friedman was responsible for hunting and searching for any products that could be sold online by Sound Around.  *Id.* ¶ 10.  This included buying goods from manufacturers and creating private brands for Sound Around to use in selling the products.  *Id*.

**Response: Disputed**. Friedman's role as buyer was to develop products that he believed would be profitable and developed relationships with manufacturers who could manufacture those products in a profitable manner. Friedman was never responsible for purchasing products from manufacturers or creating private brands for Plaintiff. *See* Friedman Decl., ¶¶ 57-58.

10.   Friedman was obligated to negotiate and purchase goods at the best price for Sound Around. *Id.* ¶ 11.

**Response: Disputed**. Friedman's role as buyer was limited to developing products that he believed would be profitable and offering them to Plaintiff. It was Plaintiff's exclusive responsibility to negotiate with manufacturers regarding price, to order products from manufacturers, and to negotiate with retailers regarding the price point for the sale of products to the customers. *See* Friedman Decl., ¶¶ 57-58, 65.

11.   Friedman primarily worked out of Sound Around's Monroe warehouse in its upstate New York office during his time as Buyer. *Id.* ¶ 12. Sound Around had a dedicated office space for Friedman at that location. *Id.*

**Response: Disputed**. Although Friedman had an office in Plaintiff's Monroe, New York warehouse, Plaintiff's comptroller Jacob "Jack" Tyberg informed him that he was no longer covered under Plaintiff's worker's compensation policy while at the warehouse once he became an independent contractor in January 2019. Thereafter, Friedman worked primarily from his home office. *See* Friedman Decl., ¶ 21.

12.   In 2018, a local rabbi, Rabbi Mesisels, drafted a contract (the "Friedman Contract") between Sound Around and Friedman. **Exhibit 3**; **Exhibit 2** at 133:22-142:17.

**Response: Clarification**. Jeremiah ("Jerry") Brach retained and paid for a Rabbi to draft an agreement between Jerry Brach and Friedman. *See* Friedman Decl., ¶ 5.

4

13.     In discussing Friedman's role as Buyer, the Friedman Contract notes the following:



> 5.  Party B has an additional role [the 2 roles are not linked at all, obviously], to serve
>     as buyer for the above mentioned enterprise, one that is known in the business
>
>     world as Buyer; on that track, it is his role to hunt and search for all merchandise
>     and goods and the likes, that he see an opportunity to turn a good profit on; this
>     includes both, to buy goods from other merchants, and to manufacture goods from
>     scratch, known as creating a private brand for the enterprise, – and when he finds
>     such goods in either of the aforementioned ways,  then he has to take the first step
>     with those merchants, or with the manufacturers, to negotiate with them about the
>     quality of the goods and about the price of the goods, or for manufacturing the
>     goods, it should be for the best price; as well as about shipping the goods.

*Figure 1: Excerpt of Paragraph 5 from contract between Sound Around
and Friedman executed on June 6, 2018*

**Exhibit 3 ¶** 5.

    **Response: Undisputed**.

14.     The Friedman Contract further provides that:



> 6.  Party B is responsible for supervise the above-mentioned goods to be presented
>     on internet sites, Amazon, E-Bay and the likes, in a manner that's most ideal to
>     attract clients to interest them to buy the goods. He shall also be in steady contact
>     with other team members in the enterprise who are involved in selling the goods,
>     to see and to hear how one can succeed in selling the goods, and what else can be
>     done to succeed in selling the goods, such as how to present it, and the price of
>     the goods in general, especially where the is a competitor, as well as to be
>     involved with them with advice and understanding how to sell the goods as soon
>     as possible, for the most profit possible; in any event, the goods shall not remain
>     in the enterprise for more than one year.

*Figure 2: Excerpt of paragraph 6 from contract between Sound Around
and Friedman executed on June 6, 2018*

*Id.* ¶ 6.

    **Response: Undisputed**.

15.     In addition, the Friedman Contract contains a restrictive covenant providing:

11. Party B accepted upon himself in an effective manner not to compete (non-compete) with Party A in the aforementioned enterprise, neither during the hours

in which he works as an employee with Party A, nor if he leaves his job either involuntarily or voluntarily, or if he they will terminate him – for 2 years after he leaves the job. The non-compete undertaking includes both, selling goods that Party B brought into the enterprise, or other goods of party A; Party B also obligated himself in an effective manner, not to work as an employee or any other types of work for others in this line of business; and it was stipulated and he committed himself in an effective manner, that in the event he breaches the aforementioned condition and obligation, that he has to pay Party A half the profit he earns from the goods that he obligated himself not to do business with, as outlined above.

*Figure 3: Excerpt of paragraph 11 from contract between Sound Around and Friedman executed on June 6, 2018*

*Id.* ¶ 11.

**Response: Undisputed**.

16.     To perform his duties as a Buyer, Sound Around vested Friedman with extraordinary discretion and authority, expecting him to act for Sound Around's best interest in the course of his work for Sound Around.**Exhibit 1** ¶ 14.

**Response: Disputed**. Plaintiff did not vest Friedman with any authority to bind Plaintiff as an agent, nor did Plaintiff vest Friedman with any authority to act on Plaintiff's behalf in the scope of his work as an independent contractor. At all times, Friedman was in business for himself as an independent contractor and sourced and developed his own products which were then offered to Plaintiff. *See* Friedman Decl., ¶¶ 21, 23-27; *see* Transcript from the October 28, 2025 Deposition of Abraham Brach (hereinafter, the "A. Brach Trans."), 92:1-25; 93:1-23.

17.     For example, and as stated in his Contract, Friedman was given discretion to negotiate on behalf of Sound Around with the manufacturers, including as to the price Sound Around paid for the products and the quality and features of the products. *Id.* ¶¶ 15-16, 18; **Exhibit 3** ¶ 5.

**Response: Disputed**. Friedman's role as buyer was limited to developing products that he believed would be profitable and presenting them to Plaintiff. It was Plaintiff's exclusive responsibility to negotiate with manufacturers regarding price, to order products to manufacturers, and to negotiate with retailers regarding the price point for the sale of products to the customers. *See* Friedman Decl., ¶¶ 22, 54, 58, 65.

18.    Friedman was also given discretion on how to market and present the products for sale online on Sound Around's behalf, as well as recommending, and at times selecting or changing, the selling price of the products sold by Sound Around or under one of Sound Around's brands.  **Exhibit 1 ¶¶** 17, 20; **Exhibit 3 ¶** 6.

**Response: Disputed**. Although Friedman was responsible for marketing the products he developed and offered to Plaintiff, Friedman was never responsible for selecting or changing the selling price of any products. *See* Friedman Decl., ¶ 22, 54.

19.    Sound Around entrusted Friedman with the authority to negotiate in the company's best interest, including by negotiating the lowest price for purchase of products from manufacturers to maximize sales and Sound Around's success. **Exhibit 1 ¶** 18; **Exhibit 3 ¶** 5.

**Response: Disputed**. Friedman's role as buyer was limited to developing products that he believed would be profitable and offering them to Plaintiff. It was Plaintiff's exclusive responsibility to negotiate with manufacturers regarding price, to order products from manufacturers, and to negotiate with retailers regarding the price point for the sale of products to the customers. *See* Friedman Decl., ¶¶ 22, 54, 58, 65.

20.    As discussed in the Contract, Friedman was also responsible for creating and developing new brands and product lines for Sound Around and analyzing and sourcing innovative

products to advance Sound Around's business lines in the constantly-changing sales environment in which Sound Around operates. **Exhibit 1** ¶ 19; **Exhibit 3** ¶ 5.

**Response**: **Disputed**. Friedman was not responsible for creating brands at Plaintiff. In addition, Plaintiff's business was not focused on sourcing "innovative products" or a "constantly-changing sales environment." From its inception until Friedman and Ilowitz began operating as buyers, Plaintiff's business was focused only on audio products and was not engaged in developing new product categories outside of this area. *See* Friedman Decl., ¶ 36-40, 65; *see* Ilowitz Decl., ¶¶ 33-34, 37-38.

21.     When initially hired in 2013 as a warehouse manager, Friedman was paid individually and received a W-2 form. **Exhibit 4** ¶ 5.

**Response: Undisputed**.

22.     In his role as a Buyer, Friedman was compensated on a commission basis once products sourced by him for Sound Around were sold. **Exhibit 1** ¶ 21; **Exhibit 4** ¶ 6.

**Response: Clarification**. Plaintiff instituted the initial commission structure, whereby Friedman would a receive a commission of 3% of sales revenue that Plaintiff received from the sale of products that Friedman sourced, less returns. At the end of 2018, Plaintiff terminated Friedman and he became an independent contractor, at which point Plaintiff instituted a different commission structure, whereby Friedman would receive a commission of 10% of profits, after the deduction of expenses. *See* Friedman Decl., ¶¶ 8, 11, 14.

23.     Sound Around agreed to the uncapped commission-based pay structure to reward and incentivize Friedman. **Exhibit 1** ¶ 22.

**Response: Disputed.** Plaintiff instituted the initial commission structure, whereby Friedman would a receive a commission of 3% of sales revenue that Plaintiff received from the

sale of products that Friedman sourced, less returns. At the end of 2018, Plaintiff terminated Friedman and he became an independent contractor. Plaintiff instituted a different commission structure, whereby Friedman would receive a commission of 10% of profits, after the deduction of expenses. Plaintiff further reduced commissions by inflating expenses and reducing the percentage in several markets; Europe, Canada, and Israel. *See* Friedman Decl., ¶¶ 8, 11, 14, 28-34; *see* Declaration of Ross Hickman (hereinafter, the "Hickman Decl."), [1] Ex. B, pg. 4; Ex. C, pg. 4; *see* J. Brach Trans., 87:1-25.

24.     At Friedman's request, Friedman's commission payments were made into his separate company Defendant MDF Marketing, Inc. ("MDF").  **Exhibit 4** ¶ 7.

**Response: Disputed.** Plaintiff's comptroller Jack Tyberg instructed Friedman to provide a separate company through which to receive his sales commissions as an independent contractor. Pursuant to this instruction, Friedman formed MDF and thereafter, all of Friedman's sales commissions were paid by Plaintiff via Form 1099 to MDF on behalf of Friedman. *See* Friedman Decl., fn. 2; *see* Friedman Decl., Ex. D.

25.     The total commissions paid to Friedman as a Buyer (through MDF) are detailed in the chart below:

---

[1] The Hickman Decl. is annexed to the Declaration of Nicholas Fortuna (hereinafter, the "Fortuna Decl.") as Exhibit F.

| Total Commissions Paid to MDF Marketing Inc. | |
|---|---|
| **Year** | **Amount** |
| 2018 | $ 497,939.86 |
| 2019 | $ 645,995.92 |
| 2020 | $ 1,298,806.24 |
| 2021 | $ 2,150,000.00 |
| 2022 | $ 2,187,000.00 |
| 2023 | $ 1,162,217.67 |
| Total | $ 7,941,959.69 |

*Figure 4: Summary of Commissions paid to Friedman from Decl. of Jack Tyberg*

**Exhibit 4 ¶ 8.**

> **Response: Clarification.** We are required to rely on Plaintiff's records regarding this point.

26.     Friedman has continuously represented to the public on Linked In that his only employment from January 2012 (for over 13 years) was as a Senior Project Manager for Sound Around:



*Figure 5: Screenshots from Linked In profile of Moises Friedman*

**Exhibit 5**.

**Response: Disputed.** Friedman does not recall creating a LinkedIn profile, has not updated that profile, and has not used LinkedIn in at least ten years. The unused profile only has 7 connections demonstrating it was not used. *See* Friedman Decl., fn. 1.

27.    Around early 2019, Ilowitz (who was the brother of Jerry's personal secretary) began working for Sound Around in the role as Buyer. **Exhibit 1** ¶ 26; **Exhibit 6** at 30:7-13, 31:12-18.

**Response: Disputed.** Ilowitz had a dual role, as an independent contractor in the role of buyer and for a short time as an employee selling overstock items. *See* Ilowitz Decl., ¶ 3.

28.    Ilowitz worked out of Sound Around's office in Brooklyn, New York.  **Exhibit 1** ¶ 27.  Sound Around had a dedicated office space for Ilowitz in its Brooklyn office.  **Exhibit 6** at 56:13-58:12.

**Response: Disputed.** In his role as an independent contractor buyer, Ilowitz did not exclusively work from Plaintiff's office in Brooklyn, New York; when he did, he had a desk he could use, not a dedicated office space. Ilowitz worked frequently from home or while traveling in the course of developing his business. *See* Ilowitz Decl., ¶ 15.

29.    Ilowitz's duties in his job as a Buyer were similar to Friedman's duties in his job as a Buyer.  **Exhibit 1** ¶ 28.

**Response: Disputed.** Ilowitz was an independent contractor. He had no specific duties other than to develop products that Plaintiff could profit on them and present them to Plaintiff. *See* Ilowitz Decl., ¶¶ 8, 13-14, 52.

30.    Among other things, Ilowitz was responsible for searching and hunting for products that could be sold by Sound Around and sourcing those products for Sound Around. **Exhibit 1** ¶ 29; *see also* **Exhibit 6** at 39:15-18 ("I was sourcing and bringing products to Sound Around").

**Response: Disputed.** Ilowitz did not sign a contract with Plaintiff and did not have specific responsibilities. *See* Ilowitz Decl., 5.

31.     This included buying goods from manufacturers and creating private brands for Sound Around to use in selling those goods.  **Exhibit 1** ¶ 30.

**Response: Disputed.** Ilowitz did not purchase goods from manufacturers, nor did he create any brands for Plaintiff. *See* Ilowitz Decl., ¶¶ 52, 56, 85.

32.     He was also responsible for marketing the products and brands to attract customers, including the products he was entrusted with and sold on Amazon.  *Id.* ¶ 31.

**Response: Disputed.** Ilowitz did not have any specific responsibilities as an independent contractor operating his own business. He did market the products he sourced, developed, and presented to Plaintiff, if Plaintiff purchased them from the manufacturers. He was never "entrusted" with products, nor did he create brands for Plaintiff or market Plaintiff's brands. *See* Ilowitz Decl., ¶¶ 8, 53, 56-57, 85; *see* Ilowitz Decl., Ex. J, pg. 102.

33.     In Friedman's words, Ilowitz was in charge of "manag[ing]" the products that he sold for Sound Around. **Exhibit 7** at 8.

**Response: Clarification.** Ilowitz developed and sourced his own products, which he presented to Plaintiff. Ilowitz did market the products he sourced, developed, and presented to Plaintiff, if Plaintiff purchased them from the manufacturers. *See* Ilowitz Decl., ¶¶ 8, 53.

34.     Sound Around vested Ilowitz with extraordinary discretion and authority in his role, expecting him to act for Sound Around's best interest in the course of his work for Sound Around.**Exhibit 1** ¶ 32.

**Response: Disputed.** Plaintiff did not vest Ilowitz with any discretion or authority to bind Plaintiff as an agent, nor did Plaintiff vest Ilowitz with any authority to act on Plaintiff's behalf in the scope of his work as an independent contractor. *See* Ilowitz Decl., ¶¶ 8, 16-20.

35.    Sound Around trusted and relied upon Ilowitz to advocate for and protect the company—for example, to negotiate for the lowest possible prices, identify new and interesting products for Sound Around, develop new brands, and work towards Sound Around's success. *Id.* ¶ 33.

**Response: Disputed.** Plaintiff did not trust or rely on Ilowitz to advocate for or protect Plaintiff. Plaintiff did not vest Ilowitz with any authority to bind Plaintiff as an agent, nor did Plaintiff vest Ilowitz with any authority to act on Plaintiff's behalf in the scope of his work as an independent contractor. Ilowitz' role as buyer was limited to developing products that he believed would be profitable and offering them to Plaintiff. It was Plaintiff's exclusive responsibility to negotiate with manufacturers regarding price, to order products from manufacturers, and to negotiate with retailers regarding the price point for the sale of products to the customers. At all times, Ilowitz was in business for himself as an independent contractor and sourced and developed his own products which were then presented to Plaintiff. *See* Ilowitz Decl., ¶¶ 8, 16-20, 52, 56, 85.

36.    Like Friedman, Ilowitz was given discretion to negotiate on behalf of Sound Around with the manufacturers, including as to the price Sound Around paid for the products and the quality and features of the products. *Id.* ¶ 34.

**Response: Disputed.** Ilowitz' role as buyer was limited to developing products that he believed would be profitable and offering them to Plaintiff. It was Plaintiff's exclusive responsibility to negotiate with manufacturers regarding price, to order products from manufacturers, and to negotiate with retailers regarding the price point for the sale of products to

the customers. At all times, Ilowitz was in business for himself as an independent contractor and sourced and developed his own products which were then presented to Plaintiff. *See* Ilowitz Dec., ¶¶ 8, 52, 56, 85; *see* Friedman Decl., ¶¶ 22, 54, 58.

37.    Sound Around entrusted Ilowitz with the authority to act and negotiate in the company's best interest by negotiating the lowest price for purchase of products from manufacturers and by ensuring that the products were competitively priced and marketed on the online platforms to maximize sales and Sound Around's success. *Id.* ¶¶ 31, 33.

**Response: Disputed.** Plaintiff did not vest Ilowitz with any authority to bind Plaintiff as an agent, nor did Plaintiff vest Ilowitz with any authority to act on Plaintiff's behalf in the scope of his work as an independent contractor. Ilowitz' role as buyer was limited to developing products that he believed would be profitable and offering them to Plaintiff. It was Plaintiff's exclusive responsibility to negotiate with manufacturers regarding price, to order products from manufacturers, and to negotiate with retailers regarding the price point for the sale of products to the customers. At all times, Ilowitz was in business for himself as an independent contractor and sourced and developed his own products which were then offered to Plaintiff. *See* Ilowitz Decl., ¶¶ 8, 16-20, 52, 56, 85.

38.    As a Buyer, Ilowitz was compensated on a commission basis once products sourced by him for Sound Around were sold.**Exhibit 1** ¶ 36.

**Response: Clarification.** Plaintiff instituted the commission structure, whereby Ilowitz would receive a commission of 10% of profits, after the deduction of expenses. *See* Ilowitz Decl., ¶ 8.

39.    Sound Around agreed to the uncapped commission-based pay structure to reward and incentivize Ilowitz. *Id.* ¶ 37.

14

**Response: Disputed.** Plaintiff instituted the commission structure, whereby Ilowitz would receive a commission of 10% of profits, after the deduction of expenses. Plaintiff reduced commissions by inflating expenses and reducing the commission rates in some markets (such as Canada, Europe, and Israel). *See* Ilowitz Decl., ¶¶ 8, 21-26.

40.    At Ilowitz's request, Sound Around paid his commissions to what Ilowitz represented to be his separate companies, Defendant Executive Laundry, LLC and Defendant Executive Services.  **Exhibit 4** ¶ 11.

**Response: Disputed.** Plaintiff's comptroller Jack Tyberg instructed Ilowitz to provide a separate company through which to receive his sales commissions as an independent contractor. Pursuant to this instruction, Ilowitz located Defendants Executive Laundry LLC and Executive Services ("Executive") and thereafter, all of Ilowitz sales commissions were paid by Plaintiff via Form 1099 to Executive on behalf of Ilowitz. *See* Ilowitz Decl., ¶¶ 9-10; *see* Transcript from the September 29, 2025 Deposition of Jacob Tyberg (hereinafter, the "Tyberg Trans."), 127:21-25; 128:1-14.

41.    Unbeknownst to Sound Around, neither Executive Laundry nor Executive Services were actually owned by Ilowitz; they were owned by an individual named Levi Rottenberg.  *Id.* ¶ 12; **Exhibit 8** at 34:5:36:21; **Exhibit 6** at 160:9-12.

**Response: Unknown if true.**

42.    Mr. Rottenberg testified that Ilowitz has never had any involvement with Defendant Executive Laundry or Defendant Executive Services; the only relation that either of those entities has with Ilowitz is that they would receive payments intended for Ilowitz and hold those funds until Ilowitz directed them to be paid out:

```
5       Q.  Okay.  And so he's sending funds to
6   you, you're holding on to the funds, right?
7           What do you do with the funds that
8   you're holding on to?
9       A.  Whatever I feel like.
10      Q.  So what did you do with the funds
11  that were transferred to you and you held on
12  to?
13      A.  The end was that, when he needed it,
14  it came back to him.
```

*Figure 6: Excerpt of Deposition of L. Rottenberg taken on March 26, 2025*

**Exhibit 8** at 56:5-14.

 **Response: Undisputed.**

 43. The total commissions earned by Ilowitz by year are included in the chart below:



**Total Commissions Paid to Executive Laundry LLC**

| Year | Amount |
|------|--------|
| 2020 | $ 138,000.00 |
| Total | $ 138,000.00 |

**Total Commissions Paid to Executive Services**

| Year | Amount |
|------|--------|
| 2019 | $ 49,000.00 |
| 2020 | $ 219,000.00 |
| 2021 | $ 884,000.00 |
| 2022 | $ 1,378,103.00 |
| 2023 | $ 702,906.00 |
| Total | $ 3,233,009.00 |

*Figure 7: Summary of Commissions paid to Ilowitz*

**Exhibit 4** ¶ 13.

 **Response: Clarification.** We are required to rely on Plaintiff's records regarding this point.

44.    Notwithstanding that Ilowitz was being paid millions of dollars by Sound Around, none of the payments to Executive Laundry or Executive Services would end up being declared to the tax authorities nor were they reported on Ilowitz's personal tax returns.  **Exhibit 8** at 194:6-8; 302:15-20; **Exhibit 6** at 300:15-304:25:

```
15      Q.  Okay.  Did you report any of these amounts
16   in your income -- personal income -- taxes?
17      A.  So this money was paid to Executive Laundry
18   and Executive Services, and I was made aware during
19   this litigation that there was no taxes filed for
20   it.  I'm working with my attorney on it in regards
21   to that.
22      Q.  Okay.  So the -- you personally never
23   reported it, correct?
24      A.  It was issued -- it wasn't issued on my
25   name.
```

```
4       Q.  Okay.  And what you're saying is that
5    Executive Laundry didn't report it either, correct?
6       A.  That's what I learned during this
7    litigation.
8       Q.  And you're also saying that Executive
9    Services didn't report it either, correct?
10      A.  Correct.
```

```
7       Q.  So the $1,378,103 for Year 2022 went
8    unreported to the IRS, correct?
9       A.  It wasn't issued in my name, which I was
10   made aware of during this litigation; it wasn't
11   reported; I'm working on that --
```

*Figure 8: Excerpts of Deposition of Ilowitz taken on April 9, 2025*

**Response: Disputed.** Ilowitz is in the process of preparing and filing amended tax returns which requires cooperation from Executive Laundry for the applicable tax years to acknowledge the receipt of sales commissions from Plaintiff. *See* Ilowitz Decl., fn. 1.

45.     Instead, Ilowitz reported to governmental entities that he received $400 a month from his father to help cover his daily expenses, which allowed him to apply for and receive food stamps. **Exhibit 9** at 5; **Exhibit 6** at 307:12-309:14**.**

46.     Ilowitz resigned as a Buyer for Sound Around on January 30, 2024. **Exhibit 1 ¶ 40**; **Exhibit 6** at 55:12-14.

**Response: Disputed.** Ilowitz terminated this relationship as an independent contractor for Plaintiff on January 30, 2024. *See* Ilowitz Decl., ¶ 14.

47.     Ilowitz has consistently represented to the public on Linked In that from December 2018 through January 2024 (for a period of 5 years and 2 months), he worked "full-time" as a "Senior Strategic Buyer" for Sound Around:



*Figure 9: Screenshots from Linked In profile of Lazer Ilowitz*

**Exhibit 10**.

**Response: Disputed.** Ilowitz has always represented himself as an independent contractor. *See* Ilowitz Decl., ¶ 14.

48.     In early 2020, unbeknownst to Sound Around, both Ilowitz and Friedman began soliciting "commissions" (i.e., kickbacks) from Sound Around's manufacturers to be paid to them based on the purchase orders they were placing for Sound Around.  *See* **Exhibit 2** at 185:18-25; **Exhibit 6** at 178:21-180:5; **Exhibit 1** ¶ 38 (explaining that Sound Around was not aware these "commission" payments were being made).

**Response: Disputed.** Neither Friedman nor Ilowitz solicited "kickbacks" from any manufacturers. Friedman and Ilowitz were not responsible for ordering products on behalf of Plaintiff; Jerry Brach, Abe Brach, and Ziggy Brach were the individuals at Plaintiff who made decisions on what products to purchase and in what quantities, and Jerry Brach regularly placed orders directly with the manufacturers. *See* Friedman Decl., ¶¶22, 58, 84-86; *see* Ilowitz Decl., ¶¶ 56, 80-82.

49.     Below is a brief background discussion relating to those kickbacks; a more detailed account of the specific kickback transactions relating to both Ilowitz and Friedman is included in **Section III.A**, *infra*.

**Response:** No response necessary as this paragraph contains no factual statements.

50.     As Sound Around has now been made aware, both Friedman and Ilowitz demanded that Sound Around's manufacturers pay between 3% and 10% of the purchase price (i.e., product cost to Sound Around) to them individually as a "commission" to incentivize them to place orders for Sound Around—as illustrated by just some examples of WeChat conversations between manufacturers and Ilowitz or Friedman. *See* **Exhibit 11-Exhibit 18**:



*Figure 10: Screenshot from WeChat conversation between*

*Ilowitz and "Tao" at Yongkang Fulaitai Industry*

**Exhibit 13** at 5;



*Figure 11: Screenshot from WeChat conversation between*
*Ilowitz and "Alicia Hoo" at Hainan Cooktone Household Co., Ltd.*

**Exhibit 18** at 18-19.



*Figure 12: Screenshot from WeChat conversation between*
*Friedman and unnamed individual at Emiliya Electrical Appliances Co., Ltd.*

**Exhibit 17** at 1-2.



From: wxid_eks4tcx2w37c12 mos (owner)
did you already give ziggy the updated price?
Priority: Normal
Platform:
6/30/2023 12:06:10 AM(UTC-4)

From: wxid_wm0f095fnut311 Jomon Chan
yes, your commison was included for each shipment.
Priority: Normal
Platform:
6/30/2023 12:06:33 AM(UTC-4)

From: wxid_eks4tcx2w37c12 mos (owner)
Yeah I know you lowered. It depends on the items but usually I will get 10% of the cost
Priority: Normal
Platform:
6/12/2023 12:27:12 AM(UTC-4)

* * *

From: wxid_wm0f095fnut311 Jomon Chan
the price decreased from $101 to $98.00, your commision is still $5.00, our net price is $93.00 now
Priority: Normal
Platform:
6/30/2023 12:07:57 AM(UTC-4)

*Figure 13: Screenshot from WeChat conversation between*
*Friedman and "Jomon Chan" at Ningbo Healthmate Health Technology Co., Ltd.*

**Exhibit 16** at 3-4.

**Response: Disputed.** Friedman and Ilowitz received commissions from manufacturers in consideration for the substantial amount of advice and assistance regarding the products they were sourcing. They provided, among other things, new ideas for products, modifications to existing products, suggestions for new colors to use to make products more marketable, suggestions for new materials to use to manufacture better-quality products, advice on entering new markets, and methods for cutting costs. Again, Friedman and Ilowitz had no authority to place orders for

products on behalf of Plaintiff and never did. *See* Friedman Decl., ¶¶ 22, 58, 84-86; *see* Ilowitz Decl., ¶¶ 56, 80-82.

51.    Based on bank statements and evidence received to date, discussed in more detail in **Section III.A.**, there is evidence of nearly $4 million in kickbacks paid to Ilowitz and Friedman. Specifically:

| Entities Receiving Kickbacks from Chinese Manufacturers for Sound Around Purchases June 5, 2020 through June 26, 2024 | | | | | | |
|---|---|---|---|---|---|---|
| Entity | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
| **Mr. Friedman's Entities** | | | | | | |
| MDF Marketing Inc. | $ 462,505 | $ 845,749 | $ 529,753 | $ 763,892 | $ 174,629 | $ 2,776,527 |
| **Entities Affiliated with Mr. Ilowitz** | | | | | | |
| Cong Kozover | $ 9,181 | $ 137,782 | $ 178,763 | $ 280,914 | $ 35,740 | $ 642,381 |
| Executive Laundry LLC | 3,300 | 150,659 | 285,101 | 104,011 | - | 543,071 |
| Levi Rottenberg | - | 6,956 | 21,717 | - | 7,993 | 36,666 |
| Subtotal - Entities Affiliated with Mr. Ilowitz | $ 12,481 | $ 295,397 | $ 485,580 | $ 384,925 | $ 43,733 | $ 1,222,117 |
| **Total - Kickbacks** | $ 474,986 | $ 1,141,146 | $ 1,015,333 | $ 1,148,817 | $ 218,362 | $ 3,998,644 |

*Figure 14: Summary of Kickback Payments*

**Exhibit 20** ¶ 5 & Ex. A.

**Response: Disputed.** Friedman and Ilowitz did not receive "kickbacks." Friedman and Ilowitz received commissions from manufacturers in consideration for the substantial amount of advice and assistance regarding the products they were sourcing. They provided, among other things, new ideas for products, modifications to existing products, suggestions for new colors to use to make products more marketable, suggestions for new materials to use to manufacture better-quality products, advice on entering new markets, and methods for cutting costs. *See* Friedman Decl., ¶¶ 84-86; *see* Ilowitz Decl., ¶¶ 80-82.

52.    And even though their duties as Buyers included negotiating with the manufacturers on Sound Around's behalf (and in Sound Around's best interest) to procure the best price for

Sound Around, Friedman and Ilowitz did precisely the opposite. *See, e.g.*, **Exhibit 11; Exhibit 16**.

      **Response: Disputed.** Friedman and Ilowitz were not responsible for negotiating pricing and were not obligated to "negotiate the best price." As independent contractor buyers, Friedman and Ilowitz were responsible for sourcing and developing new and good quality products that could potentially turn a good profit for Plaintiff and offer those products to Plaintiff, which would then negotiate with manufacturers regarding cost, order products in quantities determined by Plaintiff, and sell to Amazon at prices it unilaterally determined. Friedman and Ilowitz were not responsible for the price that Plaintiff's managers ultimately set for products offered for sale by Plaintiff. Jerry Brach and Ziggy Brach negotiated costs directly with manufacturers. *See* Friedman Decl., ¶¶ 22, 54, 58, 65, 87; *see* Ilowitz Decl. ¶¶ 8, 52, 56.

      53.    For example, Ilowitz advocated for an increase in the prices to be paid by Sound Around to allow for maximum "commissions" to his own pockets:



*Figure 15: Screenshot from WeChat between Ilowitz and "Kate" at DongGuan HongFeng Hanger Industry*

**Exhibit 11** at 2;



*Figure 16: Screenshot from WeChat conversation between*
*Ilowitz and "Tao" at Yongkang Fulaitai Industry*

**Exhibit 13** at 6-7.

      **Response: Disputed.** Ilowitz was not responsible for negotiating the ultimate cost,

quantities, or terms of the purchase of products from manufacturers. All of those functions were

handled directly by Plaintiff's managers. Prices were not changed as a result of this conversation.

*See* Ilowitz Decl., ¶¶ 56, 85. This conversation is not properly presented in context. This is an

incomplete conversation and not properly presented in context.

      54.    Consistent with these repeated breaches of their duties, Friedman and Ilowitz also

refused to approve lower prices or discounts for Sound Around unless they were guaranteed the

discount would not affect their "commission":



* * *



*Figure 17: Screenshot from WeChat conversation between*
*Friedman and "Jomon Chan" at Ningbo Healthmate Health Technology Co., Ltd.*

**Exhibit 16** at 1-2;

*Figure 18: Screenshot from WeChat conversation between*
*Ilowitz and unidentified individual at YE LingFang (Yelf)*

**Exhibit 14** at 6-8.

  **Response: Disputed.** Friedman and Ilowitz were not responsible for negotiating the ultimate cost, quantities, or terms of the purchase of products from manufacturers. All of those functions were handled directly by Plaintiff's managers. Prices were not changed as a result of these conversations. *See* Ilowitz Decl., ¶¶ 56, 85. They are not properly presented in context.

  55. At times, Friedman even instructed the manufacturers on how best to reject requested discounts from Sound Around in order to preserve their commissions:



*Figure 19: Screenshot from WeChat conversation between
Friedman and unnamed individual at Emiliya Electrical Appliances Co., Ltd.*

**Exhibit 17** at 15.

**Response: Disputed.** Friedman was not responsible for negotiating the ultimate cost, quantities, or terms of the purchase of products from manufacturers. All of those functions were handled directly by Plaintiff's managers. *See* Friedman Decl., ¶¶ 22, 58; *see* Ilowitz Decl., ¶¶ 56, 85.

56.    As a result of these actions, the prices charged to Sound Around included Friedman's and Ilowitz's unlawful kickbacks, as illustrated by the example below:





*Figure 20: Screenshot from WeChat conversation between
Friedman and "Jomon Chan" at Ningbo Healthmate Health Technology Co., Ltd.*

**Exhibit 16** at 6.

**Response: Disputed.** Friedman and Ilowitz did not receive kickbacks. Further, Friedman and Ilowitz were not responsible for negotiating the ultimate cost, quantities, or terms of the purchase of products from manufacturers. All of those functions were handled directly by Plaintiff's managers. The prices the Plaintiff paid allowed it to make over 130 million dollars in profits on the sale of Friedman and Ilowitz's products. *See* Friedman Decl., ¶¶ 22, 58, 84-87; *see* Ilowitz Decl., ¶¶ 56, 80-82, 85-86.

57.    Of course, after Friedman and Ilowitz left Sound Around, the manufacturers began lowering the prices to Sound Around given that they no longer had to account for the "commissions" to the Buyers, as illustrated by the examples that follow:



*Figure 21: Excerpt from Email between Amanda at Lehe Housewares and Ziggy Brach after Ilowitz's departure from Sound Around*

**Exhibit 21** at 1;



*Figure 22: Excerpt from Email between Alicia Hoo at Hainan Cooktone Household Co., Ltd.
and Ziggy Brach after Ilowitz's departure from Sound Around*

**Exhibit 22** at 1;



*Figure 23: Excerpt from Email between Clark Feng at Vita Leisure Co., Ltd.
and Jerry after Ilowitz's departure from Sound Around*

**Exhibit 23** at 1.

**Response: Disputed.** Plaintiff's managers determined the cost of products, quantities

purchased, and terms of purchase, including negotiating any discounts. Further, in 2024, Ziggy

Brach extorted manufacturers after Friedman and Ilowitz stopped doing business with Sound Around and threatened not to take delivery and pay for already manufactured products if manufacturers did not offer discounts on products. *See* Friedman Decl., ¶¶ 22, 58; *see* Ilowitz Decl., ¶¶ 56, 68, 85.

58.    In October 2021, Friedman and Ilowitz took their unlawful actions one step further when they made a decision to start their own business to compete with Sound Around while still working as Sound Around's Buyers:





*Figure 24: Excerpt of WhatsApp conversation between Friedman and Ilowitz from October 14, 2021*

**Exhibit 24** at 2; **Exhibit 25** at 2 ("In a week or 2 we gonna move ahead with our plans").

**Response: Disputed.** Friedman and Ilowitz were independent contractors, not employees of Plaintiff; were not engaged in illegal conduct; and as independent contractors, they were not prohibited from starting their own venture, either by contract or under common law. Further, there were thousands of sellers on Amazon for each product. Friedman and Ilowitz's launch of its sales online did not impact Sound Around. *See* Friedman Decl., ¶¶ 16-17, 21, 23; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl. ¶¶ 5, 8.

59.    In particular, Friedman and Ilowitz decided to wait until the new year (January 2022) to begin their business:





*Figure 25: Excerpt of WhatsApp conversation between Friedman and Ilowitz from October 28, 2021*

**Exhibit 26** at 1-2.

**Response: Undisputed.**

60.    The business Friedman and Ilowitz decided to (and ultimately did) set up was essentially a (smaller) clone of Sound Around's business that would revolve around sourcing, purchasing, and importing foreign products for resale online. **Exhibit 2** at 25:22-26:5 (explaining

that the entire scope of the line of business for Friedman and Ilowitz's business is to "[s]ource products and resell them.").

       **Response: Disputed.** In forming their own venture, Friedman and Ilowitz combined their efforts and continued the work of the independent contractor businesses they had been operating for years, which included continuing to source and develop products, but also expanding their range of product lines and selling products via their own retail channels and on new platforms. They were under no restrictions, either contractual or common law, that prevented them from forming their own venture and selling online. *See* Friedman Decl., ¶¶ 16-17, 21-23, 64-69, 75-76; *see* Friedman Decl., Ex. B, ¶12; *see* Ilowitz Decl., ¶¶ 5, 14, 69-70, 73.

       61.    Like Sound Around's business, Friedman and Ilowitz's business was to operate in four phases: First, they would identify products to purchase for resale and manufacturers in China to manufacture those products and label them with private label brands. **Exhibit 2** at 137:25-138:22; 150:10-21; **Exhibit 6** at 66:3-18. Second, they would arrange for the products to be shipped to the United States from China. **Exhibit 2** at 139:2-5; 47:20-25; 151:20-22. Third, the products would be transported to a warehouse and stored. *Id.* at 139:6-8; 152:5-8. And fourth, the products would be sold online and delivered to each consumer or retailer that purchases a product. **Exhibit 2** at 139:9-11; 152:11-15; *see also* **Exhibit 6** at 93:16-94:17:

```
                                                          16      Q. Okay. By the time you had a relationship --
                                                          17 when your relationship finished, right --
                                                          18      A. Yes.
                                                          19      Q. -- by the time it had finished, right, you
                                                          20 had been working with Mr. Friedman on your business
                                                          21 for years?
                                                          22      A. From 2022.
                                                          23      Q. Okay. Years.
                                                          24      A. Okay.
                                                          25      Q. You had sold products, correct, for your
```

```
 1 business with Mr. Friedman?
 2      A. Yes.
 3      Q. Right? You had sourced products? You had
 4 purchased products, correct?
 5      A. Correct.
 6      Q. You had paid for those products, correct?
 7      A. Correct.
 8      Q. You had them shipped to the U.S., correct?
 9      A. Correct.
10      Q. They were stored at a warehouse, correct?
11      A. Correct.
12      Q. And then they were sold, correct?
13      A. Correct.
14      Q. And by then, it had been years, right, since
15 at least 2022, when you had been doing that,
16 correct?
17      A. Correct.
```

*Figure 26: Excerpt of Deposition of Ilowitz taken on April 9, 2025*

**Response: Disputed.** In operating their own venture, Friedman and Ilowitz combined their efforts and continued the work of the independent contractor businesses they had been operating for years, which included continuing to source and develop products, but also expanding their range of product lines and selling products via their own retail channels and on new platforms. They were under no restrictions, either contractual or common law, that prevented them from operating their own venture and selling online. *See* Friedman Decl., ¶¶ 16-17, 21-23, 64-69, 75-76; *see* Friedman Decl., Ex. B, ¶12; *see* Ilowitz Decl., ¶¶ 5, 14, 69-70, 73.

62.     Like Sound Around, the clone business's products would sell via well-known and reputable e-commerce companies with very strong e-commerce platforms such as Amazon, Walmart, and Target. **Exhibit 2** at 152:18-154:5; **Exhibit 6** at 74:13-75:3.

**Response: Clarification.** In operating their own venture, Friedman and Ilowitz sold products on e-commerce platforms such as Amazon, Walmart, and Target, but also focused on expanding the opportunities for sales on newer platforms that Plaintiff has never used. *See* Friedman Decl., fn. 4; *see* Ilowitz Decl., ¶ 4; *See* Hickman Decl., Ex. C, pg. fn. 11.

63.    Leading up to January, Friedman and Ilowitz began to take steps to make sure they would be ready to start their business.  For example, in December 2021, they began to discuss names for the corporation they would create to operate their business, ultimately deciding on "ML Imports":





*Figure 27: Excerpt of WhatsApp conversation between Friedman and Ilowitz from December 28, 2021*

**Exhibit 27** at 2.

**Response: Clarification.** The first time Friedman sold any product on their own was the end of December 2022 and beginning of 2023. *See* Friedman Decl., ¶ 73; *see* Ilowitz Decl., ¶ 66.

64.    In an effort to conceal the business, they discussed putting it under their wives' names:



* * *





*Figure 28: Excerpt of WhatsApp conversation between Friedman and Ilowitz from December 28-29, 2021*

**Exhibit 27** at 3-4.

**Response: Disputed**. Despite Plaintiff's out-of-context selection of WhatsApp messages, Friedman and Ilowitz have always maintained their business in their own names. *See* Friedman Decl., ¶ 75; *see* Ilowitz Decl., ¶ 69

65.    By January 6, 2022, they had created Defendant ML Imports, one of the corporate entities they used to operate their competing business:

> From: 13477822352@s.whatsapp.net Moshe Friedman
>
> Good Afternoon,
>
> Please be advised that ML IMPORTS INC. has been successfully filed with the state.
> Enclosed please find the Certified Certificate along with the NYS filing receipt. We were
> unable to obtain an EIN online, therefore, a paper application will be faxed. It usually takes
> 4-7 business days for a paper application to be processed and an EIN obtained. I will let you
> know once we have any updates.
>
> Once the EIN has been obtained, I will prepare and send you the S Elections documents for
> signature.
>
> A kit has been ordered containing your documents, you will be notified once it is received by
> our office.
> Priority: Normal
> Status: Read
> Platform: Web
>
> 1/6/2022 12:26:34 PM(UTC-5)

*Figure 29: Excerpt of WhatsApp conversation between Friedman and Ilowitz from January 6, 2022*

**Exhibit 28** at 4; **Exhibit 2** at 20:22-24 ("ML Imports was created beginning of 2022.").

> **Response: Clarification.** Although ML Imports was incorporated in January 2022, it sold its first product at the end of December 2022 and the beginning of 2023. *See* Friedman Decl., ¶ 73; *see* Ilowitz Decl., ¶ 66.

66.    They also purchased the online domain for ML Imports to operate their website in early January 2022.  **Exhibit 29**; **Exhibit 30**.

> **Response: Undisputed.**

67.    Once they had a corporate entity, Friedman and Ilowitz began creating brands, or private labels—similar to the brands/private labels they were obligated to (and did) create for Sound Around—that they could use to sell products for their competing business. **Exhibit 31** at 1-6.

> **Response: Disputed.** Friedman and Ilowitz were never responsible for and, in fact, never created brands or private labels for Plaintiff. *See* Friedman Decl., ¶ 65; *see* Ilowitz Decl., ¶ 52.

68. Initially, in January 2022, they created two brands: **Bakken-Swiss** and **Lifemaster**. *Id.*[2]

**Response: Disputed.** The trademarks for these brands were not filed with the United States Patent and Trademark Office until February 16, 2022. *See* Declaration of Rebecca Canamero (hereinafter, the "Canamero Decl.,"), Ex. 118.

69. By February 2022, Friedman and Ilowitz were "ready to start working" on products "for our brand." **Exhibit 34** at 1.

**Response: Undisputed.**

70. They began creating brand logos and purchased online domains relating to the Bakken-Swiss and Lifemaster brands. **Exhibit 35**; **Exhibit 36**; **Exhibit 37**.

**Response: Undisputed.**

71. To ensure their clandestine business remained secret, they also created aliases they would use in operating their business. In particular, Ilowitz decided on the fake name "Sol Green":



From: 13477822352@s.whatsapp.net Moshe Friedman
which name do you want to use for you
Priority: Normal
Status: Read
Platform: Web
4/4/2022 3:56:52 PM(UTC-4)

---

[2] Later on, they developed and used additional brands to sell products through their clone business including: **BakkenMaster**, **TopMaster**, **HighMaster**, **ProMaster**, **RunMaster**, **Campior**, **Outdoor Cruiser**, **Emporio Kitchen**, **Dribbl**, and **Dave and Diana**. **Exhibit 32** at 1-4; **Exhibit 33** at 19:3-17.

**Response: Clarification**. Friedman and Ilowitz developed their own brands, which they were permitted to do as they were under no restriction as independent contractors, for the products that they developed on their business initiative using their own ideas, experience, and contacts. *See* Friedman Decl., ¶¶ 16-17, 23, 75-78; *see* Ilowitz Decl., ¶¶ 5, 69-70.





\*\*\*



\*\*\*

*Figure 30: Excerpt of WhatsApp conversation between Friedman and Ilowitz from April 4, 2022*

**Exhibit 38** at 1-3, 6; **Exhibit 6** at 86:20-24.

      **Response: Disputed.** Friedman and Ilowitz used alternative names to differentiate and keep separate the services they were providing as independent contractor buyers for Plaintiff and their work in establishing their own business. *See* Friedman Decl., ¶ 78; Ilowitz Decl., fn. 8. In addition, Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

      72.    Ilowitz had never used the name Sol Green prior to creating it for the competing business, and after he left Sound Around, he immediately stopped using this fake name:



```
 3   that I don't forget.  Prior to you using Sol Green,
 4   right, for Lifemaster -- do you remember that?  We
 5   talked about that? --
 6      A.  Yes.
 7      Q.  -- had you ever used Sol Green, the name
 8   Sol Green?
 9      A.  No.
10      Q.  So the very first time that you used the
11   name Sol Green was for your new business with
12   Mr. Friedman, correct?
13      A.  Correct.
14      Q.  Okay.  Do you still use it?
15      A.  No.
16      Q.  Okay.  When did you stop using it?
17      A.  After I left -- I terminated -- my sourcing
18   business with Sound Around.
```

*Figure 31: Excerpt of Deposition of Ilowitz taken on Apr. 9, 2025*

**Exhibit 6** at 284:3-18.

      **Response: Disputed.** "Sol" is a nickname for Ilowitz's first name Shulim. Ilowitz used an alternative name to differentiate and keep separate the services that he was providing as

independent contractor buyer for Plaintiff and his work with Friedman in their own business. *See* Ilowitz Decl., ¶ 73, fn. 8.

73.    Ilowitz used that name to communicate with manufacturers in starting to procure pricing information for products for the secret business. *See, e.g.*, **Exhibit 39**; **Exhibit 40**.

**Response: Disputed.** Ilowitz used an alternative name to differentiate and keep separate the communications that he was having with manufacturers related to the services that he was providing as independent contractor buyer for Plaintiff and his work with Friedman in their own business. *See* Ilowitz Decl., ¶ 73, fn. 8.

74.    Friedman used the aliases "Moshe Fried" or "Moshe Freund." *See, e.g.*, **Exhibit 40**; **Exhibit 41**.

**Response: Clarification.** Friedman has been known by those names and again, used them to keep matters separate from his independent contractor business. *See* Friedman Decl., ¶ 78.

75.    Notably, Friedman and Ilowitz agreed with each other, in deciding to operate their competing business, that neither of them could do any other separate business through Amazon. **Exhibit 42** at 1-2.

**Response: Disputed.** Friedman and Ilowitz never entered into an agreement prohibiting separate businesses through Amazon. *See* Friedman Decl., fn. 9.

76.    By March 2022, Ilowitz began communicating with an individual at Amazon (Sanil Juneja) with whom Sound Around had established a close relationship in order to try to obtain a new Vendor Central account with Amazon. **Exhibit 43**.  In doing so, Ilowitz used his Sound Around signature block and email address:

*Figure 32: Excerpts of March 29, 2022 email from Ilowitz (Sound Around email account) to S. Juneja at Amazon*

*Id.* at 8-10.

**Response: Disputed.** Plaintiff never had any relationship with Ilowitz's contact at Amazon, which he established on his own as an independent contractor. Plaintiff only became aware of Ilowitz's contact person at Amazon after Ilowitz terminated his relationship with Plaintiff. Ilowitz's use of a Pyle USA email account was inadvertent. *See* Ilowitz Decl., ¶ 75-76.

77.    As indicated in the email, prior to reaching out to Sound Around's contact (using Sound Around's email address and signature block), Ilowitz had attempted to speak with other individuals at Amazon regarding obtaining the account, but he was not successful.  *Id.*

**Response: Clarification.** Ilowitz used his own email with Amazon to set up the Vendor Central Account, but mistakenly used his email with Sound Around signature block one time. *See* Ilowitz Decl., ¶¶ 75-76.

78.    This is likely because it is extremely difficult to obtain a Vendor Central account from Amazon. **Exhibit 1 ¶ 59.**

40

**Response: Clarification.** Ilowitz used his own email with Amazon to set up the Vendor Central Account, but mistakenly used his email with Sound Around signature block one time. *See* Ilowitz Decl., ¶¶ 75-76.

79.    At the time Friedman and Ilowitz were trying to obtain a Vendor Central account, they had no history of past sales or revenue.  **Exhibit 44**.

**Response: Disputed.** Friedman and Ilowitz had developed products to sell online on their own for the benefit of Sound Around totaling almost 500 million dollars. *See* Friedman Decl., ¶ 66.

80.    In fact, the only products Friedman and Ilowitz purchased and sold between 2019 and 2022 (the years prior to their attempts to procure a Vendor Central account) were products they purchased and sold as Buyers for Sound Around:

```
6      Q.  Okay.  So all the way through 2021,
7   all the products that you were sourcing, the
8   other one that you can remember were selling
9   those products was Sound Around, correct?
10      A.  Sourced products and offered them to
11   Sound Around.
```

*Figure 33: Excerpt of Deposition of Friedman taken on April 8, 2025[3]*

**Exhibit 2** at 187:6-11.

```
17      Q.  Okay.  Prior to the end of 2022, neither you
18   nor Mr. Friedman had sold any products for your
19   venture.  Is that an accurate statement?
20      A.  Correct.
```

*Figure 34: Excerpt of Deposition of Ilowitz taken on April 9, 2025*

---

[3]The deposition transcript contains a scrivener's error.  As demonstrated by the surrounding testimony, the transcript should read: "So all the way through 2021, all the products that you were sourcing, the *only* one that you can remember . . ." *See* **Exhibit 2** at 186:7-187:20.

**Exhibit 6** at 48:17-20**.**

    **Response: Clarification.** Friedman and Ilowitz had developed products to sell online on their own for the benefit of Sound Around totaling almost 500 million dollars. Friedman Decl., ¶ 66.

    81.    Ultimately, in May 2022, using Sound Around's contacts and name, Ilowitz was able to speak with the individual at Amazon (Rachel Levy) who could set up a new Vendor Central Account. **Exhibit 45**. Again, in communicating with this individual to obtain a Vendor Central Account, Ilowitz used (misused) his Sound Around email address and Sound Around's name. *Id.*

    **Response: Disputed.** Plaintiff never had any relationship with Ilowitz's contact at Amazon, which he established on his own as an independent contractor. Plaintiff only became aware of Ilowitz's contact person at Amazon after Ilowitz terminated his relationship with Plaintiff. Ilowitz's use of a Pyle USA email account was inadvertent. *See* Friedman Decl., ¶¶ 78-80; *see* Ilowitz Decl., ¶¶ 73, 75-76.

    82.    Shortly thereafter, however, Ilowitz moved the conversation away from Sound Around's email servers by responding to Rachel Levy's email using his private Gmail account rather than continuing the conversation using his Sound Around email:



*Figure 35: Excerpt of Email conversation between Rachel Levy (Amazon) and Ilowitz from May 11, 2022*

**Exhibit 45** at 1.

**Response: Clarification.** Ilowitz moved the conversation to his personal Gmail email address because he realized his mistake and wanted to keep it clear that the contact was for his own new venture with Friedman. *See* Ilowitz Decl., ¶¶ 73, 75-76

83.    Ilowitz then proceeded to negotiate the terms of the new Amazon Vendor Central Account and continued with "onboarding" for the Vendor Central account in May 2022.  **Exhibit 45; Exhibit 46** at 2-3.

**Response: Undisputed.**

84.    Ilowitz registered the Vendor Central Account to a corporate entity used for the competing enterprise, Defendant LRI Group.  **Exhibit 47**.[4]

---

[4]A Vendor Central account is part of an invite-only program from Amazon that enables companies to sell their products wholesale directly to Amazon. **Exhibit 1** ¶ 56.  The products sold through Vendor Central are purchased in bulk by Amazon and are stored and shipped directly from Amazon.  *Id.* ¶ 57.  This business-to-business model differs from a Seller Central (business-to-consumer) account where the seller manages their own e-commerce storefront and is responsible for all aspects of the sale to the end consumer.  *Id.* ¶ 58.

**Response: Undisputed.**

**Response: Disputed.** It was registered to a corporate entity LRI Group, which Defendants dispute was a competing enterprise.

85.    By May 2021, Friedman and Ilowitz had the license they needed in place to sell directly to Amazon and thus they were ready to place orders for their clone business:



*Figure 36: Excerpt of WhatsApp conversation between Friedman and Ilowitz from May 19, 2022*

**Exhibit 46** at 4;



*Figure 37: Excerpt of WhatsApp conversation between Friedman and Ilowitz from May 30, 2022*

**Exhibit 48** at 1-2.

**Response: Disputed.** By May 2021, Friedman and Ilowitz established, through their own contacts and efforts, a relationship with Amazon, such that they could begin offering products that they developed for their own venture for wholesale to Amazon. There is no license associated with the Amazon account. *See* Friedman Decl., ¶ 80; *see* Ilowitz Decl., ¶¶ 75-76. The cited out-of-context WhatsApp conversation does not accurately reflect any facts asserted by Plaintiff.

86.     Friedman and Ilowitz then used their Vendor Central license and account to sell the products that were the same as the items being sold by Sound Around of the products for their competing business.  **Exhibit 2** at 294:10-22.  After a year of secretly competing with Sound Around while still working as Buyers for Sound Around (in June 2023), Friedman and Ilowitz decided that going forward they should not limit their business to only the items sold by Sound Around because it was too "risky" to do so.  **Exhibit 49** at 1-6.

**Response: Disputed.** In pursuing their venture, Friedman and Ilowitz did not limit themselves to any product base at any time and ultimately focused on sourcing and developing the best and most cutting-edge products that they could in order to keep up with the ever-evolving marketplace for consumer goods in the post-pandemic landscape. Nevertheless, Friedman and Ilowitz only sold products they themselves sourced and developed. *See* Friedman Decl., ¶¶ 75-76; *see* Ilowitz Decl., ¶¶ 69-70.

87.     Consequently, they plotted to incorporate additional products into their business:



From: 13477822352@s.whatsapp.net Moshe Friedman
Grill is a good thing to launch
Priority: Normal
Status: Read
Platform: Mobile
                                6/6/2023 10:09:16 PM(UTC-4)



* * *







*Figure 38: Excerpt of WhatsApp conversation between Ilowitz and Friedman on June 6-7, 2023*

*Id.*

**Response: Disputed.** In pursuing their venture, Friedman and Ilowitz did not limit themselves to any product base at any time and ultimately focused on sourcing and developing the best and most cutting-edge products that they could in order to keep up with the ever-evolving marketplace for consumer goods in the post-pandemic landscape. *See* Friedman Decl., ¶¶ 75-76; *see* Ilowitz Decl., ¶¶ 69-70. In addition, Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context. The cited out-of-context WhatsApp messages do not accurately reflect any facts asserted by Plaintiff.

88.      In the meantime, Friedman and Ilowitz acknowledged that the success of their secret and undisclosed business was reliant on the Amazon Vendor Central account:







*Figure 39: Excerpt of WhatsApp conversation between Friedman and Ilowitz from March 28, 2023*

**Exhibit 50** at 1-2.

 **Response: Disputed.** The success of Friedman and Ilowitz's venture was due to their hard work and was reliant on their own skills and expertise in the consumer goods business, which they developed as independent contractors operating their own businesses. *See* Friedman Decl., ¶¶ 75-76; *see* Ilowitz Decl., ¶¶ 69-70. The cited out-of-context WhatsApp conversation does not accurately reflect any facts asserted by Plaintiff.

 89. With a Vendor Central license in hand, Friedman and Ilowitz began to contact manufacturers in China to obtain pricing for products to sell through their secret business:

\* \* \*



\* \* \*

*Figure 40: Excerpt of WhatsApp conversation between Friedman and Ilowitz from June 20, 2022*

**Exhibit 51** at 3-6.

    **Response: Clarification.** Although the statement is correct that, in mid-2022, Friedman and Ilowitz were in the process of sourcing products for their venture from manufacturers they located and with whom they cultivated relationships, the cited out-of-context WhatsApp conversation does not pertain to any Amazon Vendor Central account and mischaracterizes

Friedman and Ilowitz's business. In addition, Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

90.    In particular, they began soliciting pricing information from manufacturers for products to be sold under their newly created brands. **Exhibit 52**; **Exhibit 53**.

**Response: Undisputed.**

91.    In soliciting these price quotes, Friedman and Ilowitz contacted the same manufacturers from whom they were purchasing products *for Sound Around* and with whom, through their work as Buyers *for Sound Around*, they had developed a working relationship:

```
10              Are you purchasing the products from
11    the same manufacturers?
12        A.  I'm sourcing products for -- I did
13    -- I was sourcing products for Sound Around,
14    and I am sourcing products for my company,
15    from the -- from some same manufacturers.
```

*Figure 41: Excerpt from Deposition of Friedman taken on April 8, 2025*

**Exhibit 2** at 162:23-163:15;

```
7         Q.  Okay.  You purchased, right, the source
8    products from the same vendors for Sound Around and
9    for your business with Mr. Friedman, correct?
10        A.  I purchased -- I suggested for Sound Around
11    to purchase my factories.
12        Q.  I understand that.
13        A.  And I was using my factories to supply for
14    myself.
```

*Figure 42: Excerpt from Deposition of Ilowitz taken on April 9, 2025*

**Exhibit 6** at 88:7-14.

**Response: Clarification.** Friedman and Ilowitz sourced products for their venture from manufacturers they located through their own efforts and with whom they cultivated

relationships as independent contractors. *See* Friedman Decl., ¶¶ 75-76; *see* Friedman Decl., Ex. J; *see* Ilowitz Decl., ¶¶ 69-70; *see* Ilowitz Decl., Ex. F

92.     For example, one of the first products Friedman and Ilowitz purchased for their competing business (in early August 2022) was a children's scooter with a foldable seat (the same product Ilowitz was purchasing for Sound Around) from Yongkang Fulaitai Industry & Trade Co. (the same manufacturer through whom Ilowitz was purchasing scooters for Sound Around). *see also* **Exhibit 53**; **Exhibit 54**; **Exhibit 55**.

**Response: Clarification.** Ilowitz located and cultivated a relationship with a scooter manufacturer as an independent contractor through his own efforts and contacts. He was under no restriction regarding sourcing products from the manufacturer for his own venture. Also, the scooter was not the same. *See* Friedman Decl., ¶ 81; *see* Ilowitz Decl., ¶¶ 5, 74, 77-78.

93.     In doing so, Friedman and Ilowitz negotiated *better* pricing for their competing business than the price Ilowitz had negotiated with the same manufacturer for Sound Around. *Compare* **Exhibit 53**; **Exhibit 54** *with* **Exhibit 56**; **Exhibit 57**.

**Response: Disputed.** The pricing examples cherry-picked by Plaintiff are for different model scooters with different materials, quality, and features to appear that they were different prices. Also, the quantities for the same goods purchased were materially different. *See* Friedman Decl., ¶ 81; *see* Ilowitz Decl., ¶ 83.

94.     To be clear, Friedman and Ilowitz were paying a price that was nearly $1 less per scooter for their competing business than the price being paid by Sound Around for the same

product at the same time, as illustrated by the emails and pricing sheets below (sent just three days apart from each other in July and August 2022):[5]



| From: | Sol Green |
|---|---|
| Sent: | Monday, August 01, 2022 7:30 PM |
| To: | moshe Fried; sales02@fulaitai.com |
| Subject: | RE: Lifemaster and cheap model scooter PO QTY sheet |
| Attachments: | Copy of Lifemaster Scooter 07.29(5291) MODEL NUMBERS.xlsx |

Hi Linda,

See attached sheet with model numbers

*Figure 43: Excerpt of August 1, 2022 Email from S. Green (Ilowitz) to Linda at Fulaitai on August 1, 2022 attaching purchase order with prices for Lifemaster scooters*

**Exhibit 53**;



| Brand Name | PO# | Product Name | Model No. | Color | Quantity | Price |
|---|---|---|---|---|---|---|
| | | | LIFMS11 | Pink | 800 | $14.80 |
| | | | LIFMS22 | Blue | 800 | $14.80 |
| | | | LIFMS33 | Red | 500 | $14.80 |
| | | | LIFMS47 | Purple | 500 | $14.80 |
| | | | LIFMS55 | Green | 400 | $14.80 |
| Lifemaster | | New 2 in 1 kids scooter with foldable seat | LIFMS62 | Yellow | 200 | $14.80 |
| | | | LIFMS71 | Black | 600 | $14.80 |
| | | | LIFMS88 | Teal Blue | 600 | $14.80 |
| | | | LIFMS93 | Watermelon | 600 | $14.80 |
| | | | LIFMSCAM | Camo | 600 | $15.80 |
| | | | LIFMSGR | Graffiti | 600 | $15.80 |
| | | | LIFMSEJ | Emoji | 600 | $15.80 |
| | | | | | | |
| Total | | | | | 6800 | |

*Figure 44: Excerpt of Attachment to August 1 email containing prices for Lifemaster scooters being purchased for competing business from Fulaitai*

**Exhibit 54**.

---

[5]As discussed in Section III.A.1.g. below, during this time period, Ilowitz was demanding and collecting kickbacks from Fulaitai on Sound Around's orders and advocating in favor of higher prices for Sound Around to accommodate his "commissions."  *See* Section III.A.1.g., *infra*.

**Response: Disputed**, as discussed in Section III, *below*.



*Figure 45: Excerpt of July 29, 2022 Email from Linda at Fulaitai to individuals at Sound Around, including Ilowitz containing purchase order with prices for scooters being purchased from Fulaitai by Sound Around*

**Exhibit 56**;



*Figure 46: Excerpt of Attachment to August 1 email containing prices for Lifemaster scooters being purchased for Sound Around from Fulaitai*

**Exhibit 57**.

> **Response: Disputed.** The pricing examples cherry-picked by Plaintiff are for different model scooters with different materials, quality, and features and different quantities. *See* Friedman Decl., ¶ 81; *see* Ilowitz Decl., ¶ 83.

95.     At the same time, Ilowitz requested and purchased a new version of the children's scooter (a lower cost model without a seat) that was not previously requested for Sound Around—even though Sound Around had been trying to purchase and sell that cheaper model:

| Brand Name | PO# | Product Name | Model No. | Color | Quantity | Price |
|------------|-----|--------------|-----------|-------|----------|-------|
| Lifemaster |  | Cheap Model without seat | LIFSCTBL | Blue | 800 | $8.80 |
|  |  |  | LIFSCTRD | Red | 600 | $8.80 |
|  |  |  | LIFSCTBLK | Black | 600 | $8.80 |
|  |  |  | LIFSCTPIK | Pink | 800 | $8.80 |
|  |  |  | LIFSCT85 | Purple | 300 | $8.80 |
|  |  |  | LIFSCT37 | Teal | 800 | $8.80 |
|  |  |  | LIFSCTYL | Yellow | 200 | $8.80 |
| Total |  |  |  |  | 4100 |  |

*Figure 47: Excerpt of price sheet from Linda at Fulaitai to Sol Green on August 1, 2022 with prices for "Cheap Model"*

**Exhibit 54**; *see also* **Exhibit 1** ¶ 45.



*Figure 48: Excerpt of WhatsApp conversation between Ilowitz and Friedman on August 27, 2022*

**Exhibit 58**; *see also* **Exhibit 1** ¶ 45 (discussing that Jerry had requested Ilowitz look into purchasing a cheaper scooter model without a seat for Sound Around but that Ilowitz never did so).

        **Response: Disputed.** Jerry Brach, or anyone from Sound Around, never requested that Ilowitz source a "cheaper scooter model without a seat" for Plaintiff. *See* Ilowitz Decl., fn. 7.

96.     Friedman and Ilowitz also began requesting price quotations for bakeware and cookware items in June 2022 from the same manufacturer from whom Friedman was purchasing the same products for Sound Around (Zhejiang Wuyi Hongchang Industrial & Trade Co., Ltd. ("K-Lead")). **Exhibit 59**.

**Response: Disputed.** Friedman and Ilowitz sourced products for their venture from manufacturers they located through their own efforts and with whom they cultivated relationships as independent contractors. Also, Friedman did not purchase products for Sound Around. *See* Friedman Decl., ¶¶ 21-22, 40, 48-51, 58, 75; *see* Friedman Decl., Ex. J; *see* Ilowitz Decl., ¶¶ 35, 38, 46-49, 69; *see* Ilowitz Decl., Ex. F.

97.     In doing so, Friedman and Ilowitz again negotiated *better* pricing for their competing business than the prices they had negotiated with the same manufacturer for Sound Around. *Compare* **Exhibit 60** *with* **Exhibit 61**.[6]   For example, Friedman and Ilowitz were able to purchase a pizza pan for $0.10 cheaper per piece than the price Sound Around was paying for the same product.  *Id.*

**Response: Disputed.** The pricing examples cherry-picked by Plaintiff are for different model pizza pans with different materials, quality, and features. *See* Friedman Decl., ¶ 81.

98.     Friedman and Ilowitz also requested price quotes for portable air conditioners from Yoau Electric Co. Ltd., the same manufacturer from whom they were purchasing the same products for Sound Around.  **Exhibit 62**; **Exhibit 63**.

**Response: Clarification.** Friedman and Ilowitz sourced products for their venture from manufacturers they located through their own efforts and with whom they cultivated relationships

---

[6] During this time period, Ilowitz was collecting kickbacks from the same vendor on Sound Around's orders. *See* **Exhibit 12**.

    **Response: Disputed.** Ilowitz did not receive "kickbacks." *See* Ilowitz Decl., ¶¶ 80-82.

as independent contractors. *See* Friedman Decl., ¶¶ 21, 40, 48-51; *see* Friedman Decl., Ex. J; *see* Ilowitz Decl., ¶¶ 35, 38, -46-49; *see* Ilowitz Decl., Ex. F.

99.    In fact, nearly all manufacturers Friedman and Ilowitz disclosed in discovery as using for their competing business were manufacturers with whom they had established a working relationship purchasing products as a Buyer for Sound Around:



| Amounts Paid to Manufacturers by ML Imports by Year | | | | | |
|---|---|---|---|---|---|
| **Manufacturer** | **2022** | **2023** | **2024** | **2025** | **Total** |
| Hainan Cooktone Household | $ 79,841 | $ 775,249 | $ 2,091,886 | $ 373,209 | $ 3,320,185 |
| Zhejiang Wuyi Hongchang Industry & Trade | - | 463,097 | 950,239 | 124,584 | 1,537,920 |
| Yongkang Fulaitai Industry & Trade | 10,000 | 406,050 | 955,173 | - | 1,371,224 |
| Linkfair International | 51,132 | 396,962 | 808,726 | 56,319 | 1,313,139 |
| Dongguan Hongfeng Hongkong Hange | - | 252,303 | 838,453 | 117,571 | 1,208,328 |
| Yoau Electric | - | 255,793 | 428,508 | - | 684,301 |
| Yongkang Yilien Industry & Trade | - | - | 207,873 | 250,899 | 458,772 |
| Jieyang Coopway Industries | - | 134,480 | 164,899 | 75,439 | 374,818 |
| Pujiang Xufeng Yijia | - | 2,886 | 282,919 | 55,848 | 341,654 |
| Hefei Smartmak Industrial | - | - | 191,024 | - | 191,024 |
| Ningbo Healthmate Health Technology | - | - | 180,924 | - | 180,924 |
| Anhui Light Industries | - | - | 156,460 | 3,576 | 160,036 |
| Yongkang Jieyao Industry & Trade | - | - | 98,623 | 20,077 | 118,700 |
| Jiangsu Shuoda Sports Equipment | - | - | 76,489 | - | 76,489 |
| Ningbo Audio Plus Import & Export | - | - | 70,368 | - | 70,368 |
| Ningbo James Electronic | - | - | 24,600 | - | 24,600 |
| Hebei Changan Ductile Iron | - | - | - | 21,857 | 21,857 |
| Jiangsu Baoxiang Sports Equipment | - | 5,755 | - | - | 5,755 |
| **Grand Total** | $ 140,974 | $ 2,692,574 | $ 7,527,165 | $ 1,099,378 | $ 11,460,091 |

*Figure 49: Chart Identifying Manufacturers from whom Friedman and Ilowitz purchased products for their competing business*

**Exhibit 20 ¶¶** 13-14 & Ex. F; **Exhibit 1 ¶** 42 (explaining that the only manufacturers on the above list that Sound Around did not buy products from during the time Friedman and Ilowitz were working as Buyers were: Jieyang Coopway, Pujiang Xufeng, Yongkang Jiayao, Jiangsu Shuoda, and Ningbo Audio).

    **Response:  Disputed.** As the information set forth in the parenthetical above demonstrates, Plaintiff's misleading statement is not accurate. Friedman and Ilowitz sourced products for their

venture from manufacturers they located through their own efforts and with whom they cultivated relationships as independent contractors. *See* Friedman Decl., ¶¶ 21, 40, 48-51; *see* Friedman Decl., Ex. J; *see* Ilowitz Decl., ¶¶ 35, 38, -46-49; *see* Ilowitz Decl., Ex. F.

100.    And many of the manufacturers used by Friedman and Ilowitz from whom Sound Around did not purchase products were originally identified and contacted by Ilowitz or Friedman *during the time they were working as Buyers for Sound Around*. *See, e.g.*, **Exhibit 64** (Pujiang purchase order from Sept. 28, 2023); **Exhibit 65** (Delivery order for products shipped Jan. 26, 2024 from Coopway); **Exhibit 66** (email chain with Yongkang JieYao from Aug. 2021).

**Response: Clarification.** Friedman and Ilowitz sourced products for their venture from manufacturers they located through their own efforts and with whom they cultivated relationships as independent contractors. *See* Friedman Decl., ¶¶ 21, 40, 48-51; *see* Friedman Decl., Ex. J; *see* Ilowitz Decl., ¶¶ 35, 38, -46-49; *see* Ilowitz Decl., Ex. F.

101.    Significantly, to open doors, Ilowitz communicated with these manufacturers during the time they worked as Buyers for Sound Around *using (again, misusing) his Sound Around email address and signature block*—at times referencing Sound Around's brands.  For example, when reaching out initially to Jieyang Coopway Industries ("Jieyang"), Ilowitz used his Sound Around email address and signature block and referenced Sound Around's well-known Nutrichef brand:



***Figure 50: Excerpt of Dec. 22, 2022 from Ilowitz (using his Sound Around email address and signature block) to Angieli at Jieyang Coopway Industries referencing Sound Around's Nutrichef brand***

**Exhibit 67**.

     **Response: Disputed.** "Nutrichef" is not a well-known brand. Ilowitz did not use Sound Around's email signature block to open doors. *See* Ilowitz Decl., ¶¶ 75-76.

     102.    Indeed, Jieyang, the potential manufacturer, issued pricing quotations personalized to Sound Around, identifying the "seller" as "Nutrichef Kitchen":



*Figure 51: Excerpt of Jan. 4, 2023 Proforma Invoice from Jieyang issued to Nutrichef Kitchen*

**Exhibit 68.**

      **Response: Undisputed.**

      103.    Once Ilowitz had established a conversation using his Sound Around credentials and brand, however, he repeatedly diverted the conversation off of Sound Around's email server to the more private WeChat platform (a tactic used repeatedly by Ilowitz as discussed in Section I.D.1, *infra*):



*Figure 52: Excerpt of Dec. 29, 2022 from Ilowitz (using Sound Around email address) to Lily Tang at Jieyang*

**Exhibit 69** at 1;



*Figure 53: Excerpt of Jan. 12, 2023 email from Ilowitz (using his Sound Around email address)*
*to Fiona at Jieyang Coopway Industries*

**Exhibit 70** at 1.

**Response: Disputed.** Ilowitz contacted manufacturers he had located through his own efforts and with whom he cultivated relationships as an independent contractor via WeChat because it was common practice for manufacturers in China to use their local messaging platform. *See* Ilowitz Decl., ¶ 69.

104.    By September 2023, and while being paid by Sound Around as Buyers, Friedman and Ilowitz's business had already shipped 50 containers and done $3.7 million in sales. **Exhibit 71**.

**Response: Clarification.** Friedman and Ilowitz were paid as independent contractors by Sound Around. *See* Friedman Decl., ¶¶ 11, 25; *see* Friedman Decl., Exs. D and E; *see* Ilowitz Decl., ¶¶ 11-12, 18; *see* Ilowitz Decl., Exs. B and C; *see* A. Brach Trans., 92:9-25; 93:1-3.

105.    And as of March 2025, the clone business had sold over 685 product SKUs sold on Amazon.[7]*See* ECF No. 149-1 ¶ 2 (Affirmation of Friedman – "We have developed approximately 685 individual product SKUs, the sales of which have involved hundreds of thousands of individual transactions") (footnote omitted); ECF No. 150 ("[T]here are at least 685 individual SKUs developed by the Individual Defendants and sold under [their] brands.").

**Response: Clarification.** It was Friedman and Ilowitz's separate business, unique in many ways. It was not a clone of Sound Around's business.

106.    To bolster their business, Friedman and Ilowitz began soliciting employees of Sound Around to help with the clone business.

**Response: Disputed.** Friedman and Ilowitz did not solicit any employees of Plaintiff for their own venture. *See* Friedman Decl., ¶¶ 82-83.

107.    For example, in June 2023, Ilowitz (using his Sol Green alias) contacted an employee of Sound Around seeking graphics work for Friedman and Ilowitz' Business. **Exhibit 72**.

---

[7]These products include 118 products that Friedman and Ilowitz claim to be directly competing with Sound Around. *See, e.g.*, ECF No. 278-3 ¶ 4 (Decl. of N. Fortuna) (claiming that 118 SKUs overlap with products sold by Sound Around); ECF No. 149-1 at 4-5 (Affirmation of Friedman) (same).

        **Response: Disputed.** The 118 products were termed to be "Competing Products" by the Hon. Katherine H. Parker in the Opinion and Order on Motion for Protective Order with Respect to Plaintiff's Document Requests dated April 25, 2025. *See* ECF Doc. No. 175.

**Response: Disputed.** Friedman and Ilowitz did not contact any employees of Plaintiff to perform graphics work for their venture. *See* Friedman Decl., ¶¶ 82-83.

108.    Separately, by August 2023, Friedman and Ilowitz had convinced Sheina Flores, a Sound Around employee providing customer service for Sound Around's products, to work in customer service for their competing business as demonstrated by the below discussion referencing payment to Flores for her work in the competing business:



*Figure 54: Excerpt of WhatsApp conversation between Ilowitz and Friedman on August 22, 2023*

**Exhibit 73** at 3-5; *see also* **Tyberg Decl**. ¶¶ 14-15 (discussing that Sheina Flores left Sound Around on May 9, 2024).

**Response: Disputed.** "Sheina Flores" was not an employee of Plaintiff. To elide the fact that "Sheina Flores" was an overseas contractor, Jack Tyberg in his Declaration states that she "worked" for Plaintiff but does not characterize her as an employee, which she was not. She worked at a company in the Philippines that did customer service work for Sound Around on a contract basis. *See* Friedman Decl., ¶¶ 82-83.

109.    To ensure that Sound Around did not discover they were using its employee and to hide any potential connection between Friedman and Ilowitz and the new competing business, they gave Sheina Flores an alias: Monica Smith:





*Figure 55: Excerpt of WhatsApp conversation between Ilowitz and Friedman on September 21, 2023*

**Exhibit 74**; *see also* **Exhibit 75** at 163:9-11 (claiming that he does not know how he found Monica Smith to work with the competing business).

**Response: Disputed.** "Sheina Flores" was an Americanized name that was used by this individual contractor assigned to her by her employer in the Philippines because it would be more palatable for American customers than using their Filipino name. Likewise, "Monica Smith" was another Americanized name used by this individual contractor that was assigned to her. *See* Friedman Decl., ¶¶ 82-83.

110.    Friedman and Ilowitz also used Sound Around's resources to pay expenses for their competing business, including using Sound Around's Paypal account to pay photographers for

photographs to be used in marketing the products for their competing business. *See* **Exhibit 76**;

**Exhibit 77**; **Exhibit 78**; **Exhibit 79**.

      **Response: Disputed.** Friedman and Ilowitz did not use Plaintiff's funds to pay expenses

for their business. *See* Friedman Decl., ¶¶ 75, 77-78; *see* Ilowitz Decl., ¶¶ 69, 72-73.

      111.    For example, one photographer from Barcelona, Spain (Joel Ventura) confirmed

that Ilowitz paid thousands of dollars to him from Sound Around's PayPal account for photography

projects for Lifemaster and Bakken-Swiss products:



> It's obvious that Sol and Lazer it's the same person and that Lazer or Sol name was doing orders to us from brands they do not belongs to your company like lifemaster bakkerswis or others until Genuary 17.
> Recently from genuray 22th 2024 we start reciving orders, products and payments for the same products form a different comapny and different paypal account.

*Figure 56: Excerpt of email from Joel Ventura to Jerry on March 1, 2024*

**Exhibit 76** at 3.

      **Response: Disputed.** Mr. Ventura's email, an excerpt of which is provided out-of-context,

states that that Ilowitz placed orders for photography for brands like LifeMaster and Bakken-Swiss

that did not belong to Plaintiff. He does not state in that excerpt or anywhere else that Ilowitz paid

for those orders with Plaintiff's PayPal account.

      112.    In particular, Ventura reviewed the payments he had received from Sound Around's

PayPal account and color-coded the payments to identify those that pertained to jobs for Friedman

and Ilowitz's competing brands (Lifemaster and Bakken-Swiss):



I've made comment in green what I consider it's correct. Payment and job it's for Nutrichef clearly.

I've made comment in orange when I can not reconize any brand on the product or I have dubts cuz they do not have logos or anything.

I've made comment in red the two brands you are looking for on the products lifemaster and bakkerswiss

*Figure 57: Excerpt of email from Joel Ventura to Jerry on March 1, 2024*

*Id.*;

*Figure 58: Excerpt of email from Joel Ventura to Jerry on March 1, 2024 listing and color-coding photography jobs paid through Sound Around's account by Ilowitz for Lifemaster and Bakken-Swiss products*

**Exhibit 77**.

**Response: Disputed.** Mr. Ventura's email, an excerpt of which is provided out-of-context, states that that he color coded certain orders for photography for Plaintiff's brands and Friedman and Ilowitz's brands, where possible. He does not state in that excerpt or anywhere else, or provide any evidence, that Ilowitz paid for photography orders for Friedman and Ilowitz's brands with Plaintiff's PayPal account.

113.   Another photographer from New York (Isaac Kaufman) confirmed that Ilowitz paid thousands of dollars from Sound Around's PayPal account for images of Bakken-Swiss products. **Exhibit 78**; **Exhibit 79**; **Exhibit 80**.

**Response: Disputed.** The cited Exhibits do not state or demonstrate that Ilowitz paid for images of Bakken-Swiss Products with Plaintiff's PayPal account, nor do they contain any admissible statements from Mr. Kaufman to that effect.

114.   Friedman and Ilowitz went to great efforts to conceal their business and related activities from Sound Around.  Not only did they create fake aliases (discussed above), they went to great efforts to move any conversation about the competing business off of Sound Around's email servers, as discussed below.

**Response: Disputed.** Friedman and Ilowitz did not inform Plaintiff of their separate business venture because they were aware of the hostility that Plaintiff's managers exhibited toward them and were aware that as a result of Plaintiff's managers' would act in an unhinged manner as a result, as they have many times. Further, Friedman and Ilowitz used alternative names and separate email addresses to differentiate and keep separate the services they were providing as independent contractor buyers for Plaintiff and their work in establishing their own business. *See* Friedman Decl., ¶ 78; *see* Ilowitz Decl., ¶ 67-68, 73, fn. 7l; *see* Ilowitz Decl., Exs. L and M.

115.    For example, Ilowitz began contacting potential manufacturers for the purpose of identifying products for their competing business; in doing so, to open doors, he would initially use Sound Around's signature block, email address, and referenced Sound Around's established brands like Nutrichef USA and Serenelife USA (benefitting from the goodwill and reputation of Sound Around in the industry), as shown below.  **Exhibit 81** at 5; **Exhibit 82**.  Deliberately, he then made sure to divert those conversations to a separate WeChat platform, as also shown below:



*Figure 59: Excerpt of email from Ilowitz to potential manufacturer on Jan. 4, 2023*
*using Sound Around email address and signature block but directing replies to WeChat*

**Exhibit 81**;

发件人：Lazer Ilowitz <Lazeri@pyleusa.com>
发送时间：2023年11月3日(星期五) 05:00
收件人：Judy <trade@rishengsocks.com>; Chin <commerce@rishengsocks.com>; Lily Li <service@rishengsocks.com>
主　题：Product Inquiry – serenelife USA
Hello,
Hope all is well.
best way to get in touch with me is thru wechat add me lazeri
I'm interested in more information about your products
1. What is your MOQ on typical standard products ?
2. What is your price per unit for this MOQ?
3. Can you ship a sample to USA or do you have other companies sell your products, and I can order from them?
4. Do you have Product certification (ex. Safety or product license) ? and are you able to place my company logo on the products ?
5. What other companies have you have worked with? Anyone on Amazon USA?
6. What is your turnaround production time?
7. Please attached your company catalog
Skype live:f08b4642aa3f953a
Wechat Lazeri
Email Lazeri@pyleusa.com
Lazer Ilowitz
Sound Around Inc.
(718) 535-1800 x315
www.PyleUSA.com

* * *

From: Lazer Ilowitz
Sent: Friday, November 03, 2023 8:46 AM
To: 'Judy' <trade@rishengsocks.com>
Cc: 'Chin' <commerce@rishengsocks.com>; '??' <Lilei@rishengsocks.com>
Subject: RE: Product Inquiry – serenelife USA
Thanks I REPLIED TO YOU on wechat
From: Judy <trade@rishengsocks.com>
Sent: Thursday, November 2, 2023 9:48 PM
To: Lazer Ilowitz <Lazeri@pyleusa.com>
Cc: Chin <commerce@rishengsocks.com>; 李磊 <Lilei@rishengsocks.com>
Subject: Re: Product Inquiry – serenelife USA
Dear Lazeri,
Nice to hear from you and please kindly note I just added your WeChat, so please kindly approve it asap. Then I will send the E-catalogue. Thanks.
Besides, please kindly check the below answers. Thanks.

*Figure 60: Excerpt of email from Ilowitz to potential manufacturer on Nov. 2, 2023
using Sound Around email address and signature block but directing replies to WeChat*

**Exhibit** **82**.

**Response: Disputed.** Ilowitz contacted manufacturers he had located through his own efforts and with whom he cultivated relationships as an independent contractor via WeChat because it was common practice for manufacturers in China to use their local messaging platform. Use of his Pyle USA email account was inadvertent. Sound Around was not as well-known as Friedman and Ilowitz to the manufacturers. Friedman and Ilowitz initiated contact with the

68

manufacturers, developed the relationship with them before Sound Around knew of them. *See* Friedman Decl. ¶ 21, 40, 48-51, 78; *see* Friedman Decl., Ex. J; *see* Ilowitz Decl., ¶¶ 35, 38, 46-49, 73; *see* Ilowitz Decl., Ex. F.

116.    Additionally, when communications relating to Friedman and Ilowitz's business were inadvertently sent to their Sound Around email address, they became very concerned.

**Response: Clarification.** This is proof that Friedman and Ilowitz mistakenly used Sound Around's email, it was not intentional.

117.    For example, when Friedman and Ilowitz's shipping company (a company that also shipped products for Sound Around) sent an email in December 2022 relating to a shipment for ML Imports to Friedman's Sound Around email address, Friedman expressed great frustration:



*Figure 61: Excerpt of email from Friedman to L. Landau (Shifl) on Dec. 26, 2022 responding to ML Imports shipment email sent to Sound Around email address*

**Exhibit 83**.

**Response: Undisputed.**

118.    Friedman had a similar reaction in March 2023 when one of the manufacturers (from whom Friedman and Ilowitz purchased products for both Sound Around and their competing business) sent an email relating to Lifemaster to Friedman's Sound Around email address:



*Figure 62: Excerpt of email from Friedman to Yoau on Mar. 23, 2022 responding to email relating to Lifemaster products that was sent to Sound Around email address*

**Exhibit 84**.

   **Response: Undisputed.**

119.    In May 2023, Friedman and Ilowitz faced another scare when they discovered that certain of the scooters being sold by their competing business under the Lifemaster brand were using a Sound Around QR code on its package inserts and customers who purchased their scooters were submitting customer service tickets to Sound Around:



*Figure 63: Excerpt of email from Pyle Support to Ilowitz forwarding conversation between Sharmaine Santos (Support) and a customer who submitted a "ticket" when she was trying to register Lifemaster scooter with Sound Around*

**Exhibit 85**;



* * *





*Figure 64: Excerpt of WhatsApp conversation between Ilowitz and Friedman on May 21, 2023*

**Exhibit 7** at 1-3;



*Figure 65: Picture of Sound Around QR Code on Insert from Lifemaster brand scooter*

**Exhibit 86** at 3.

      **Response: Undisputed.**

120.    Worried that their clandestine business operation was about to be exposed, Friedman and Ilowitz devised a plan to (a) downplay the customer service tickets that were submitted to Sound Around, (b) contact those customers directly, and (c) blame another brand for using Sound Around's QR code:





From: 13477822352@s.whatsapp.net Moshe Friedman

That handles this kind of tickers

Priority: Normal
Status: Read
Platform: Mobile

5/21/2023 1:51:55 AM(UTC-4)

From: 13477822352@s.whatsapp.net Moshe Friedman

That you see a couple of people asking g but this is not our brand.

Priority: Normal
Status: Read
Platform: Mobile

5/21/2023 1:52:11 AM(UTC-4)

From: 13477822352@s.whatsapp.net Moshe Friedman

So like tell the customers they got the wrong brand info

Priority: Normal
Status: Read
Platform: Mobile

5/21/2023 1:52:30 AM(UTC-4)

From: 13477822352@s.whatsapp.net Moshe Friedman

And we should check out this daily. And contact the customers directly

Priority: Normal
Status: Read
Platform: Mobile

5/21/2023 1:52:46 AM(UTC-4)

From: 13477822352@s.whatsapp.net Moshe Friedman

It's like any brand used our contact

Priority: Normal
Status: Read
Platform: Mobile

5/21/2023 1:52:59 AM(UTC-4)

* * *

From: 13477822352@s.whatsapp.net Moshe Friedman

If you tell her will be much safer

Priority: Normal
Status: Read
Platform: Mobile

5/21/2023 1:54:42 AM(UTC-4)

* * *

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman

Sharmine,
I realized now other brand is registering on our website and not our brand, please tell them that it is the wrong brand

See ticket example 751483

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsapp.net Moshe | 5/21/2023 1:56:11 | 5/21/2023 | |

* * *



*Figure 66: Excerpt of WhatsApp conversation between Ilowitz and Friedman on May 21, 2023*

**Exhibit 7** at 5-13, 17.

**Response: Clarification.** Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

121.    Friedman and Ilowitz also decided to put a sticker over the QR code on future orders, worried their secret was going to be revealed to Abe:







*    *    *

**Figure 67: Excerpt of WhatsApp conversation between Ilowitz and Friedman on May 21, 2023**

**Exhibit 7** at 8-12.

**Response: Disputed.** Friedman and Ilowitz had the insert that was inadvertently included in their product removed from all previously-manufactured products and acted quickly to ensure that any products in the process of being manufactured and shipped would not have the insert inadvertently included. *See* Ilowitz Decl., ¶ 74. In addition, Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

122.    To ensure their secret stayed protected, Friedman also spoke to Jerry to convince him that there was an unrelated third-party competitor causing the issue:

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman

Spoke to Jerry?

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsa | 6/7/2023 | 6/7/2023 | |

From: 13477822352@s.whatsapp.net Moshe Friedman

Yes

Priority: Normal
Status: Read
Platform: Mobile

6/7/2023 9:41:38 AM(UTC-4)

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman

Convinced him to is is competition

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsa | 6/7/2023 | 6/7/2023 | |

\* \* \*

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman

I blamed the whole thing on the other completion that sells baking trays

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsapp.net | 6/7/2023 9:47:47 | 6/7/2023 | |

From: 13477822352@s.whatsapp.net Moshe Friedman

Jerry came to ask you?

Priority: Normal
Status: Read
Platform: Mobile

6/7/2023 9:48:39 AM(UTC-4)

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman

Yes

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsa pp.net Moshe Friedman | 6/7/2023 9:50:20 AM(UTC-4) | 6/7/2023 9:50:28 AM(UTC-4) | |

*Figure 68: Excerpt of WhatsApp conversation between Ilowitz and Friedman on June 7, 2023*

**Exhibit 49** at 2-3, 10; *see also* **Exhibit 1** at 47-48.

**Response: Clarification.** Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

123.    They also developed a plan to communicate the same story to Abe:



\* \* \*





*Figure 69: Excerpt of WhatsApp conversation between Ilowitz and Friedman on June 7, 2023*

**Exhibit 49** at 16, 20; *see also* **Exhibit 1** at 47-48.

**Response: Clarification.** Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

124.    A few months later, in January 2024, the issue of the third-party competitor using Sound Around's information came up again because customers were attempting to register Lifemaster scooters on Sound Around's website.  **Exhibit 1** ¶ 49-50.

**Response: Disputed.** The issue with the QR code occurred and was corrected in mid-2023. No customers confused Plaintiff's scooter with a scooter produced by Friedman and Ilowitz or attempted to register a scooter produced by Friedman and Ilowitz with Plaintiff. *See* Ilowitz Decl., ¶ 74.

125.    Consequently, Sound Around began to investigate the Lifemaster brand's use of Sound Around's QR code, and PYLE and SCOOTKID trademarks:



***Figure 70: Excerpt of email communication on Jan. 8, 2024 between Abe
and other individuals at Sound Around discussing Lifemaster***

**Exhibit 87** at 1-2; *see also* **Exhibit 88**; **Exhibit 1** ¶ 51.

**Response: Undisputed.**

126.    As part of that investigation, Sound Around involved Defendant Ilowitz (being that he was the Buyer responsible for scooters at Sound Around), and once again Friedman and Ilowitz

devised a plan to blame the same competitor they previously blamed in June 2023 for stealing and using Sound Around's information:



\* \* \*



*Figure 71: Excerpt of WhatsApp conversation between Ilowitz and Friedman on January 8, 2024*

**Exhibit 89** at 2-3; **Exhibit 1** ¶ 52.

      **Response: Undisputed.**

    127.    Although Ilowitz was copied on emails discussing his and Friedman's competing business, not once did Ilowitz (or Friedman) reveal that Lifemaster was *their brand*—a brand they had been using to secretly compete with Sound Around.**Exhibit 88**.

    **Response: Disputed**. The scooter that Friedman and Ilowitz developed under their LifeMaster brand was not "competing" with Plaintiff. *See* Friedman Decl., ¶ 81; *see* Ilowitz Decl., ¶¶ 78, 83.

    128.    Consistent with their plan, Ilowitz claimed to have no knowledge regarding the Lifemaster brand, laying blame on the unrelated competitor of Sound Around that (in reality) had no involvement with Lifemaster:



*Figure 72: Excerpt of email string between Abe and Ilowitz regarding Lifemaster scooter on Jan. 8, 2024*

**Exhibit 88**.

**Response: Undisputed.**

129.    Ilowitz did not indicate in the email that the scooter was being sold by his and Friedman's competing business:

```
                                              Page 103
 1     Q.  It doesn't say, "It was me"?
 2     A.  No.
 3     Q.  It doesn't say, "It was Mr. Friedman"?
 4     A.  It says, "Same guy we saw a long time ago."
 5     Q.  Okay.  It doesn't say, "It was
 6  Mr. Friedman," correct?  It doesn't say it,
 7  Mr. Ilowitz?  It's simple; it's a yes-or-no answer.
 8     A.  No.
 9     Q.  Okay.  And it was your intent at that
10  particular point in time to actually conceal from
11  Sound Around that you and Mr. Friedman were behind
12  Lifemaster?
13     A.  I don't recall the events.
14     Q.  Okay.  But you were concealing in this
15  e-mail that you and Mr. Friedman are behind
16  Lifemaster, correct?
17     A.  No.
18     Q.  You're not concealing it?
19     A.  What does "concealing" mean?
20     Q.  You're not revealing that it's you and
21  Mr. Friedman.
22     A.  It says, "Same guy we saw a long time ago."
23     Q.  It doesn't reveal that it's you and
24  Mr. Friedman, correct?
25     A.  It doesn't reveal anything.
```

*Figure 73: Excerpt of Deposition of Ilowitz on April 9, 2025*

**Exhibit 6** at 102:9-103:25.

**Response: Undisputed.**

130.    These close calls into the uncovering of their clone business worried Friedman and Ilowitz who began discussing plans to leave Sound Around before their unlawful acts were discovered:





*Figure 74: Excerpt of WhatsApp conversation between Ilowitz and Friedman on Jan. 8, 2024*

**Exhibit 91**.

**Response: Disputed.** Friedman and Ilowitz did not commit any unlawful acts in operating their own venture while providing services as independent contractor buyers for Plaintiff, and they had no legal obligation that prevented them from conducting their own business. However, Friedman and Ilowitz were aware that, due to the Plaintiff's managers hostility toward them and general and that Plaintiff would respond in an unhinged manner as a result. *See* Friedman Decl., ¶¶ 16-17; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl., ¶¶ 5, 67-68; *see* Ilowitz Decl., Exs. L and M.

131.    In fact, Sound Around was already discussing a plan with Ilowitz to sue the competitor who was using its trademarks and even asked Ilowitz to contact Sound Around's attorney (Max Moskowitz) about having the competitor removed from Amazon:



From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman
He wants to sue him
Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsa | 1/8/2024 | 1/8/2024 | |

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman
Told him he should sue him
Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsa | 1/8/2024 | 1/8/2024 | |

From: 13477822352@s.whatsapp.net Moshe Friedman
OMG
Priority: Normal
Status: Read
Platform: Mobile
1/8/2024 12:27:01 PM(UTC-5)

From: 13477822352@s.whatsapp.net Moshe Friedman
this is a problem
Priority: Normal
Status: Read
Platform: Mobile
1/8/2024 12:27:01 PM(UTC-5)

* * *

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman
He wants I sjoood ask max Moskowitz
Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsa | 1/8/2024 | 1/8/2024 | |

From: 13475782325@s.whatsapp.net Lazer (owner)
To: 13477822352@s.whatsapp.net Moshe Friedman
If we can remove him from amaozn
Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 13477822352@s.whatsa | 1/8/2024 | 1/8/2024 | |

*Figure 75: Excerpt of WhatsApp conversation between Ilowitz and Friedman on Jan. 8, 2024*

**Exhibit 89** at 9-10, 15-16.

**Response: Clarification.** Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

132.    Recognizing the potential threat to their secret, Friedman and Ilowitz planned to have Ilowitz proceed with contacting Sound Around's attorney as requested:





*Figure 76: Excerpt of WhatsApp conversation between Ilowitz and Friedman on Jan. 8, 2024*

**Exhibit 89** at 17-18.



*Figure 77: Excerpt of email conversation between Ilowitz and Sound Around's attorney (Max Moskowitz) on Jan. 8, 2024*

**Exhibit 87** at 1.

**Response: Undisputed.**

133.    Ilowitz also volunteered to order the infringing products.    **Exhibit 91** (email volunteering to place the order); **Exhibit 92** (Jan. 8, 2024 order confirmation from Amazon showing a delivery estimate of Jan. 9, 2024).

**Response: Disputed.** The scooter sourced, developed, and produced by Friedman and Ilowitz under their brand LifeMaster does not infringe any protectible intellectual property owned by Plaintiff. Abe Brach requested that Ilowitz place the order for the scooter. *See* Ilowitz Decl., ¶¶ 77-79; *see* Canamero Decl., Ex. 94.

134.    In doing so, Ilowitz never informed Sound Around he had those scooters at his warehouse:



```
7     Q.  You didn't tell Jerry, "Jerry, there's no
8   need for that.  I have -- I have -- all these
9   scooters.  You don't need to buy any when I have"
10  -- how many did you have at the warehouse at that
11  time?
12    A.  I was -- it says, "Should we buy"; I was
13  instructed to buy.
14    Q.  You didn't tell Jerry, right, in response,
15  right, "I have a bunch of these at a warehouse"?
16    A.  I wasn't asked.
17    Q.  Okay.  You certainly didn't tell Jerry,
18  right, that, again, Lifemaster was yours and
19  Mr. Friedman's, correct?
20    A.  It wasn't -- he didn't ask me that question.
21    Q.  You didn't volunteer it either?
22    A.  I wasn't asked.
23    Q.  I understand that.  You didn't volunteer it?
24    A.  No.
```

*Figure 78: Excerpt of Deposition of Ilowitz taken on April 9, 2025*

**Exhibit 6** at 121:20-122:24.

**Response: Undisputed.**

135.    Then, the morning after the products arrived, Ilowitz sent an email to Jerry and another Sound Around attorney (Mario Simoeyan) claiming that the scooters did not contain the Sound Around QR code:



**Figure 79: Jan. 10, 2024 email from Ilowitz to Jerry (copying attorney M. Simoeyan)**

**Exhibit 93** at 1; *see also* **Exhibit 94** at 1.

    **Response: Undisputed.**

136.    Ilowitz again concealed that the scooters were being sold by his and Friedman's company:

```
 6     Q.  Okay.  Now, you're not revealing to Jerry or
 7  the attorney, right, that Lifemaster belongs to you
 8  and Mr. Friedman, correct?
 9     A.  I wasn't being asked that question.
10     Q.  But you're not revealing it, right?  Whether
11  you're being asked, you're not being asked, you're
12  not revealing it.  That's correct?
13     A.  I wasn't being asked.
14     Q.  The -- let me ask you a different question.
15  Do you reveal in this e-mail that Lifemaster
16  belongs to you and Mr. Friedman?
17     A.  I don't see it being asked.
```

*Figure 80: Excerpt of Deposition of Ilowitz taken on April 9, 2025*

**Exhibit 6** at 137:6-21**.**

    **Response: Undisputed.**

    137.    Not long after this incident, in late January 2024, Friedman and Ilowitz developed a plan to leave the company, beginning with Ilowitz, who resigned on January 30, 2024 (shortly after the Lifemaster investigation). **Exhibit 95** at 2**; Exhibit 96** at 2-3.

    **Response: Disputed.** Although Ilowitz informed Jerry Brach that he would be terminating his independent contractor relationship with Plaintiff on January 30, 2024, Jerry Brach requested that Ilowitz provide a list of open projects within a week. Ilowitz's relationship with Plaintiff was officially terminated shortly after midnight on January 31, 2024. *See* Ilowitz Decl., ¶ 14.

    138.    On January 31, 2024, the day after Ilowitz's resignation, Jerry began to review Ilowitz's emails on Sound Around's server. **Exhibit 1** ¶ 54. It was at this point that Jerry began to uncover the disturbing details regarding Ilowitz's breach of Sound Around's trust. *Id.*

    **Response: Disputed.** Plaintiff did not trust and did not place any trust in Ilowitz. Plaintiff had an adversarial relationship with Ilowitz from early on. *See* Friedman Decl., Ex. H; *see* Ilowitz Decl., ¶¶ 27, 65, 68; *see* Ilowitz Decl., Ex. D; *see* A. Brach Trans., 91:9-17.

139.    As Sound Around began to further investigate Ilowitz's conduct, Jerry (and others at Sound Around) copied Friedman on emails discussing the investigation into the competing brands, still not knowing of Friedman's involvement:



**From:** Moshe Joseph[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1F1A1C351ED34A648CA0552CDB4FE103-MJOSEPH]
**Sent:** Wed 1/31/2024 8:42:19 PM Coordinated Universal Time
**To:** Moshe Friedman[moshef@pyleusa.com]
**Subject:** FW: Information on the Companies we tracking

---

**From:** ziggyb@lanzar.com <ziggyb@lanzar.com>
**Sent:** Wednesday, January 31, 2024 11:32 AM
**To:** Moshe Joseph <mjoseph@pyleusa.com>
**Subject:** FW: Information on the Companies we tracking

More in depth details below:
Call me

1. There is a brand called "Bakken-Swiss" that has been identical to our Nutrichef Bakeware products.
2. The company that owns that trade mark is called "**ML Imports Inc**"

*Figure 81: Jan. 31, 2024 email from M. Joseph to Friedman forwarding email about companies being investigated after Ilowitz's resignation (including ML Imports, Bakken-Swiss, Lifemaster, etc.)*

**Exhibit 97**; *see also* **Exhibit 1** ¶ 55.

**Response: Disputed.** The cited email forwarded to Friedman was from Moshe Joseph. Plaintiff has not provided emails forwarded to Friedman from Jerry Brach or any others regarding Ilowitz.

140.    In response, Friedman continued to conceal the truth. **Exhibit 1** ¶ 55.

**Response: Clarification.** Friedman did not tell Plaintiff about his other business activities at this point.

141.    But after coming across certain documents on Sound Around's email server that linked Ilowitz's competing business to Friedman on February 2, 2024, Friedman was then terminated by Sound Around on February 3, 2024. *Id.*.

**Response: Clarification.** Friedman's relationship as an independent contractor was terminated on February 3, 2024. *See* Friedman Decl., ¶¶ 3, 65.

142.    Since at least September 2019, Plaintiff has continuously used the trademark SCOOTKID in connection with the advertising, marketing, and sale of children's scooters online throughout the United States and internationally.  *See, e.g.*, **Exhibit 1 ¶** 63; **Exhibit 98**; **Exhibit 99**; **Exhibit 100**.

**Response: Disputed.** As per Plaintiff's trademark application to the United States Patent and Trademark Office, Plaintiff's first use of the mark "SCOOTKID" as applied to a children's scooter was October 15, 2023. *See* Canamero Decl., Ex. 98.

143.    Plaintiff owns U.S. Trademark Registration No. 7,356,433 for SCOOTKID in International Class 28, covering "roller balance boards for improving strength, toning, conditioning, balance, and proprioception; roller skates and toy scooters, and accessories therefor." **Exhibit 101**.

        **Response: Undisputed.**

144.    Plaintiff's SCOOTKID mark is valid, subsisting, and in full force and effect.  *Id.*

**Response: Disputed.** The mark "SCOOTKID" is generic or descriptive. Plaintiff did not devise the name SCOOTKID, which was devised by Ilowitz as an independent contractor. Plaintiff did not obtain Ilowitz's consent or approval before filing the trademark registration application and did not credit Ilowitz with the name.

145.    Plaintiff has expended substantial resources to advertise and promote the SCOOTKID mark, and as a result, the mark has acquired substantial goodwill and consumer recognition nationwide.  **Exhibit 1 ¶** 64.

**Response: Disputed.** The cited Exhibit is merely Jerry Brach's Declaration in which he asserts, without any elaboration, the statement set forth above. Plaintiff has not produced any evidence of any expenditure of resources to advertise or promote the SCOOTKID mark or evidence that the mark has acquired any goodwill or consumer recognition.

146.    For nearly five decades, Plaintiff has continuously used the mark PYLE in connection with the advertising, marketing, and sale of products online throughout the United States and internationally. *See, e.g.*, **Exhibit 1** ¶ 60; **Exhibit 102**.

**Response: Disputed.** According to the United States Patent and Trademark Office registration for "PYLE" registered to Sound Around, Inc., the "PYLE" mark has been registered as applied to "automotive products, namely, speakers and woofers, audio amplifiers, loud speakers, audio cassette players, equalizers, crossover, subwoofers and automotive LCD televisions."[8]

147.    Plaintiff owns U.S. Trademark Registration No. 3,610,945 for PYLE in International Class 9. **Exhibit 103**.

**Response: Undisputed.**

148.    Plaintiff's PYLE mark is valid, subsisting, and in full force and effect. *Id.*

**Response: Undisputed.**

149.    Plaintiff has expended substantial resources to advertise and promote the PYLE mark, and as a result, the mark has acquired substantial goodwill and consumer recognition nationwide. **Exhibit 1** ¶ 61.

**Response: Disputed.** The cited Exhibit is merely Jerry Brach's Declaration in which he asserts, without any elaboration, the statement set forth above. Plaintiff has not produced any

---

[8] Plaintiff has not plead that the Defendants violated the "PYLE" trademark. Plaintiff seemingly has raised the issue of the "PYLE" trademark for the first time in its motion for summary judgment. However, because no causes of action concern this trademark, this Court should not consider Plaintiff attempt to raise new claims after the close of discovery.

evidence of any expenditure of resources to advertise or promote the PYLE mark or evidence that the mark has acquired any goodwill or consumer recognition.

150.    In late 2022 or early 2023, Friedman and Ilowitz (using the Lifemaster brand owned by Defendant ML Imports and the Vendor Central account registered to Defendant LRI Group) began using the PYLE and SCOOTKID marks in association with scooters being purchased for the competing business from Yongkang Fulaitai Industry & Trade Co. (the same company through which Ilowitz was purchasing Sound Around's SCOOTKID scooters):



| From: | sales02@fulaitai.com |
| Sent: | Friday, December 16, 2022 4:37 AM |
| To: | Sol Green |
| Subject: | Re: RE: Color box and master carton dieline for Lifemaster scooter with seat |
| Attachments: | Lifemaster Scooter with seat Specs - 12.16.docx |

Hi Sol,

Pls check product details file attached.

BR
Linda

*Figure 82: Excerpt of Dec. 16, 2022 email from Linda at Yongkang Fulaitai Industry & Trade Co. sending product details for Lifemaster Scootkid scooter*

**Exhibit 104**.



MODEL#:LIFMS22

**Mini Kids Toy Scooter with Foldable seat**

ScootKid 3-Wheel Kids Scooter - Child & Toddler Toy Scooter with Built-in LED Wheel Lights, Fold-Out Comfort Seat

*Figure 83: Excerpt of attachment to Dec. 16, 2022 email from Linda at Yongkang Fulaitai Industry & Trade Co.*

**Exhibit 105**.



*Figure 84: Picture of Sound Around QR Code and PYLE Mark on Insert from Lifemaster brand scooter*

**Exhibit 86** at 3.

**Response: Disputed.** Friedman and Ilowitz did not intentionally use either the PYLE mark at any time. The minimal use of the mark "SCOOTKID" by Friedman and Ilowitz is attributable

to the fact that Ilowitz created the name SCOOTKID and Plaintiff took steps to trademark that name without Ilowitz's knowledge or consent. Any use of the name "Pyle" was inadvertent and caused by the mistaken application of Plaintiff's QR code to Friedman and Ilowitz's product by the manufacturer. *See* Ilowitz Decl., ¶¶ 74, 77-79.

151.    At some point between December 2022 and May 2023, Friedman and Ilowitz used the SCOOTKID and PYLE marks in commerce in connection with the sale of children's scooters online under their Lifemaster brand:



| From: | Monica Lambresa <mlambresa@gmail.com> |
| Sent: | Tuesday, May 16, 2023 8:17 AM |
| To: | Customer Service @lifemasterusa |
| Subject: | Free Helmet on ScootKid scooter |

Hi there,

I just received the ScootKid 3 wheel kids scooter and there was a flyer in the box that states I can email you for a free helmet. Please let me know what next steps I can take to receive one.

Thank you,
Monica DePierro

*Figure 85: Excerpt of May 16, 2023 email from customer who purchased Lifemaster Scootkid Scooter*
**Exhibit 106**; *see also* **Exhibit 107**; **Exhibit 108**; **Exhibit 109**.

**Response: Disputed.** Friedman and Ilowitz did not intentionally use either the PYLE mark at any time. The minimal use of the mark "SCOOTKID" by Friedman and Ilowitz is attributable to the fact that Ilowitz created the name SCOOTKID and Plaintiff took steps to trademark that name without Ilowitz's knowledge or consent. Any use of the name "Pyle" was inadvertent and caused by the mistaken inclusion of an insert with Plaintiff's QR code with Friedman and Ilowitz's product. *See* Ilowitz Decl., ¶¶ 74, 77-79.

152.    For example, on the packaging of those scooters and on the Lifemaster website, Friedman and Ilowitz used the term SCOOTKID:



*Figure 86: Photograph captured from Lifemaster Website on Feb. 26, 2024*

**Exhibit 107**;



*Figure 87: Packaging for product received April 17, 2024*

**Exhibit 109**.

**Response: Disputed.** The minimal use of the mark "SCOOTKID" by Friedman and Ilowitz is attributable to the fact that Ilowitz created the name SCOOTKID and Plaintiff took steps to trademark that name without Ilowitz's knowledge or consent. *See* Ilowitz Decl., ¶¶ 74, 77-79.

153.    Friedman and Ilowitz's SCOOTKID mark is confusingly similar in appearance, sound, and commercial impression to Plaintiff's SCOOTKID mark. *See, e.g.*, **Exhibit 99**; **Exhibit 107**.

**Response: Disputed.** The minimal use of the mark "SCOOTKID" by Friedman and Ilowitz is attributable to the fact that Ilowitz created the name SCOOTKID and Plaintiff took steps to trademark that name without Ilowitz's knowledge or consent. *See* Ilowitz Decl., ¶¶ 74, 77-79.

154.    Friedman and Ilowitz also used the PYLE mark on the inserts inside the packaging of their scooters:



*Figure 88: Picture of Sound Around QR Code on Insert from Lifemaster brand scooter*

**Exhibit 86** at 3; **Exhibit 6** at 114:1-5 ("I don't know who told me or if I realized myself when I opened up a box and I saw it, but I saw the words 'Pyle USA' which was incorrect. 'Pyle USA' underneath the QR code.").

**Response: Disputed.** Any use of the name "Pyle" was inadvertent and caused by the mistaken inclusion of an insert with Plaintiff's QR code with Friedman and Ilowitz's product by the manufacturer. *See* Ilowitz Decl., ¶¶ 74, 77-79.

155.    Friedman and Ilowitz's PYLE mark is confusingly similar in appearance, sound, and commercial impression to Plaintiff's PYLE mark. *See, e.g.*, **Exhibit 103**; **Exhibit 86**.

**Response: Disputed.** Any use of the name "Pyle" was inadvertent and caused by the mistaken inclusion of an insert with Plaintiff's QR code with Friedman and Ilowitz's product by the manufacturer. *See* Ilowitz Decl., ¶¶ 74, 77-79.

156.     Friedman and Ilowitz used Sound Around's SCOOTKID and PYLE marks to market children's scooters online that were identical to the scooters Plaintiff was marketing online. *See* **Exhibit 106**; **Exhibit 107**; **Exhibit 108**; **Exhibit 109**.

**Response: Disputed.** Friedman and Ilowitz's scooter was distinctly different from the scooter sold by Plaintiff and the use of the SCOOTKID and PYLE trademarks were mistaken, *de minimis*, and inadvertent, as detailed above. *See* Friedman Decl., ¶ 81; *see* Ilowitz Decl., ¶¶ 74, 77-79, 83.

157.     In addition, Friedman and Ilowitz's use occurs in the same channels of trade (i.e., online platforms such as Amazon, Target, and Walmart) and targets the same consumers as Plaintiff.  *See* **Exhibit 106**.

**Response: Disputed.** Friedman and Ilowitz's scooter was distinctly different from the scooter sold by Plaintiff and the use of the SCOOTKID and PYLE trademarks were mistaken, *de minimis*, and inadvertent, as detailed above. In addition, there are over 1,000 other scooters offered for sale on the named online platforms. *See* Friedman Decl., ¶ 81; *see* Ilowitz Decl., ¶¶ 74, 77-79, 83; *see* Declaration of Keith Sterling (hereinafter, the "Sterling Decl."),[9] Ex. A.

158.     In using the SCOOTKID and PYLE marks, Friedman and Ilowitz confused consumers who purchased Lifemaster scooters, leading them to believe that products were affiliated with Plaintiff.  **Exhibit 85**.

**Response: Disputed.** Plaintiff has not adduced any evidence of actual consumer confusion between the scooters sold by Plaintiff and by Friedman and Ilowitz. The cited Exhibit is from a consumer that attempted to register a scooter purchased from Friedman and Ilowitz on Plaintiff's

---

[9] The Sterling Declaration is annexed to the Fortuna Decl. as Ex. E.

website due to the inadvertent inclusion of a product insert with a QR code leading to Plaintiff's website. *See* Ilowitz Decl., ¶ 74.

159.    To be sure, as early as May 2023, at least one consumer (Dawn Gary) who purchased Friedman and Ilowitz' infringing Lifemaster scooters was attempting to register those scooters with Plaintiff.  **Exhibit 85**.

**Response: Disputed.** The Lifemaster scooters were not infringing.

160.    And by January 2024, over 30 consumers accessed Plaintiff's website to try to register kids scooters that had been sold by Friedman and Ilowitz under the Lifemaster brand. **Exhibit 1 ¶** 50.

**Response: Disputed.** Plaintiff has provided no evidence of customers attempting to register a scooter sold by Friedman and Ilowitz with Plaintiff's website, other than as cited in Canamero Decl., Ex. 85.

161.    Friedman and Ilowitz had actual knowledge of Plaintiff's SCOOTKID and PYLE marks before adopting the infringing SCOOTKID and PYLE marks for their own products.  In fact, Defendant Ilowitz was the Buyer at Plaintiff who was responsible for the purchasing, marketing, and selling Plaintiff's products containing SCOOTKID and PYLE marks from 2019 through his departure in early 2024.  **Exhibit 111**; **Exhibit 98**; **Exhibit 1 ¶** 52.

**Response: Disputed.** Friedman and Ilowitz did not intentionally use either the PYLE or SCOOTKID mark at any time. The minimal use of the mark "SCOOTKID" by Friedman and Ilowitz is attributable to the fact that Ilowitz created the name SCOOTKID, which is generic or descriptive, and Plaintiff took steps to trademark that name without Ilowitz's knowledge or consent. Any use of the name "Pyle" was inadvertent and caused by the mistaken inclusion of an

insert with Plaintiff's QR code with Friedman and Ilowitz's product. *See* Ilowitz Decl., ¶¶ 74, 77-79.

162.    Although Friedman and Ilowitz claimed to have stopped using the SCOOTKID mark shortly after litigation commenced, they continued to ship products with the mark.  **Exhibit 112**.

**Response: Disputed.** Upon learning that Plaintiff had submitted an application to register the generic or descriptive "SCOOTKID" name, Friedman and Ilowitz removed any scooter in their warehouse with the "SCOOTKID" name on it and ensured that all future products shipped did not bear that name. *See* Ilowitz Dec., ¶ 79.

163.    Specifically, rather than removing the mark from the packaging, Friedman and Ilowitz "covered" the giant SCOOTKID letters with semi-transparent white stickers:



*Figure 89: Packaging for product received June 9, 2024*

**Exhibit 112**.

> **Response: Disputed.** Friedman and Ilowitz only had a non-transparent sticker placed over the SCOOTKID name on the small first order that had already been produced, were shipped to Amazon, and could not be recalled. *See* Ilowitz Decl., ¶ 79. Further, Canamero Decl., Ex. 89 does not present evidence in admissible form from which this Court could conclude that any product was received by anyone on June 9, 2024, and is merely an unattributed photograph.

164.    From 2023 to the present, Friedman and Ilowitz have sold more than $700,000 worth of the children's scooters that were using the SCOOTKID mark, at least some of which also used the PYLE mark. **Exhibit 44**.

> **Response: Disputed.** A *de minimum* number of scooters sold by Friedman and Ilowitz bore the SCOOTKID mark, due to the reasons set forth above. Plaintiff provides no evidence for their conclusion that more than $700,000 worth of scooters have been sold using the SCOOTKID mark, and has simply cited to Friedman and Ilowitz's gross yearly sales numbers to create this number. None of the scooters sold by Friedman and Ilowitz bore the PYLE mark at any time and the insert cards bearing the QR code was included only in the first shipment. *See* Ilowitz Decl., ¶ 74.

165.    As discussed above, both Friedman and Ilowitz demanded and received millions of dollars in "commissions" (i.e., kickbacks) from Sound Around's manufacturers in exchange for purchasing products for Sound Around. *See* **Exhibit 2 at** 185:18-25 (admitting that he was receiving "commissions" from Sound Around's manufacturers beginning in 2020); 191:14-22 (discussing that commissions stopped when Friedman was no longer bringing sales from Sound Around to the manufacturer); **Exhibit 6** at 179:20-180:10 (admitting to receiving "commissions" from manufacturers from 2020 until shortly after he resigned from Sound Around).

**Response: Disputed.** Friedman and Ilowitz received commissions from manufacturers for the work they performed for the manufacturers, including but not limited to providing new ideas for products, modifying existing products, suggesting new colors to use to make products more marketable, suggesting new materials to use to manufacture better-quality products, advising on entering new markets, and recommending methods for cutting costs. *See* Friedman Decl., ¶¶ 84-86; *see* Ilowitz Decl., ¶¶ 80-82.

166.    Below are just a few *examples* of the "commissions" Friedman and Ilowitz obtained.

**Response:** No response necessary, as this paragraph does not contain any statement of fact.

167.    After Ilowitz's resignation from Sound Around, Sound Around discovered reference to a wire payment from its manufacturer, RL Industry, on a spreadsheet found on Ilowitz's computer at Sound Around.  *See* **Exhibit 113** at 2.

**Response: Disputed.** Ilowitz located and developed the relationship with the referenced manufacturer, not Plaintiff. The cited Exhibit does not provide support for the asserted statement of fact. *See* Friedman Decl., ¶¶ 21, 40, 48-51; *see* Friedman Decl., Ex. J; *see* Ilowitz Decl., ¶¶ 35, 38, 46-49; *see* Ilowitz Decl., Ex. F.

168.    Jerry emailed Doris Yu, Sound Around's contact at RL Industry, on February 27, 2024, to ask about the payment to Ilowitz.  *Id.*  Doris responded on February 28, 2024, explaining that Ilowitz requested a kickback from Daniel Arahon ("Daniel"), RL Industry's CEO, but Daniel refused to pay "commission" because "in his eyes this is not the right way to do the business."  *Id.* Doris admitted, however, that Ilowitz then requested Daniel pay a "donation" to a "Yeshiva" requested by Ilowitz and Daniel agreed:

From: Doris-RL Industry <Doris@RLindustry.com>
Sent: Wednesday, February 28, 2024 5:01 AM
To: Jerry Brach <JerryB@pyleusa.com>; ziggyb@lanzar.com
Cc: Kelly -RL industry <kelly@RLindustry.com>; Abe Brach <abe@pyleusa.com>
Subject: RE: confidential

Dear Jerry,

Thanks for your email and nice to know you .

I check with Daniel about the issue, we wired from RL to Lazer account . As far as I know, Daniel explains to me that he refuse to do commission to the bakeware orders because in his eyes  this is not the right way do the business,
As for the below record, this is not commission, this is the Lazer ask Daniel for donation to "Yeshiva" and Daniel agreed.

*Figure 90: Excerpt of email from Doris Yu to Jerry and Ziggy on Feb. 28, 2024*

**Exhibit 113** at 2.

**Response: Disputed.** Ilowitz did not "solicit kickbacks" from RL Industry and the cited Exhibit does not state as such. The *ex post facto* email containing Doris Yu's recounting to the Plaintiff's managers of what she believed others said and did is not evidence of the facts asserted by Plaintiff.

169.     Doris sent an additional email on February 29, 2024, clarifying that her boss, Daniel, did not like Ilowitz "from the beginning" in October 2020 because he was talking about a commission and Daniel "think [sic] this is not the right way to do the business."  *Id.* at 1.

**Response: Disputed.** Ilowitz stopped working with RL Industry because of quality problems with the products they manufactured. *See* Ilowitz Decl., ¶ 49.

170.     In addition, in her February 29th email, Doris noted that Ilowitz stopped ordering from RL Industry after the summer of 2022 (even though its product quality and price are very good), which Daniel attributed to his unwillingness to comply with Ilowitz's demand for commission:



**Figure 91: Excerpt of email from Kelly Zhou on Mar. 1, 2024 to Jerry and Ziggy**

**Exhibit 113** at 1.

> **Response: Disputed.** The *ex post facto* email containing Doris Yu's recounting to the Plaintiff's managers of what she believed others said and did is not evidence of the facts asserted by Plaintiff, nor is Plaintiff's unsupported assertion regarding why Ilowitz sourced products from certain manufacturers and the quality of RL Industry's products. In fact, these were issues with the quality of RL Industry products.

171.    The following day, on March 1, 2024, Kelly Zhou, the sales manager at RL Industry, contacted Jerry to inform him that Ilowitz had messaged Daniel upset that Daniel had informed Sound Around about the commission payment:



*Figure 92: Excerpt of email from Clark Feng on Feb. 27, 2024 to Jerry and Ziggy*

*Id.*

**Response: Clarification.** The parties were beginning litigation at the time.

172.    Kelly also attached a chat record between Ilowitz and Daniel from that date wherein Ilowitz was trying to make sure that his conversation with Daniel was not revealed to Sound Around:



*Figure 93: Picture of Chat between Ilowitz and Daniel (RL Industry)*

**Exhibit 114**.

> **Response: Clarification.** The parties were beginning litigation at that time.

173.    On March 21, 2024, Ziggy emailed Alex at Ningbo Homful Import and Export Co. Ltd. ("Homful") to inform him that Ilowitz was no longer with Sound Around and that Ilowitz had been asking factories for "money back." **Exhibit 115** at 3.

> **Response: Disputed.** Ziggy Brach states in the cited Exhibit that Ilowitz was "not anymore with my company as he was asking many factories for money back," which was an inaccurate statement. *See* Canamero Ex. 115, pg. 4.

174.    Alex responded that day and informed Ziggy that Ilowitz had requested money, but that Homful believed that type of payment would do harm to Homful and Sound Around and thus did not acquiesce to Ilowitz's request:



------- Original message -------
From: alex@homful.net
Date: 3/21/24 10:27 PM (GMT-05:00)
To: Ziggy Brach <ziggyb@pyleusa.com>
Cc: vicky <vicky@homful.net>, Jerry Brach <JerryB@pyleusa.com>, abby@homful.net
Subject: Re:RE: Re:RE: Re:Re: Updated status of PO / HOMFUL 15459
Hi Ziggy,

After we received this PO, we also get message from Lazer for money, but we think this action will do harm to both Homful and you. Even he said he will place more order to other suppliers and not to us. We don't agree with him. In addition, for our quote provide, our price is really low.

Please check the signed PI, invoice and packing list in Excel on the attachment. For the shipping to Canada, it's OK and you can share the shipping plan and forwarder information with is then we can arrange.

If you have any question, please don't hesitate to contact me.
Best Regards,
Alex

*Figure 94: Excerpt of email from Alex (Homful) to Ziggy on Mar. 21, 2024*

**Exhibit 115** at 2.

**Response: Disputed.** Ilowitz did not receive commissions from Homful, which received numerous orders for products from Plaintiff, as demonstrated in Canamero Ex. 15.

175.    When Ziggy asked Alex when that request had taken place, Alex responded that Ilowitz asked for the kickback on January 23, 2024 (just days before his Jan. 30, 2024 resignation) and noted that Ilowitz threatened to cancel the order for Sound Around if the kickback was not paid:



From: alex@homful.net <alex@homful.net>
Sent: Friday, March 22, 2024 12:53 AM
To: Ziggy Brach <ziggyb@pyleusa.com>
Cc: vicky <vicky@homful.net>; Jerry Brach <JerryB@pyleusa.com>; abby <abby@homful.net>
Subject: Re:RE: E: Re:RE: Re:Re: Updated status of PO / HOMFUL 15459
Hi Ziggy,

He asked us at Jan 23, 2024. And he told us if we don't agree he can cancel the order.
Best Regards.
Alex

*Figure 95: Excerpt of email from Alex (Homful) to Ziggy on Mar. 22, 2024*

**Exhibit 115** at 2.

**Response: Disputed.** Ilowitz did not receive commissions from Homful, which received numerous orders for products from Plaintiff, as demonstrated in Canamero Ex. 15.

176.    Homful's sales manager, Abby, confirmed Alex's account as well, noting that Ilowitz began asking for commission from the beginning of Homful's relationship with Sound Around and threatened not to give it any orders unless it paid the commission he was demanding:



> From: abby <abby@homful.net>
> Sent: Sunday, March 24, 2024 10:39 PM
> To: Ziggy Brach <ziggyb@pyleusa.com>; alex <alex@homful.net>
> Cc: vicky <vicky@homful.net>; Jerry Brach <JerryB@pyleusa.com>
> Subject: Re:RE: Re:RE: Re:RE: Re:RE: Re:Re: Updated status of PO / HOMFUL 15459
> Dear Ziggy,
>
> This is Homful's sales manager Abby. Nice to talk with you.
>
> 1. Our company will not pay any money for the purchase, so lazer has not received any commission from us, although he began to ask for it from us at the very beginning of the cooperation and threatened not to give us orders without commission. Because our company's principle is to do business with companies, not with individuals, we oppose the behavior that damages the interests of the company for personal interests. Therefore, our quotation is a normal cooperation price, and we will not intentionally increase the price for some special circumstances.

*Figure 96: Excerpt of email from Abby (Homful) to Ziggy on Mar. 24, 2024*

**Exhibit 116** at 1.

**Response: Disputed.** Ilowitz did not receive commissions from Homful, which received numerous orders for products from Plaintiff, as demonstrated in Canamero Ex. 15.

177.    Alex also sent Ziggy a copy of his "chatting record" with Ilowitz in which Ilowitz states that all of his factories give him 5% from the Sound Around sales:



**From:** alex@homful.net <alex@homful.net>
**Sent:** Friday, March 22, 2024 1:35 AM
**To:** Ziggy Brach <ziggyb@pyleusa.com>
**Cc:** vicky <vicky@homful.net>; Jerry Brach <JerryB@pyleusa.com>; abby <abby@homful.net>
**Subject:** Re:RE: E: E: Re:RE: Re:Re: Updated status of PO / HOMFUL 15459
Hi Ziggy,

Please check our chatting record as below:

***Figure 97: Excerpt of email from Alex (Homful) to Ziggy on Mar. 22, 2024
containing picture of chat record between Ilowitz and Alex (Homful)***

**Exhibit 115** at 1.

**Response: Undisputed.**

178.    When Alex offered to Ilowitz to help with shipping rates rather than pay a commission (which would have inured to Sound Around's benefit), Ilowitz rejected that offer, again demanding commission instead, reiterating that "[a]ll companies offer me . . . And your [sic] the only company that doesn't." *Id.*

**Response: Disputed.** Shipping arrangements and payment terms were made by Jerry Brach and Ziggy Brach and Ilowitz had nothing to do with it. *See* Friedman Decl., ¶¶ 22, 58; *see* Ilowitz Decl., ¶¶ 56, 85.

179.    Alex then responded and reiterated that Homful believed a payment of commission would "damage your reputation" noting such payments would be an "improper operation"— Ilowitz shamelessly responded: "This is between me and you [a]nd nobody else":



*Figure 98: Excerpt of chat record between from Alex (Homful) to Ziggy and Ilowitz*

**Exhibit 115** at 1.

**Response: Clarification.** The excerpt of the chat is accurate. The characterizations are not.

180.    After Ilowitz's departure, Sound Around discovered reference to a wire payment from Vita Leisure Co., Ltd. ("Vita") on a spreadsheet contained on Ilowitz's computer at Sound Around. **Exhibit 23**.

**Response: Undisputed.**

181.    Jerry emailed Clark Feng, the Sales Manager at Vita, on February 26, 2024 to ask about the payment to Ilowitz. *Id.* In response, Clark informed Jerry that it had been paying "commissions" to Ilowitz since May 2022. *Id.*

**Response: Undisputed.**

182.    In particular, Vita paid Ilowitz a commission of 3% in 2022 and 4% in 2023, and Ilowitz asked for 5% commission for the following year:



From: Vita-Clark <clark@vitazj.com>
Sent: Tuesday, February 27, 2024 10:33 PM
To: Jerry Brach <JerryB@pyleusa.com>; VITA Hattie <hattie@vitazj.com>; PY Ziggy <ziggyb@lanzar.com>
Subject: Re: RE: wire
Dear Jerry & Ziggy,
First, I'm very sorry for what happened.
Now things like this, I tell you the truth as below:
Year 2022 Lazer find me for copperation for my items, I offer lazer commission in return.
MAY.17, 2022, I send USD9035(deduct bank fee, so 9015 in the file), based on order USD301176, so 3%.
MAY.15, 2023, I send USD13616, based on order USD340384.4, so 4%.
For current season, Lazer asked for 5% commission, as order not finished, so til now, I dont send him money.
For current orders, I will low down 5% for you, as no more commission to Lazer.
Sorry to hurt you, I also dont have choice, now things all clear, it is also a relief to me.
I'm glad that I can talk with Boss directly now, so no more dirty things.

Best Regards
Clark Feng
Sales Manager
VITA LEISURE CO., LTD.
Dayang Street, Linhai, Zhejiang, China
M P: +86 13136461166

*Figure 99: Excerpt of email from Clark Feng on Feb. 27, 2024 to Jerry and Ziggy*

**Exhibit 23**.

**Response: Clarification.** Clark Feng confirms in the above email that Vita offered Ilowitz commission, not that it was demanded by Ilowitz.

183.   Sound Around has since discovered that at least some of these "commission" payments from Vita were paid to a nonprofit entity, Congregation Kozover, that would receive and hold on to money for Ilowitz until Ilowitz requested those moneys be transferred back to Ilowitz or another entity at his request.  **Exhibit 20** ¶ 10 & Ex. E, ¶ 12 & Ex. F; **Exhibit 8** at 63:3-5; 196:9-16.

**Response: Undisputed.**

184.   Beginning in at least June 2020, Ilowitz was demanding and receiving "commission" from Hainan Cooktone Household Co., Ltd. ("Cooktone") from the orders he was placing for Sound Around from Cooktone for kitchen products, which was factored into the "cost" to Sound Around:



*Figure 100: Excerpt of WeChat conversation between A. Hoo (Cooktone) and Ilowitz on June 10, 2020*

**Exhibit 18** at 12;

*Figure 101: Excerpt of WeChat conversation between A. Hoo (Cooktone) and Ilowitz on October 15, 2020*

**Exhibit 18** at 27-28.

**Response: Disputed.** Plaintiff has cited to isolated WeChat messages from different period of time (June 10, 2020 and October 15, 2020) to mislead the Court as to the nature of the conversation had between a Cooktone factory representative and Ilowitz. These messages pertain to different sets of products and do not establish, based on admissible evidence, the cost of any product ordered by Plaintiff. *See* Ilowitz Decl., ¶ 84.

185.    On June 17, 2020, Cooktone agreed to pay Ilowitz a commission of 7% of Sound Around's purchase price:





*Figure 102: Excerpt of WeChat conversation between A. Hoo (Cooktone) and Ilowitz on June 17, 2020*

**Exhbit 18** at 18-19.

**Response: Disputed.** Ilowitz did not receive 7% commission and the price was cut lower. *See* Ilowitz Decl., ¶ 84.

186.    By August 2020, Ilowitz was receiving tens of thousands of dollars in commission for Sound Around orders:



*Figure 103: Excerpt of WeChat conversation between A. Hoo (Cooktone) and Ilowitz on August 24, 2020*

**Exhibit 18** at 26.

**Response: Undisputed.**

187.    On March 5, 2024, Ziggy emailed Amanda, Sound Around's contact at Shandong Lehe Housewares Co., TD ("Lehe") to ask whether Lehe had paid commission to Ilowitz prior to his departure at Sound Around.  **Exhibit 21** at 1.

**Response: Undisputed.**

188.    Amanda responded that Lehe "always" paid "3%" of Sound Around's orders to Ilowitz's bank account.  *Id.*

**Response: Undisputed.**

189.    Amanda further noted that because it no longer had to pay Ilowitz the 3% "commission", it could now lower the price to Sound Around by 3%.  *Id.*

**Response: Disputed.** The cited Exhibit demonstrates that Amanda gave Ziggy Brach a 3% discount because he demanded it. *See* Canamero Ex. 21, pg. 1.

190.    Ilowitz also demanded and received "commission" payments from Dongguan Hongfeng Hanger Industry Co. Ltd. ("Dongguan").

**Response: Undisputed.**

191.    In fact, by August 2023, Ilowitz was requesting an increase in his commission to 6%.  **Exhibit 11** at 2.  In doing so, he suggested Dongguan increase the price to Sound Around in order to accommodate his increased commission:



From: wxid_q2vnxflytzm112 Lazer (owner)
Can we increase the commission to 6%
Priority: Normal
Platform:
8/21/2023 12:05:12 PM(UTC-4)

From: wxid_q2vnxflytzm112 Lazer (owner)
So let's increase the price
Priority: Normal
Platform:
8/21/2023 12:06:30 PM(UTC-4)

From: wxid_q2vnxflytzm112 Lazer (owner)
Send me new sheet with price
Priority: Normal
Platform:
8/21/2023 12:06:35 PM(UTC-4)

*Figure 104: Excerpt of WeChat conversation between Kate (Dongguan) and Ilowitz on August 21, 2023*

**Exhibit 11** at 2.

**Response: Disputed.** The commission paid to Ilowitz was not increased. The price to Sound Around was not increased. *See* Ilowitz Decl., ¶¶ 85-86.

192.    Based on the discovery obtained to date, Sound Around has uncovered that at least some of these "commission" payments from Dongguan were paid to Congregation Kozover, which held the money for Ilowitz until Ilowitz requested those moneys be transferred back to Ilowitz or another entity at his request.  **Exhibit 20** ¶ 10 & Ex. E, ¶ 12 & Ex. F; **Exhibit 8** at 63:3-5.

**Response: Undisputed.**

193.    Ilowitz also demanded and received "commission" payments from Yongkang Fulaitai Industry ("Fulaitai").  Ilowitz requested the commission payments as early as May 2020:



*   *   *

*Figure 105: Excerpt of WeChat conversation between Tao (Fulaitai) and Ilowitz
on May 17, 2020 and June 27, 2020*

**Exhibit 13** at 1-2, 5.

**Response: Disputed.** Ilowitz did not receive a 3% commission from Fulaitai. *See* Ilowitz
Decl., ¶¶ 83-84. In addition, Plaintiff has presented series of messages with intervening messages
omitted to create a false "conversation" out of context.

194.    Ilowitz also made clear on multiple occasions that he was in favor of a higher price
to Sound Around to maintain his commission, notwithstanding his duty to negotiate the best price
for Sound Around.

**Response: Disputed.** Not only did Ilowitz not have any such duty to Plaintiff as an
independent contractor, Plaintiff does not cite to any evidence for the factual assertions in this
paragraph. *See* Ilowitz Decl., ¶ 5.

195.    For example, on July 14, 2020 when Fulaitai asked him whether the price for a scooter could be "higher than the current price" or had to stay "the same", Ilowitz responded *in three seconds* that the higher price was fine:



*Figure 106: Excerpt of WeChat conversation between Tao (Fulaitai) and Ilowitz on July 14, 2020*

**Exhibit 13** at 17.

**Response: Disputed.** The messages are taken out of context, and the conversation was regarding a different scooter product with different materials. *See* Friedman Decl., ¶ 81; *see* Ilowitz Decl., ¶ 83.

196.    He also made clear that he was willing to make "huge" purchase orders and negotiate the quantity of products purchased, not based on Sound Around's needs but to ensure he would receive his commission:

From: shoujili630434 Tao
commission first that I am sorry  that I've delayed
Priority: Normal
Platform:
7/15/2020 9:35:17 AM(UTC-4)

* * *

From: wxid_q2vnxflytzm112 Lazer (owner)
What did you think
Priority: Normal
Platform:
7/15/2020 9:37:14 AM(UTC-4)

From: wxid_q2vnxflytzm112 Lazer (owner)

I have give. You huge order

Priority: Normal
Platform:

7/15/2020 9:37:18 AM(UTC-4)

\* \* \*

From: shoujil630434 Tao

Thought about it for a long time. 3% ok, but The order quantity per month is not less than 30K

Priority: Normal
Platform:

7/15/2020 10:02:49 AM(UTC-4)

From: wxid_q2vnxflytzm112 Lazer (owner)

Per month is crazy to send 30k

Priority: Normal
Platform:

7/15/2020 10:05:26 AM(UTC-4)

\* \* \*

From: wxid_q2vnxflytzm112 Lazer (owner)

so what do you suggest?

Priority: Normal
Platform:

7/15/2020 11:18:18 AM(UTC-4)

\* \* \*

From: shoujil630434 Tao

3 months if order qty over 40K give you 3% that is ok?

Priority: Normal
Platform:

7/15/2020 10:16:35 AM(UTC-4)

\* \* \*

From: wxid_q2vnxflytzm112 Lazer (owner)

Let's say 50,000 and I ask you for payment

Priority: Normal
Platform:

7/15/2020 10:23:54 AM(UTC-4)

From: shoujil630434 Tao

about 2.5%, hurtle, Start the large order，serenelife，first order to start

Priority: Normal
Platform:

7/15/2020 11:22:20 AM(UTC-4)



*Figure 107: Excerpt of WeChat conversation between Tao (Fulaitai) and Ilowitz on July 15, 2020*

**Exhibit 13** at 19-20, 23, 33-34.

    **Response: Disputed.** Ilowitz never placed orders for Plaintiff. All orders were placed by Jerry Brach, and prices were negotiated by Jerry and Ziggy Brach. *See* Ilowitz Decl., ¶¶ 56, 85. In addition, Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

    197.    Ilowitz also demanded and received "commission" payment from YE Lingfang (Yelf):

From: yelf1202 Yelf.YXR
shall I send the commission list to yu
Priority: Normal
Platform:
11/1/2020 7:34:44 PM(UTC-5)

* * *



**From: wxid_q2vnxflytzm112 Lazer (owner)**
Do you have a full amount based on orders
Priority: Normal
Platform:
11/1/2020 7:57:43 PM(UTC-5)

\* \* \*

**From: yelf1202 Yelf.YXR**
I think over $10000
Priority: Normal
Platform:
11/1/2020 7:58:05 PM(UTC-5)

**From: yelf1202 Yelf.YXR**
over 20,000
Priority: Normal
Platform:
11/1/2020 8:01:20 PM(UTC-5)

*Figure 108: Excerpt of WeChat conversation between unidentified individual*
*at Yelf and Ilowitz on Nov. 1, 2020*

**Exhibit 14** at 3, 5.

**Response: Clarification.** Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

198.    In negotiating his commission with Yelf, Ilowitz negotiated *against* Sound Around, making clear that Yelf should not offer any discount to Sound Around if it would have a negative effect on his commission amount:

**From: wxid_q2vnxflytzm112 Lazer (owner)**
So he said he will accept or not?
Priority: Normal
Platform:
9/10/2023 11:37:28 PM(UTC-4)

\* \* \*



\* \* \*



*Figure 109: Excerpt of WeChat conversation between unidentified individual at Yelf and Ilowitz on September 10, 2023*

**Exhibit 14** at 7-8.

   **Response: Disputed.** Ilowitz fulfilled his obligations as an independent contractor buyer, which were to source and develop new and good quality products that could potentially turn a good profit for Plaintiff and offer those products to Plaintiff. Plaintiff was responsible for negotiating with manufacturers regarding cost, ordering products in quantities determined by Plaintiff, and

selling to Amazon at prices that it unilaterally determined. Ilowitz was not responsible for the price that Plaintiff's managers ultimately set for products offered for sale by Plaintiff. In addition, Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context. *See* Ilowitz Decl., ¶¶ 52, 56, 85.

199.    Based on discovery received to date, Sound Around is aware that Ilowitz received at least $1,222,117 in "commission" payments from at least 44 of Sound Around's manufacturers in exchange for order he placed from those manufacturers on Sound Around's behalf:

**Sound Around Inc. v. Moises Friedman, et al.**
**Summary of Kickbacks by Vendor by Year - Mr. Ilowitz**
**August 5, 2020 - June 26, 2024**

| Vendor | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
|---|---|---|---|---|---|---|
| ZHEJIANG MERCI KITCHENWARE CO | $ - | $ 112,412 | $ 62,160 | $ 61,591 | $ - | $ 236,163 |
| LIN FUTAO | - | 12,980 | 49,850 | 39,970 | - | 102,800 |
| Hu Yue Fang | - | 4,001 | 21,717 | 46,680 | 15,985 | 88,383 |
| NINGBO WENTAI SPORTS EQUIPMENT CO., LTD. | - | 22,354 | 22,927 | 34,215 | 7,240 | 86,736 |
| DBS BANK HONG KONG LTD | - | - | 85,175 | - | - | 85,175 |
| ZHEJIANG SUPOR CO LTD | - | 29,974 | 6,494 | 27,840 | - | 64,309 |
| LINKFAIR INTERNATIONAL | - | - | 47,625 | 11,782 | - | 59,407 |
| Dekel Abstract LLC | - | - | 42,761 | - | - | 42,761 |
| XIAOKUAI LIN | - | - | 9,947 | 20,284 | 7,993 | 38,224 |
| Aibite Trading Co Ltd | 9,181 | 13,394 | 13,503 | - | - | 36,078 |
| DONGGUAN HONGFENG (HONGKONG) | - | - | 11,959 | 8,648 | 12,515 | 33,122 |
| YONGKANG HONOUR INDUSTRIAL LIMITED | - | - | 11,600 | 18,967 | - | 30,567 |
| HK Risheng International Trade | - | 21,500 | 8,320 | - | - | 29,820 |
| Miss Fu Yang | - | 2,955 | - | 21,723 | - | 24,678 |
| Vita Leisure Co., Ltd. | - | - | 9,015 | 13,596 | - | 22,611 |
| Able Trend Development Limited Lucu | - | 8,021 | - | 12,000 | - | 20,021 |
| Tu Tao | - | - | 9,990 | 9,980 | - | 19,970 |
| Wenshuo Zheng | - | 5,991 | 9,096 | 3,000 | - | 18,087 |
| TIANLEI HUANG NA,CN | - | 16,339 | - | - | - | 16,339 |
| Wfuk Pfx Usd (US) | - | - | 14,534 | - | - | 14,534 |
| EZ Canopy Co., Limited | - | - | - | 10,698 | - | 10,698 |
| KINGLEADER IMP EXP CO., LIMITED (Yineng Electrical Appliance) | 3,300 | 6,840 | - | - | - | 10,140 |
| Shuangcheng Zhao Enterprises | - | - | 10,000 | - | - | 10,000 |
| Li Qian | - | - | - | 9,990 | - | 9,990 |
| TU TAO OGB (Jack) | - | 9,990 | - | - | - | 9,990 |
| Team Worldwide Corp Ltd | - | - | - | 9,983 | - | 9,983 |
| Goldenbaby Co Limited | - | - | - | 9,531 | - | 9,531 |
| Fulilong Trading Limited | - | - | 7,693 | - | - | 7,693 |
| RI Industry CO Ltd | - | - | 7,186 | - | - | 7,186 |
| Singbell Appliance Co Ltd New Wo | - | 3,169 | - | 3,765 | - | 6,934 |
| CHEN YUE XIAO (Yontai) | - | 5,985 | - | - | - | 5,985 |
| Tianlei Huang | - | - | - | 5,503 | - | 5,503 |
| Yongkang Honour Industrial Commercial Building | - | 5,090 | - | - | - | 5,090 |
| Orient Garden Co Limited | - | 5,022 | - | - | - | 5,022 |
| ZHEJIANG CHOUZHOU | - | - | 5,020 | - | - | 5,020 |
| Jiancong Zeng | - | - | 4,990 | - | - | 4,990 |
| Daniel Davita Shvili | - | 4,926 | - | - | - | 4,926 |
| Chang Jie | - | - | 4,785 | - | - | 4,785 |
| SINOLINK GROUP CO LTD (Cathy) | - | 4,453 | - | - | - | 4,453 |
| Joy Kie Corporation Limited | - | - | 3,986 | - | - | 3,986 |
| Shandong Lehe Housewares Co Ltd | - | - | 3,662 | - | - | 3,662 |
| Ys Ceramics Company Limited | - | - | - | 3,075 | - | 3,075 |
| Hou Yongzhi | - | - | - | 2,104 | - | 2,104 |
| Bi Shi Kai Add Room0703 Liuquanro | - | - | 1,585 | - | - | 1,585 |
| **Total** | $ 12,481 | $ 295,397 | $ 485,580 | $ 384,925 | $ 43,733 | $ 1,222,117 |

*Figure 110: Summary Chart of Manufacturers from whom Ilowitz received kickback payments*

**Exhibit 20** ¶ 10 & Ex. D.

      **Response: Disputed.** The factories from which Ilowitz received commissions were ones with which Ilowitz established a relationship and to which Ilowitz provided services. In addition, this list is not correct. *See* Ilowitz Decl., ¶ 80-82.

200.    These payments were received by Ilowitz through payments to Levi Rottenberg, or through one of the entities owned or controlled by Mr. Rottenberg: Defendant Executive Laundry, LLC or the nonprofit religious entity Congregation Kozover:

| Entities Receiving Kickbacks from Chinese Manufacturers for Sound Around Purchases June 5, 2020 through June 26, 2024 | | | | | | |
|---|---|---|---|---|---|---|
| Entity | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
| **Mr. Friedman's Entities** | | | | | | |
| MDF Marketing Inc. | $ 462,505 | $ 845,749 | $ 529,753 | $ 763,892 | $ 174,629 | $ 2,776,527 |
| | | | | | | |
| **Entities Affiliated with Mr. Ilowitz** | | | | | | |
| Cong Kozover | $ 9,181 | $ 137,782 | $ 178,763 | $ 280,914 | $ 35,740 | $ 642,381 |
| Executive Laundry LLC | 3,300 | 150,659 | 285,101 | 104,011 | - | 543,071 |
| Levi Rottenberg | - | 6,956 | 21,717 | - | 7,993 | 36,666 |
| Subtotal - Entities Affiliated with Mr. Ilowitz | $ 12,481 | $ 295,397 | $ 485,580 | $ 384,925 | $ 43,733 | $ 1,222,117 |
| **Total - Kickbacks** | $ 474,986 | $ 1,141,146 | $ 1,015,333 | $ 1,148,817 | $ 218,362 | $ 3,998,644 |

*Figure 111: Summary Chart of Entities through which Friedman and Ilowitz received kickbacks that have been identified to date*

**Exhibit 20** ¶ 5 & Ex. A; **Exhibit 6** at 180:19-181:19 (explaining that these commissions were paid to Defendant Executive Laundry, Defendant Executive Services, and Congregation Kozover).

**Response: Undisputed.**

201.    Ilowitz never informed anyone (other than Levi Rottenberg) that he was receiving "commissions" from Sound Around's manufacturers:

```
3        Q.  Okay.  Other than you, who knew that you
4   were receiving these commissions?
5        A.  The factory.
6        Q.  Okay.
7        A.  Mr. Rottenberg.
8        Q.  Okay.  Who else?
9        A.  That's what I recall.
```

*Figure 112: Excerpt of Deposition of Ilowitz taken on April 9, 2025*

**Exhibit 6** at 184:3-9.

**Response: Clarification.** The factories from which Ilowitz received commissions were ones with which Ilowitz established a relationship and to which Ilowitz provided services. *See* Ilowitz Decl., ¶¶ 80-82.

202.    These payments were never declared on tax returns for Ilowitz, Rottenberg, or any of the entities owned or controlled by Rottenberg. **Exhibit 8** at 194:6-8; 302:15-20; **Exhibit 6** at 300:15-25; 301:1-16; 302:24-303:25.

**Response: Clarification.** Ilowitz is attempting to address these payments via the process of filing amended returns, which requires the cooperation of Executive Laundry and Executive Services. *See* Ilowitz Decl., fn. 1.

203.    In June 2023, Friedman began demanding commission payments from Emiliya Electrical Appliances Co., Ltd. ("Emiliya").



*** 

*Figure 113: Excerpt of WeChat conversation between unidentified individual at Emiliya and Friedman on June 12, 2023*

**Exhibit 17** at 1-2.

**Response: Clarification.** Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

204.    When doing so, Friedman explained that he usually received 10% of the cost of the products purchased from Sound Around in commission payments:

> From: wxid_eks4tcx2w37c12 mos (owner)
> Yeah I know you lowered. It depends on the items but usually I will get 10% of the cost
> Priority: Normal
> Platform:
>
> 6/12/2023 12:27:12 AM(UTC-4)

*Figure 114: Excerpt of WeChat conversation between unidentified individual at Emiliya and Friedman on June 12, 2023*

**Exhibit 17** at 2.

**Response: Undisputed.**

205.    Friedman made clear to Emiliya that he was seeking a similar commission amount from Emiliya as well, not only for new orders but also for all prior orders he placed from Emiliya for Sound Around:



> From: wxid_6536725367811 (^_^) YES欣悦
> so for new items, if I could ask my Boss to consider this for you?
> Priority: Normal
> Platform:
>
> 6/12/2023 12:29:11 AM(UTC-4)

\* \* \*

> From: wxid_eks4tcx2w37c12 mos (owner)
> I don't need just for new. Need for old as well
> Priority: Normal
> Platform:
>
> 6/12/2023 12:32:39 AM(UTC-4)

*Figure 115: Excerpt of WeChat conversation between unidentified individual at Emiliya and Friedman on June 12, 2023*

**Exhibit 17** at 3.

**Response: Disputed.** Friedman did not place orders for products on behalf of Plaintiff, and all ordering was done by Plaintiff's managers. *See* Friedman Decl., ¶ 22, 583.

206.    Emiliya agreed to pay the commissions on any new models, but Friedman was not satisfied with that offer:



*Figure 116: Excerpt of WeChat conversation between unidentified individual at Emiliya and Friedman on June 27, 2023*

**Exhibit 17** at 3.

**Response: Disputed.** Defendants dispute Plaintiff's characterization that Friedman was unsatisfied by the negotiation with Emiliya.

207.    After further discussion with Emiliya over a voice call, Friedman was able to obtain agreement to the commissions he was requesting:



*Figure 117: Excerpt of WeChat conversation between unidentified individual at Emiliya and Friedman on June 27, 2023*

**Exhibit 17** at 4-5.

**Response: Undisputed.**

208.    By September 2023, Friedman began receiving thousands of dollars in commission payments from Emiliya to an account at Bank of America belonging to one of Friedman's companies, Defendant MDF Marketing, Inc.

**Response: Undisputed.**

209.    For example:

| 09/21/23 | WIRE TYPE:INTL IN DATE:230921 TIME:0440 ET TRN:2023092100091665 SEQ:HK121093BI584101/041086 ORIG:EMILIYA ELECTRICAL APPLIA ID:819679440838 ORIG BK:HONGKONG AND SHANGHAI BANKING ID:HSBCHKHHH KH | 8,880.00 |

| 11/07/23 | WIRE TYPE:INTL IN DATE:231107 TIME:0436 ET TRN:2023110700025114 SEQ:HK107113BI496903/732121 ORIG:EMILIYA ELECTRICAL APPLIA ID:819679440838 ORIG BK:HONGKONG AND SHANGHAI BANKING ID:HSBCHKHHH KH | 27,630.00 |

| 01/03/24 | WIRE TYPE:INTL IN DATE:240103 TIME:0448 ET TRN:2024010300143650 SEQ:HK103014BI520418/298405 ORIG:EMILIYA ELECTRICAL APPLIA ID:819679440838 ORIG BK:HONGKONG AND SHANGHAI BANKING ID:HSBCHKHHH KH | 16,224.00 |

*Figure 118: Excerpt of MDF Marketing Bank of America account statements showing sample deposits from Emiliya on various dates*

**Exhibit 19**.

**Response:** This paragraph does not contain a statement of fact to which Defendants are obligated to respond.

210.    Though he was entrusted with negotiating the best price for Sound Around, Friedman instructed Emiliya not to agree to any discount requested by Sound Around if it would result in his commission being deducted:



*Figure 119: Excerpt of WeChat conversation between unidentified individual at Emiliya and Friedman on Sept. 10, 2023 in response to image containing illegible message*

**Exhibit 17** at 15.

**Response: Disputed.** Friedman was not obligated to "negotiate the best price," which implies that he was obligated to obtain the lowest price possible for a particular product. As an independent contractor buyer, Friedman was responsible for sourcing and developing new and good quality products that could potentially turn a good profit for Plaintiff and offer those products to Plaintiff, which would then negotiate with manufacturers regarding cost, order products in quantities determined by Plaintiff, and sell to Amazon at prices it unilaterally determined. Friedman was not responsible for the price that Plaintiff's managers ultimately set for products offered for sale by Plaintiff. *See* Friedman Decl., ¶¶ 22, 58, 65, 87; *see* Ilowitz Decl., ¶¶ 56, 85. Plaintiff earned approximately 100 million dollars in profits on 305 million dollars in sales Friedman did. *See* Friedman Decl., ¶ 14.

211.    Beginning in June 2020, Friedman was also receiving "commission" payments from Anhui Light Industries ("Anhui") from whom Sound Around purchased standup paddleboards, kneeboards, and other relating goods and equipment.

**Response: Undisputed.**

212.    These payments, which were sometimes hundreds of thousands of dollars at a time, were sent to a Bank of America account belonging to Friedman's company, Defendant MDF Marketing, Inc., as illustrated by the sample bank entries below:

| | | |
|---|---|---|
| 06/05/20 | WIRE TYPE:INTL IN DATE:200605 TIME:0514 ET TRN:2020060400257214 SEQ:TT08518200000954/614006 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET:COMMISSION | 79,680.00 |

| | | |
|---|---|---|
| 08/13/20 | WIRE TYPE:INTL IN DATE:200813 TIME:0520 ET TRN:2020081300125530 SEQ:TT08518200001350/127719 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET:COMMISSION | 167,754.50 |

| | | |
|---|---|---|
| 10/14/20 | WIRE TYPE:INTL IN DATE:201014 TIME:0519 ET TRN:2020101400055972 SEQ:TT08518200001731/917283 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET: $10.00 FEE DEDUCTCOMMISSION | 74,620.50 |
| 10/29/20 | WIRE TYPE:INTL IN DATE:201029 TIME:0524 ET TRN:2020102900187091 SEQ:TT08518200001835/576664 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET: $10.00 FEE DEDUCTCOMMISSION | 140,450.00 |

| | | |
|---|---|---|
| 01/08/21 | WIRE TYPE:INTL IN DATE:210108 TIME:0520 ET TRN:2021010800084062 SEQ:TT08518210000043/647917 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET: $10.00 FEE DEDUCTCOMMISSION | 139,560.00 |

| | | |
|---|---|---|
| 09/01/21 | WIRE TYPE:INTL IN DATE:210901 TIME:0514 ET TRN:2021083100201683 SEQ:TT08518210001478/427780 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET: $10.00 FEE DEDUCTCOMMISSION | 103,965.00 |
| 09/27/21 | WIRE TYPE:INTL IN DATE:210927 TIME:0442 ET TRN:2021092700064735 SEQ:TT08518210001665/918080 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET: $10.00 FEE DEDUCTCOMMISSION | 96,370.00 |

| | | |
|---|---|---|
| 03/17/22 | WIRE TYPE:INTL IN DATE:220317 TIME:0444 ET TRN:2022031700091425 SEQ:TT08518220000548/383973 ORIG:1/ANHUI LIGHT INDUSTRIES ID:185701151792 PMT DET: $10.00 FEE DEDUCTCOMMISSION | 195,531.00 |

*Figure 120: Excerpt of MDF Marketing Bank of America account statements showing sample deposits from Anhui on various dates*

**Exhibit 19**.

> **Response: Undisputed.**

213.    In total, Friedman received $2,177,038 from Anhui in kickbacks between June 2020 and March 2024. **Exhibit 20 ¶ 8 & Ex. B.**

> **Response: Disputed.** Friedman did not receive kickbacks. Friedman was paid commissions from manufacturing partners with whom he provided a substantial amount of advice and assistance regarding the products he was sourcing. *See* Friedman Decl., ¶¶ 84-86.

214.    Friedman also received kickback payments from Jiangsu Yoau Electric Co. Ltd. ("Yoau") relating to purchase orders he placed for Sound Around for portable air conditioners and related products, totaling at least $272,087. **Exhibit 20 ¶ 8 & Ex. B.**

> **Response: Disputed.** Friedman was paid commissions from manufacturing partners with whom he provided a substantial amount of advice and assistance regarding the products he was sourcing. *See* Friedman Decl., ¶¶ 84-86.

215.    For example:

| | | |
|---|---|---|
| 11/29/23 | WIRE TYPE:INTL IN DATE:231129 TIME:0439 ET TRN:2023112900058311 SEQ:2023112956477088/999036 ORIG:1/YOAU ELECTRIC CO LTD ID:1060041404000343 ORIG BK:AGRICULTURAL BANK OF CHINA, T ID:ABOCCNBJ1 00 PMT DET:PAYMENT FOR COMMISSION | 235,140.00 |

| | | |
|---|---|---|
| 01/29/24 | WIRE TYPE:INTL IN DATE:240129 TIME:0444 ET TRN:2024012900110777 SEQ:2024012966210150/168935 ORIG:1/YOAU ELECTRIC CO LTD ID:1060041404000343 ORIG BK:AGRICULTURAL BANK OF CHINA, T ID:ABOCCNBJ1 00 PMT DET:PAYMENT FOR COMMISSION | 36,947.00 |

*Figure 121: Excerpt of MDF Marketing Bank of America account statements showing sample deposits from Emiliya on various dates*

**Exhibit 19**.

**Response:** This paragraph contains no statements of material fact to which Defendants are obligated to respond.

216.    Friedman also demanded and received "commission" payments from Ningbo Healthmate Health Technology Co., Ltd. ("Ningbo") in exchange for orders being placed for Sound Around. *See* **Exhibit 16**.

**Response: Disputed.** Friedman was paid commissions from manufacturing partners with whom he provided a substantial amount of advice and assistance regarding the products he was sourcing. *See* Friedman Decl., ¶¶ 84-86.

217.    By June 2023, Friedman was receiving a little over 5% commission on Sound Around's purchases:



From: wxid_wm0f095fnut311 Jomon Chan
yes, your commison was included for each shipment.
Priority: Normal
Platform:
6/30/2023 12:06:33 AM(UTC-4)

\* \* \*



From: wxid_wm0f095fnut311 Jomon Chan
the price decreased from $101 to $98.00, your commision is still $5.00, our net price is $93.00 now
Priority: Normal
Platform:
6/30/2023 12:07:57 AM(UTC-4)

*Figure 122: Excerpt of WeChat conversation between Jomon Chan at Ningbo and Friedman on June 30, 2023*

**Exhibit 16** at 4.

**Response: Disputed.** Friedman was paid commissions from manufacturing partners with whom he provided a substantial amount of advice and assistance regarding the products he was sourcing. *See* Friedman Decl., ¶¶ 84-86.

218.    Although he was obligated to negotiate the best price for Sound Around, Friedman instructed Ningo to reject discounts requested by Ziggy (that Ningbo was willing to provide) if doing so would reduce his commission amount:



From: wxid_wm0f095fnut311 Jomon Chan
Ziggy want me to give some discount for the pending invoice, shall i accept ?
Priority: Normal
Platform:
3/9/2023 8:04:35 AM(UTC-5)

From: wxid_wm0f095fnut311 Jomon Chan
only two invoice in March. the invoice in Feb is paid without the discount
Priority: Normal
Platform:
3/9/2023 8:05:20 AM(UTC-5)

From: wxid_eks4tcx2w37c12 mos (owner)
Not if it will affect the commission
Priority: Normal
Platform:
3/9/2023 8:05:24 AM(UTC-5)

From: wxid_wm0f095fnut311 Jomon Chan
ok, understand. I will try to solve it and keep you commission no change
Priority: Normal
Platform:
3/9/2023 8:07:11 AM(UTC-5)

* * *

From: wxid_eks4tcx2w37c12 mos (owner)
For the pricing for jerry. Make sure to leave the commission included.  Don't give different pricing
Priority: Normal
Platform:
9/6/2023 11:44:30 PM(UTC-4)

*Figure 123: Excerpt of WeChat conversation between Jomon Chan at Ningbo and Friedman on Sept. 6, 2023*

**Exhibit 16** at 1-2, 6.

**Response: Disputed.** Plaintiff has spliced together messages regarding different topics from March 9, 2023 and September 6, 2023, to mislead the Court and create a false impression.

Moreover, Friedman was not obligated to "negotiate the best price," which implies that he was obligated to obtain the lowest price possible for a particular product. As an independent contractor buyer, Friedman was responsible for sourcing and developing new and good quality products that could potentially turn a good profit for Plaintiff and offer those products to Plaintiff, which would then negotiate with manufacturers regarding cost, order products in quantities determined by Plaintiff, and sell to Amazon at prices it unilaterally determined. Friedman was not responsible for the price that Plaintiff's managers ultimately set for products offered for sale by Plaintiff. *See* Friedman Decl., ¶¶ 22, 58, 65, 87. Plaintiff earned approximately 100 million dollars in profits on sales of 305 million dollars Friedman did. *See* Friedman Decl., ¶14. In addition, Plaintiff has presented series of messages with intervening messages omitted to present a false "conversation" out of context.

219.    Based on discovery received to date, Sound Around is aware that Friedman received at least $2,776,527 in "commission" payments from at least six of Sound Around's manufacturers in exchange for orders he placed from those manufacturers on Sound Around's behalf:

| Vendor | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
|---|---|---|---|---|---|---|
| **Moises Friedman's Entities** | | | | | | |
| Account: MDF Marketing - TD 1424 | | | | | | |
| HK HEALTHMATE HEALTH TECHNOLOGY | | | | $ 113,824 | $ 55,137 | $ 168,961 |
| HONGKONG SMARTMAK CO . , LIMITED | | | | 47,925 | 19,950 | 67,875 |
| JIANGSU BAOXIANG SPORTS EQUIPMENT | | | | 20,657 | | 20,657 |
| MDF Marketing - TD 1424 Total | $ - | $ - | $ - | $ 182,406 | $ 75,087 | $ 257,492 |
| | | | | | | |
| Account: MDF Marketing - BOA #5301 | | | | | | |
| ANHUI LIGHT INDUSTRIES | $ 462,505 | $ 845,749 | $ 529,753 | $ 301,515 | $ 37,516 | $ 2,177,038 |
| EMILIYA ELECTRICAL APPLIA | | | | 44,831 | 25,079 | 69,910 |
| YOAU ELECTRIC CO LTD | | | | 235,140 | 36,947 | 272,087 |
| MDF Mkt - BOA #5301 Total | $ 462,505 | $ 845,749 | $ 529,753 | $ 581,486 | $ 99,542 | $ 2,519,035 |
| | | | | | | |
| Subtotal - Moises Friedman's Entities | $ 462,505 | $ 845,749 | $ 529,753 | $ 763,892 | $ 174,629 | $ 2,776,527 |

*Figure 124: Summary Chart of Manufacturers from whom Friedman received kickback payments*

**Exhibit 20** ¶ 8 & Ex. B.

**Response: Disputed.** Friedman was paid commissions from manufacturing partners with whom he provided a substantial amount of advice and assistance regarding the products he was sourcing. Commissions were not paid in exchange for orders. The manufacturers did not belong to Plaintiff, nor did Plaintiff locate and develop relationships with the manufacturers, which Friedman did as a result of his research and hard work. Further, Friedman did not place orders for products on behalf of Plaintiff, and all ordering was done by Plaintiff's managers. *See* Friedman Decl., ¶¶ 21, 22, 40, 48-51, 58, 84-86; *see* Friedman Decl., Ex. J.

220.    As stated before, these payments were received by Friedman through payments to his entity, Defendant MDF Marketing. *Id.*; **Exhibit 2** at 206:23-207:5 (noting that all of the "commissions" from manufacturers to Friedman were paid to Defendant MDF Marketing).

**Response: Undisputed.**

221.    Friedman admitted these "commission" payments were paid based on the sales he was bringing to the manufacturer—he also claimed he was bringing his "ideas and knowledge" to the manufacturers. **Exhibit 2** at 217:5-218:20.[10]

**Response: Disputed**. Friedman was paid commissions from manufacturing partners with whom he provided a substantial amount of advice and assistance regarding the products he was sourcing. He provided, among other things, new ideas for products, modifications to existing products, suggestions for new colors to use to make products more marketable, suggestions for new materials to use to manufacture better-quality products, advice on entering new markets, and methods for cutting costs. *See* Friedman Decl., ¶¶ 84-86.

---

[10]Friedman also admitted that he is unaware of any document where he presented such ideas and knowledge to any manufacturer. **Exhibit 2** at 217:21-218:20.

222.    Friedman never informed anyone that he was receiving "commissions" from Sound Around's manufacturers.  The only people who knew about each payment was Friedman and the manufacturer making the payment:



```
2        Q.  Who do you know knew that you were
3    receiving commissions from the vendors that
4    were sourcing -- the vendors that were
5    selling products to Sound Around?
6        A.  Myself.
7        Q.  Obviously, the vendor knew, because
8    the vendor is paying you commissions; that,
9    you do know, correct?
0        A.  Yes.
```

*Figure 125: Excerpt of Deposition of Friedman taken on April 8, 2025*

**Exhibit 2** at 193:2-10; *see also* 194:15-3 (explaining that the only other person he recalls knowing about the payments is his attorney in this litigation).

    **Response: Undisputed.**

223.    As discussed above, in December 2022, Friedman and Ilowitz began using the SCOOTKID mark in association with scooters being purchased from Yongkang Fulaitai Industry & Trade Co. (the same company through which Ilowitz was purchasing Sound Around's SCOOTKID scooter).Friedman admits that he and Ilowitz sold these scooters since 2022.  **Exhibit 75** at 7:8-14.

    **Response: Disputed.** The unintentional and minimal use of the mark "SCOOTKID" by Friedman and Ilowitz is attributable to the fact that Ilowitz created the name SCOOTKID and Plaintiff took steps to trademark that name without Ilowitz's knowledge or consent. Although Friedman and Ilowitz have sold a children's scooter since 2023, the scooter has not borne the SCOOTKID mark since that time. Friedman and Ilowitz ceased using the SCOOTKID mark upon learning that Plaintiff submitted a trademark application. *See* Ilowitz Decl., ¶¶ 77-79.

224.    Summaries produced by Friedman and Ilowitz in the litigation show that from 2023

through 2024 they collected nearly half a million dollars in sales on those scooters:

| SKU | ASIN | Description | Group | Total Sales Report | | | |
|---|---|---|---|---|---|---|---|
| | | | | Sales Qty (2023) | Sales Amount (2023) | Sales Qty (2024) | Sales Amount (2024) |
| LIFMS11 | B0BZWSFHL8 | scooter with seat - 3 wheelPink | 6 | 2403 | $79,928.12 | 2969 | $93,670.57 |
| LIFMS22 | B0C1BKKXCF | scooter with seat - 3 wheelBlue | 6 | 1921 | $66,290.60 | 3102 | $99,013.54 |
| LIFMS33 | B0C1BKGBZ6 | scooter with seat - 3 wheelRed | 6 | 741 | $25,214.29 | 1448 | $46,534.75 |
| LIFMS47 | B0C1BM281C | scooter with seat - 3 wheel (1/b)Purple | 6 | 953 | $30,095.31 | 1120 | $34,216.56 |
| LIFMS55 | B0C1BL3MQ6 | scooter with seat - 3 wheelGreen | 6 | 855 | $28,268.73 | 906 | $28,566.69 |
| LIFMS62 | B0C1BHNP1F | scooter with seat - 3 wheelYellow | 6 | 398 | $13,338.86 | 967 | $29,278.89 |
| LIFMS71 | B0C1K9SNMS | scooter with seat - 3 wheelBlack | 6 | 798 | $28,183.02 | 181 | $5,055.48 |
| LIFMS88 | B0C1BL7VH3 | scooter with seat - 3 wheelTeal | 6 | 888 | $30,509.47 | 1331 | $38,791.05 |
| LIFMS93 | B0C1BHSHR3 | scooter with seat - 3 wheelWatermelon | 6 | 1348 | $42,482.78 | 1147 | $38,513.80 |

*Figure 126: Excerpt of Sales Chart Produced by Defendants for the Years 2023-2024*

**Exhibit 117**.

**Response: Clarification.** The scooters did not bear the name ScootKid.

225.    And from January through July 2025, Friedman and Ilowitz sold an additional

nearly $300,000 in those scooters:

| Sales Qty (2025) | Sales Amount (2025) |
|---|---|

| | |
|---|---|
| 3074 | $93,417.96 |
| 669 | $20,886.55 |
| 837 | $26,105.51 |
| 1068 | $32,503.97 |
| 837 | $24,700.25 |
| 261 | $8,238.58 |
| 533 | $15,847.24 |
| 1551 | $44,658.17 |
| 848 | $25,215.51 |

*Figure 127: Excerpt of Sales Chart Produced by Defendants for the Years 2023-2025*

**Exhibit 44**.

**Response: Clarification.** The scooters did not bear the name ScootKid.

226.    Each of these products and sales is an opportunity that should have been presented to Sound Around but that was instead diverted to Friedman and Ilowitz's clone business and companies, including Defendant ML Imports, Defendant LRI Group, and Defendant World Group Imports.

**Response: Disputed.** From 2022 through January 2024, Friedman and Ilowitz were independent contractors without any contractual or legal obligation to Plaintiff. They were therefore free to pursue their own business and product ideas. *See* Friedman Decl., ¶¶ 16-17, 23; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl., ¶ 5.

227.    Friedman and Ilowitz also admit that at least 118 of the products sold by their clone business overlap and are the same as products being sold by Sound Around.  *See* ECF No. 278-3 ¶ 4 (Decl. of N. Fortuna) (claiming that 118 SKUs overlap with products sold by Sound Around); ECF No. 149-1 at 4-5 (Affirmation of Friedman) (same).

**Response: Disputed.**  The 118 products represented 28 items with various colors and other nonmaterial changes, said products were sourced and developed by Friedman and Ilowitz. They were sourced and presented to Sound Around and used for ML Imports.

228.    According to Friedman and Ilowitz, the total revenue for these 118 products in sales to Amazon from 2022 through 2025 amounts to over $9 million.  **Exhibit 44.**

**Response: Undisputed.**

229.    Each of these products and sales is an opportunity that should have been presented to Sound Around for Sound Around's business but that was instead diverted to Friedman and Ilowitz's clone business.

**Response: Disputed.** From 2022 through January 2024, Friedman and Ilowitz were independent contractors without any contractual or legal obligation to Plaintiff. They were therefore free to pursue their own business and product ideas. *See* Friedman Decl., ¶¶ 16-17, 23; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl., ¶ 5.

230.    Both Ilowitz and Friedman were responsible for searching and hunting for products that could be sold by Sound Around and sourcing those products for Sound Around.  **Exhibit 1 ¶¶ 10, 29;** *see also* **Exhibit 6** at 39:15-18 ("I was sourcing and bringing products to Sound Around"); **Exhibit 3 ¶ 5:**

> world as Buyer; on that track, it is his role to hunt and search for all merchandise and goods and the likes, that he see an opportunity to turn a good profit on; this includes both, to buy goods from other merchants, and to manufacture goods from scratch, known as creating a private brand for the enterprise, – and when he finds such goods in either of the aforementioned ways,  then he has to take the first step with those merchants, or with the manufacturers, to negotiate with them about the quality of the goods and about the price of the goods, or for manufacturing the goods, it should be for the best price; as well as about shipping the goods.

*Figure 128: Excerpt of Paragraph 5 from contract between Sound Around and Friedman executed on June 6, 2018*

**Response: Disputed**. The cited Exhibit is an excerpt from the June 6, 2018 employment Agreement, which is not enforceable against Friedman and was repudiated by the parties in December 2018. Ilowitz is not a party to the June 6, 2018 Agreement. Moreover, as independent

contractors, Friedman and Ilowitz were not obligated to source and develop products exclusively for Plaintiff, and were free to pursue their own business and products. *See* Friedman Decl., ¶¶ 16-17, 23; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl., ¶¶ 5, 35.

231.    Nevertheless, while still working as Buyers for Sound Around, beginning in 2022 and through their termination in early 2024, Friedman and Ilowitz have sourced and resold hundreds of products in their business. *See* **Exhibit 2** at 65:11-15 (noting that their business began selling products in 2022); ECF No. 149-1 ¶ 2.

**Response: Disputed.** From 2022 through January 2024, Friedman and Ilowitz were independent contractors without any contractual or legal obligation to Plaintiff. They were therefore free to pursue their own business and product ideas. *See* Friedman Decl., ¶¶ 16-17, 23; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl., ¶ 5.

232.    Each of those products sold by Friedman and Ilowitz's competing business and each of the sales associated with those products is an opportunity that should have been presented to Sound Around for Sound Around's business but that was instead diverted to Friedman and Ilowitz's clone business.

**Response: Disputed.** As independent contractors without any contractual or legal obligation to Plaintiff, neither Friedman nor Ilowitz were obligated to present every product idea to Plaintiff and were free to pursue their own business and product ideas. *See* Friedman Decl., ¶¶ 16-17, 23; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl., ¶ 5.

233.    It was both Ilowitz and Friedman's duties as Buyers to create and develop new brands through which Sound Around could private label and sell its products. **Exhibit 1** ¶¶ 10, 15, 17, 19, 30, 31, 33; **Exhibit 3** ¶ 5:

> world as Buyer; on that track, it is his role to hunt and search for all merchandise and goods and the likes, that he see an opportunity to turn a good profit on; this includes both, to buy goods from other merchants, and ==to manufacture goods from scratch, known as creating a private brand for the enterprise==, – and when he finds such goods in either of the aforementioned ways, then he has to take the first step with those merchants, or with the manufacturers, to negotiate with them about the quality of the goods and about the price of the goods, or for manufacturing the goods, it should be for the best price; as well as about shipping the goods.

*Figure 129: Excerpt of Paragraph 5 from contract between Sound Around and Friedman executed on June 6, 2018*

**Response: Disputed.** The cited Exhibit is an excerpt from the June 6, 2018 employment Agreement, which is not enforceable against Friedman and was repudiated by the parties in December 2018. Ilowitz is not a party to the June 6, 2018 Agreement. Moreover, it was neither Friedman nor Ilowitz's responsibility as independent contractor buyers to develop brands for Plaintiff, and they in fact never developed brands for Plaintiff. *See* Friedman Decl., ¶¶ 16-17, 65; *see* Friedman Decl., Ex. B, ¶ 12; *see* Ilowitz Decl., ¶¶ 5, 8, 35.

234.    Beginning in early 2022 (while working as Buyers for Sound Around), however, Friedman and Ilowitz began creating and developing brands, including logos and marketing materials for those brands, for use in their competing business.

**Response: Disputed.** In 2022, both Friedman and Ilowitz were independent contractors. *See* Friedman Decl., ¶ 3; *see* Friedman Decl., Ex. D; *see* Ilowitz Decl., ¶ 14; *see* Ilowitz Decl., Ex. B.

235.    For example, in January 2022, they created the Bakken-Swiss brand (for the sale of kitchen-related products) and the Lifemaster brand (for the sale of scooters, air conditioners, and

other products).[11] *See, e.g.*, **Exhibit 32**; **Exhibit 2** at 279:3-280:24; 285:2-17.

> **Response: Undisputed.**

236.    Later, in August 2023, Friedman and Ilowitz filed a trademark application for "Bakken". **Exhibit 118** at 1.  Defendant ML Imports was listed as the owner of the Bakken mark. *Id.*

> **Response: Undisputed.**

237.    By September 2023 (while still working as Plaintiff's Buyers), Friedman and Ilowitz had also created the Bakkenmaster Highmaster, Runmaster, and Topmaster brands. **Exhibit 119**; **Exhibit 120**; **Exhibit 118**.

> **Response: Disputed.** In September 2023, both Friedman and Ilowitz were independent contractors. *See* Friedman Decl., ¶ 3; *see* Friedman Decl., Ex. D; *see* Ilowitz Decl., ¶ 14; *see* Ilowitz Decl., Ex. B.

238.    The Bakkenmaster brand was used to sell cooking and baking relating products, and Friedman and Ilowitz applied to register the trademark in September 2023.  **Exhibit 118** at 3; **Exhibit 2** at 279:24-280:14. Defendant ML Imports was listed as the owner of the Bakkenmaster mark.  **Exhibit 118** at 3.

> **Response: Undisputed.**

---

[11] Friedman and Ilowitz applied for a trademark registration for the Lifemaster and Bakken-Swiss marks in February 2022 (while they were still working as Buyers for Sound Around).  **Exhibit 118** at 5, 7.  Defendant ML Imports was listed as the owner of those marks.  *Id.*

> **Response: Disputed.** In February 2022, both Friedman and Ilowitz were independent contractors. *See* Friedman Decl., ¶ 3; *see* Friedman Decl., Ex. D; *see* Ilowitz Decl., ¶ 14; *see* Ilowitz Decl., Ex. B.

239.    The Highmaster brand was used to sell trampolines.  **Exhibit 118** at 9.  Friedman and Ilowitz applied to register that brand in August 2023 (while working for Sound Around).  *Id.* Defendant World Group Import was listed as the owner of that mark.  *Id.*

**Response: Disputed.**  In August 2023, both Friedman and Ilowitz were independent contractors. *See* Friedman Decl., ¶ 3; *see* Friedman Decl., Ex. D; *see* Ilowitz Decl., ¶ 14; *see* Ilowitz Decl., Ex. B.

240.    The Runmaster brand was used to sell treadmills.  **Exhibit 118** at 11-12; **Exhibit 2 at** 287:22-24.  Friedman and Ilowitz applied to register that brand in August 2023 (while working for Sound Around).  *Id.* Defendant World Group Import was listed as the owner of that mark. **Exhibit 118** at 11-12.

**Response: Disputed.**  In August 2023, both Friedman and Ilowitz were independent contractors. *See* Friedman Decl., ¶ 3; *see* Friedman Decl., Ex. D; *see* Ilowitz Decl., ¶ 14; *see* Ilowitz Decl., Ex. B.

241.    The Topmaster brand was used to sell mannequins, paddleboards, saunas, heaters, and massage equipment.  **Exhibit 118** at 13-14; **Exhibit 2 at** 288:7-21.  Friedman and Ilowitz applied to register that brand in August 2023 (while working for Sound Around).  **Exhibit 118** at 13-14*.* Defendant World Group Import was listed as the owner of that mark.  *Id.*

**Response: Disputed.**  In August 2023, both Friedman and Ilowitz were independent contractors. *See* Friedman Decl., ¶ 3; *see* Friedman Decl., Ex. D; *see* Ilowitz Decl., ¶ 14; *see* Ilowitz Decl., Ex. B.

242.    The Promaster brand was used to sell musical items.  **Exhibit 118** at 15-16; **Exhibit 2** at 289:12-16.  Friedman and Ilowitz applied to register that brand in August 2023 (while working

for Sound Around). **Exhibit 118** at 15-16. Defendant World Group Import was listed as the owner of that mark. *Id*.

**Response: Disputed.** In August 2023, both Friedman and Ilowitz were independent contractors. *See* Friedman Decl., ¶ 3; *see* Friedman Decl., Ex. D; *see* Ilowitz Decl., ¶ 14; *see* Ilowitz Decl., Ex. B.

243.     In total, from January 2022 through early 2024, during the time they were working as Buyers for Sound Around, Friedman and Ilowitz developed and used *at least* seven brands, which they still use to sell products through their clone business including: Bakken-Swiss, Lifemaster, Bakken, Bakkenmaster, Topmaster, Highmaster, Promaster, and Runmaster.[12] **Exhibit 2 at** 291:3-292:22 (admitting that all of the aforementioned brands were created by Ilowitz and Friedman, registered with the USPTO, and used to sell products for Friedman and Ilowitz's competing business during the time Friedman and Ilowitz were working as Buyers for Sound Around); **Exhibit 33 at** 13:11-20; **Exhibit 118**.

**Response: Disputed.** Neither Friedman nor Ilowitz were ever responsible for creating brands for Plaintiff and, in fact, never created brands for Plaintiff. Moreover, as independent contractors, neither Friedman nor Ilowitz were under any obligation to present their every thought and idea for products and brands to Plaintiff. *See* Friedman Decl., ¶ 65; *see* Ilowitz Decl., ¶¶ 5, 8, 35.

---

[12]Friedman and Ilowitz also developed five additional brands—Campior, Outdoor Cruiser, Emporio Kitchen, Dribbl, and Dave and Diana—they use to sell products for their competing business. **Exhibit 33** at 19:3-17; **Exhibit 2** at 293:5-294:3. The trademark applications for almost all of those brands were filed shortly after their departure from Plaintiff, suggesting that those brands, too, may have been developed during their time at Sound Around. **Exhibit 118**.

**Response: Disputed.** Neither Friedman nor Ilowitz were ever responsible for creating brands for Plaintiff and, in fact, they never did create brands for Plaintiff. Moreover, as independent contractors, neither Friedman nor Ilowitz were under any obligation to present their every thought and idea for products and brands to Plaintiff. In addition, these brands were created after Friedman and Ilowitz's independent contractor relationship with Plaintiff terminated. *See* Friedman Decl., ¶¶ 3, 65; *see* Ilowitz Decl., ¶¶ 5, 8, 14.

244.    Each of these brands is an opportunity that should have been presented to Sound Around for Sound Around's business but that was instead diverted to Friedman and Ilowitz's clone business.

**Response: Disputed.** Neither Friedman nor Ilowitz were ever responsible for creating brands for Plaintiff. Moreover, as independent contractors, neither Friedman nor Ilowitz were under any obligation to present their every thought and idea for products and brands to Plaintiff. *See* Friedman Decl., ¶ 65; *see* Ilowitz Decl., ¶¶ 5, 8, 35.

245.    But for Friedman and Ilowitz setting up their competing business, each of these brands would have belonged to Sound Around.  Indeed, had Friedman and Ilowitz presented them to Sound Around, Sound Around would have sold products under these brands. **Exhibit 1 ¶¶** 10, 15, 19, 28, 29, 30, 33, 35.

**Response: Disputed.** Neither Friedman nor Ilowitz were ever responsible for creating brands for Plaintiff. Moreover, as independent contractors, neither Friedman nor Ilowitz were under any obligation to present their every thought and idea for products and brands to Plaintiff. *See* Friedman Decl., ¶ 65; *see* Ilowitz Decl., ¶¶ 5, 8, 35.

246.    As discussed above, in March 2022, during the time he was working as a Buyer for Sound Around, Ilowitz began communicating with an individual at Amazon (Sanil Juneja) with whom Sound Around had established a close relationship in order to try to obtain a new Vendor Central account with Amazon.  **Exhibit 43**.  In doing so, Ilowitz used (misused) his Sound Around signature block and email address. *Id.*

**Response: Disputed.** Plaintiff had no relationship with Sanil Juneja and did not even know who he was until after Ilowitz terminated his relationship with Plaintiff. Ilowitz obtained the Amazon Vendor Central account for his venture with Friedman while he was an independent

contractor and based on Ilowitz's own contacts and based on his own efforts. *See* Ilowitz Decl., ¶¶ 75-76.

247.    Amazon Vendor Central is by invitation only and businesses can only obtain a Vendor Central account if they are invited by Amazon directly. **Exhibit 1** ¶ 56.

     **Response: Undisputed.**

248.    Amazon Vendor Central operates on a wholesale model where businesses sell their products directly to Amazon and Amazon is the customer. Amazon then resells those products to end customers on Amazon. **Exhibit 1** ¶ 57-58

     **Response: Undisputed.**

249.    Ultimately, in May 2022 (while working as a Buyer for Sound Around), using Sound Around's contacts, name and relationships with Amazon, Ilowitz was able procure and set up a new Vendor Central Account. **Exhibit 45**; **Exhibit 46** at 2-3.

     **Response: Disputed.** The Amazon Vendor Central account procured by Ilowitz for his venture with Friedman was developed by Ilowitz while he was an independent contractor and based on Ilowitz's own contacts and based on his own efforts. *See* Ilowitz Decl., ¶¶ 75-76.

250.    Ilowitz registered this account to Defendant LRI Group. **Exhibit 47; Exhibit 2** at 318:19-319:2.

     **Response: Undisputed.**

251.    Friedman and Ilowitz used this Vendor Central license and account to sell the majority of the products for their competing business. **Exhibit 20** ¶¶ 15-18 & Ex. H; **Exhibit 33** at 52:2-24 (discussing which accounts are affiliated with the Vendor Central license).

     **Response: Clarification.** Friedman and Ilowitz used the account for ML Imports.

252.    Later, and again while they were still Buyers for Sound Around, Friedman and Ilowitz decided that they wanted a separate vendor account for the Highmaster brand.  **Exhibit 119**; **Exhibit 120**.  They decided the new vendor central account would be registered to Defendant World Group Import, an entity they had created in July 2023 for the purpose of registering new brands because they did not want all of their brands to be registered to ML Imports. *Id.*; **Exhibit 121**; **Exhibit 33** at 9:23-24; 10:14-16; 11:5-11; 23:13-18; 48:5-20.

**Response: Disputed.** The World Group Import account was created for other business reasons and not for the Highmaster brand. Sound Around was falsely claiming to Amazon that it owned the LRI Group Account. *See* Ilowitz Decl., ¶ 67.

253.    Each of these Vendor Central accounts is an opportunity that should have been presented to Sound Around for Sound Around's business but that was instead diverted to Friedman and Ilowitz's clone business.

**Response: Disputed.** Neither Friedman nor Ilowitz were ever responsible for creating brands for Plaintiff. Moreover, as independent contractors, neither Friedman nor Ilowitz were under any obligation to present their every thought and idea for products and brands to Plaintiff. *See* Friedman Decl., ¶ 65; *see* Ilowitz Decl., ¶¶ 5, 8, 35.

254.    Friedman and Ilowitz used multiple corporate entities to operate their competing business.

**Response: Undisputed.**

255.    Defendant ML Imports is the main entity used by Friedman and Ilowitz to operate their competing business.  **Exhibit 33** at 11:9-11, 23:10-13.

**Response: Undisputed.**

145

256.    For example, Defendant ML Imports is the entity that contracted with the manufacturers for the purchase and import of products for Friedman and Ilowitz's competing business.  **Exhibit 33** at 31:19-20, 32:22-23.

**Response: Undisputed.**

257.    Defendant ML Imports is also the entity that received payments from the sales of products (e.g., from Amazon) either directly or from another entity used by Defendants, and these funds were held in bank accounts owned by ML Imports.  **Exhibit 33** at 33:4-17, 34:9-15.

**Response: Undisputed.**

258.    In addition, ML Imports owns the trademarks for Bakken, BakkenMaster, Bakken-Swiss, and Lifemaster, each of which was used by Friedman and Ilowitz to sell products online in their competing business.  **Exhibit 33** 13:11-20; **Exhibit 118**.

**Response: Undisputed.**

259.    Defendant World Group Imports owns the trademarks Highmaster, Runmaster, Topmaster, and Promaster **Exhibit 33** 13:11-20; **Exhibit 118**.

**Response: Undisputed.**

260.    Defendant World Group Imports also owns one of the two Vendor Central accounts obtained by Friedman and Ilowitz from Amazon, which they use to operate their competing business.  **Exhibit 33** at 66:15-19.

**Response: Undisputed.**

261.    Defendant World Group Imports also received funds from Amazon for sales through the Vendor Central account registered to Defendant World Group, which funds were then transferred to a bank account owned by ML Imports.  **Exhibit 33** at 32:24-33:17, 34:9-15.

**Response: Undisputed.**

262.    Defendant LRI Group owns the first Vendor Central account procured by Friedman and Ilowitz (using Sound Around's contacts, goodwill, and reputation), which is used by Friedman and Ilowitz to sell their products to Amazon.  **Exhibit 45**; **Exhibit 47**; **Exhibit 33** at 65:23-66:14.

**Response: Disputed.** The Amazon Vendor Central account procured by Ilowitz for his venture with Friedman was developed by Ilowitz while he was an independent contractor and based on Ilowitz's own contacts and based on his own efforts. *See* Ilowitz Decl., ¶¶ 75-76.

263.    Defendant LRI Group also received one or two payments from Amazon from sales that were made using the Vendor Central account registered to Defendant LRI Group.  **Exhibit 33** at 63:20-25; 64:11-14.

**Response: Undisputed.**

264.    Defendant Cyrf, Inc. owns the Seller Central account on Amazon that Friedman and Ilowitz also use to sell products for their competing business, directly to consumers on the Amazon platform.  **Exhibit 33** at 49:9-13.

**Response: Undisputed.**

265.    Any revenues generated by sales on the seller central account were sent through a bank account belonging to Defendant Cyrf, Inc.  **Exhibit 33** at 52:19-24.

**Response: Undisputed.**

266.    Defendant MDF Marketing is owned and controlled by Friedman and acts through Friedman.**Exhibit 2** at 15:23-16:4.

**Response: Disputed.** Friedman is the sole member of MDF Marketing.

267.    The "commission" payments made to Friedman by the Chinese manufacturers as improper kickbacks were paid to him through MDF Marketing, Inc. at bank accounts in its name. **Exhibit 20** ¶ 8 & Exs. B-C.

**Response: Disputed.** Friedman did not receive "kickbacks" from manufacturers.

268.    Defendant Executive Services and Defendant Executive Laundry were entities used by Ilowitz to receive payments intended for Ilowitz and hold those funds until Ilowitz directed them to be paid out.  **Exhibit 8** at 34:22-36:21.

**Response: Clarification.** Ilowitz was instructed by Jack Tyberg, Sound Around's comptroller to get a company to receive payments made to Ilowitz as a 1099 independent contractor. *See* Ilowitz Decl., ¶ 9; *see* Tyberg Trans., 127:21-25; 128:1-14.

269.    Defendant Executive Services and Defendant Executive Laundry were also used to receive kickback payments from Chinese manufacturers being paid to Ilowitz.  **Exhibit 20** ¶¶ 10-12 & Exs. E-F.; **Exhibit 6** at 180:19-181:19.

**Response: Disputed.** Ilowitz did not receive "kickbacks" from manufacturers. *See* Ilowitz Decl., ¶¶ 80-82.

Dated:  December 19, 2025

ALLYN & FORTUNA LLP

/s/Nicholas Fortuna

By:_____

Nicholas Fortuna
*Attorneys for Defendants*
400 Madison Avenue, Suite 10D
New York, New York 10017
(212) 213-8844
nfortuna@allynfortuna.com